J9hWmac1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                                    S11 18 Cr. 834 (PAE)

ALJERMIAH MACK,
    a/k/a "Nuke," and
ANTHONY ELLISON,
    a/k/a "Harv,"

              Defendants.            Trial
------------------------------x

                              New York, N.Y.
                              September 17, 2019
                              9:10 a.m.

Before:

                  HON. PAUL A. ENGELMAYER,

                              District Judge
                              -and a Jury-

J9hWmac1

```
1                               APPEARANCES

2

3    GEOFFREY S. BERMAN
         United States Attorney for the
         Southern District of New York
4    BY:  MICHAEL D. LONGYEAR
         JACOB E. WARREN
5        JONATHAN REBOLD
         Assistant United States Attorneys
6

7    AIELLO & CANNICK
         Attorneys for Defendant Ellison
8    BY:  DEVERAUX L. CANNICK
         -and-
9        CALVIN H. SCHOLAR

10

11   FASULO BRAVERMAN & DiMAGGIO LLP
         Attorneys for Defendant Mack
     BY:  LOUIS V. FASULO
12       MICHAEL E. GIORDANO
         ROBERTO BETTEGA
13       -and-
     EYLAN SCHULMAN
14       -and-
     ALEX S. HUOT

15

16   Also Present:  Hannah Harney, Paralegal Specialist
                    Special Agent Robert Moraca, ATF
17                  Special Agent Rory Palmer, Homeland Security
                    Det. Nicholas Geroulakis, NYPD
18

19

20

21

22

23

24

25
```

J9hWmac1

1                    (Trial resumed; jury not present)

2                    THE COURT:  Counsel, I'm just going to wait for the

3     defendants.

4                    Good morning, everyone.  Who do I have for the

5     government?

6                    MR. LONGYEAR:  Yes.

7                    Good morning, your Honor.  Michael Longyear, Jacob

8     Warren and Jonathan Rebold on behalf of the United States.  And

9     we are joined at counsel table by Hannah Harney, a paralegal

10    specialist in our office.

11                   THE COURT:  Very good.  Good morning, government

12    counsel and Ms. Harney.

13                   Mr. Fasulo.

14                   MR. FASULO:  Good morning, Judge.  Louis Fasulo, along

15    with Alex Huot; our client, Mr. Mack; Mr. Schulman; Mr.

16    Giordano; and Mr. Bettega.

17                   THE COURT:  Very good.  Good morning to all of you,

18    including Mr. Ellison.

19                   DEFENDANT ELLISON:  Good morning.

20                   THE COURT:  Mr. Mack, good morning.

21                   DEFENDANT MACK:  Good morning.

22                   THE COURT:  We received an email from Mr. Cannick

23    indicating that he is caught in traffic but expects to be here

24    shortly.  I don't expect, in his absence, to resolve anything

25    of consequence, but just as a matter of orderly planning, let

J9hWmac1

1    me understand, going around the table, is there any issue to

2    take up this morning?

3              MR. LONGYEAR:  Just one issue, your Honor, that I

4    flagged for your Honor's courtroom deputy that we would like to

5    discuss.

6              THE COURT:  All right.  When Mr. Cannick is here,

7    we'll take that up.

8              MR. LONGYEAR:  Yes, your Honor.

9              THE COURT:  That requires the presence of all counsel.

10             MR. LONGYEAR:  Yes, your Honor.

11             THE COURT:  Mr. Fasulo, anything from you?

12             MR. CANNICK:  We've already spoken to the government

13   about that.

14             THE COURT:  Anything else to raise?

15             MR. FASULO:  Oh, I'm sorry.  No, Judge.

16             THE COURT:  Counsel, I'm going to ask, as I said

17   before, I need everyone here, ready and set up at 9:00.  The

18   people who are here I realize have complied with that.  But

19   it's imperative that defendants be produced at 9:00 and that

20   all counsel be ready at 9:00.

21             Insofar as nobody has any business to take up, I will

22   retire until I'm notified that Mr. Cannick is here.  He may

23   have something to raise.  There may also be a matter that I

24   need to take up with counsel in the robing room but only when

25   he is here.  Stay close, because we'll get started at 9:30 or

J9hWmac1

1   as soon thereafter as all the jurors are here.

2            Let me just ask Mr. Fasulo, on the one issue I asked

3   you to reflect upon about limiting instructions, you're fine

4   with the present version?

5            MR. FASULO:  Judge, in terms of the limiting

6   instruction as to the videos, we still object to the limiting

7   instruction as to that.  As to the other limiting instruction,

8   we are fine with it.

9            THE COURT:  Very good.

10           All right.  I'll be out as soon as Mr. Smallman tells

11   me Mr. Cannick is here.

12           Thank you.

13           (Recess)

14           THE COURT:  I took the roll earlier.  I'll note the

15   appearance of Mr. Cannick and Mr. Scholar.

16           Mr. Cannick and Mr. Scholar, you need to be here at

17   9:00.  I start at 9:00.

18           MR. SCHOLAR:  Yes, your Honor.

19           THE COURT:  Mr. Cannick, I earlier inquired of

20   Mr. Fasulo whether he had anything to add to the limiting

21   instructions we discussed yesterday.

22           Do you have anything to add?

23           MR. CANNICK:  No, your Honor.

24           THE COURT:  Do you have anything else to raise with

25   the Court?

J9hWmac1

1          MR. CANNICK:  Only that the limited instruction as it

2   relates to the rap music, we would ask that that not be

3   administered.

4          THE COURT:  At this point, no defense counsel is

5   seeking such an instruction, so my present intention is not to

6   give a limiting instruction with respect to the rap videos.

7          We're running a little bit late, but the jurors'

8   breakfast is only arriving now.  In addition, I'm told that we

9   don't have a full jury panel yet, so I think I can give you at

10  least ten minutes' dispensation.  We'll get started, I expect,

11  in about ten minutes.

12          Thank you.

13          (Recess)

14          THE COURT:  Our final juror has just arrived, and

15  we're ready to resume.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

J9hWmac1

```
 1              (Jury present)

 2              THE COURT:  All right.  Be seated.

 3              Good morning, everyone.

 4              I just have a few items of housekeeping to take up

 5     before we get started with today's business.  To begin with, I

 6     owe you an apology.  The breakfast that I promised you would be

 7     here at 8:45 didn't arrive until close to 9:30.  That's not

 8     acceptable.  I just want you to know that Mr. Smallman and I

 9     are on it, and that will not happen again.  In any event, I

10     sincerely apologize.

11              Second of all, just to remind everybody, I need all of

12     you to be here on time for us to get started.  Without a full

13     jury, we all have to wait for the last juror to arrive.  Now

14     that everyone has a sense of what the logistics and timing are

15     getting here in the morning, please be more aware of the

16     starting time.

17              Finally, Mr. Smallman got an inquiry from a juror

18     about how jurors can be reached in an emergency insofar as we

19     have confiscated your devices.  The answer is that Mr. Smallman

20     can be reached, and so speak to him.  He will get you his

21     contact information, so if there are any family members who

22     need to reach you, give them Mr. Smallman's information.  He is

23     completely on top of things and anyone can reach him within a

24     moment's notice.

25              With that, government, call your first witness.
                 (Continued on next page)
```

1          MR. REBOLD:  The government calls Detective Robert

2    Deck.

3    ROBERT DECK,

4         called as a witness by the government,

5         having been duly sworn, testified as follows:

6              THE COURT:  Good morning, Detective Deck.

7              THE WITNESS:  Good morning.

8              THE COURT:  I am going to ask you to move the mic a

9    little closer to you to make sure that you are within range at

10   all times.  It's a big courtroom.  If you don't speak into the

11   mic, people won't hear you.

12             Counsel, you may inquire.

13             MR. REBOLD:  Thank you, your Honor.

14   DIRECT EXAMINATION

15   BY MR. REBOLD:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  Where do you work, sir?

19             Can I just ask you to speak a little bit slower and

20   pull that microphone a little closer to your mouth.

21   A.  81st Precinct, detective squad.

22   Q.  Is that part of the New York City Police Department?

23   A.  Yes, it is.

24   Q.  How long have you been in the NYPD?

25   A.  Thirteen years.

1   Q.   What is your current title?

2   A.   I am a detective.

3   Q.   How long have you been a detective?

4   A.   About five years now.

5   Q.   What county is the 81st Precinct in?

6   A.   It's in the County of Kings.

7   Q.   And is there a particular neighborhood that's covered by

8   the 81st Precinct within Brooklyn?

9   A.   Yes.  81st Precinct covers Bedford Stuyvesant.

10  Q.   Does Bedford Stuyvesant and the 81st Precinct also include

11  a housing development commonly known as Smurf Village or the

12  Smurf Houses?

13  A.   Yes, it does.

14  Q.   Just articulate the confines of Smurf Village.

15  A.   Smurf Village, as we call them, is a low-rise apartment

16  building approximately three floors high.

17  Q.   If you can again pull that microphone a little closer.  The

18  acoustics are just not great.

19       Can you answer that question again, please.

20  A.   Smurf Village apartments, as we call them, are low-rise

21  apartments approximately about three floors high.

22  Q.   What blocks do they run in between?

23  A.   Smurf Village runs along Fulton Street east and west, down

24  Utica Avenue north and south, around Atlantic Avenue east and

25  west again, down Hunterfly Place north and south, and in

1   between there is Herkimer Street, which runs east and west

2   also.

3   Q.  Detective Deck, were you working on October 24 of 2018?

4   A.  Yes, I was.

5   Q.  Do you remember what your hours were that day?

6   A.  Yes, I do.

7   Q.  What were your hours?

8   A.  I was working from 4 p.m. to 1 a.m.

9   Q.  Did you assist to responding to several incidents that

10  night?

11  A.  Yes, I did.

12  Q.  Can you just summarize in very broad strokes what were the

13  incidents that occurred that evening, starting at about 8:50

14  p.m.

15  A.  At 8:50 p.m., we had a radio broadcast over our radio for a

16  male that had been shot --

17          MR. CANNICK:  I'm sorry, your Honor.  I am having

18  difficulty hearing.

19          THE COURT:  I think I am as well, frankly.

20          Keep your voice up, but speak a little more slowly,

21  please.  Maybe experiment by moving your mouth a little bit

22  further back from the mic.  You may be crowding in too much.

23          Let's try the question and answer again.

24  Q.  Detective, before we get into detail, can you tell us the

25  types of events that occurred on the evening of October 24?

1            MR. FASULO:  Objection.

2            THE COURT:  Overruled.

3   A.  So on October 24, at 8:50 p.m., my partners and I responded

4   to 14 Hunterfly Place.  There we had a radio broadcast over our

5   radio that there was a male that had been shot there.

6            While I was there and, after we responded, a short

7   time later, about 9:15 p.m. there was a radio broadcast of

8   shots being fired or someone being shot at at 1700 Fulton off

9   Fulton Park, which is opposite 1700 Fulton Street.

10           A short time after that, within an hour after that,

11  while I was downloading video at a location on Rochester and

12  Herkimer Street, there was a gentleman that was approaching the

13  store, that there was a gentleman who had been slashed across

14  his face and was bleeding at 781 Herkimer Street.

15  Q.  Are you personally familiar with each of those three

16  incidents that you identified?

17  A.  Yes, I am.

18  Q.  Starting with the first incident that you mentioned, at

19  8:50 in the evening, of an individual shot, did you personally

20  respond to that scene at or shortly after 8:50 p.m.?

21  A.  Yes, I did.

22  Q.  What was the address that you went to?

23  A.  14 Hunterfly Place.

24  Q.  Can you tell us what it is that you saw when you arrived at

25  14 Hunterfly Place?

1  A.  When I entered 14 Hunterfly Place, there was a victim in

2  apartment 1A, Mr. David Cheeks, who was lying on the ground who

3  had been shot.

4  Q.  Did you learn the extent of David Cheeks' injuries?

5  A.  While I was there EMS had rolled him over just to see how

6  many times he had been shot, if there was an entry or exit

7  wound on him.  At that time we observed one entry wound on his

8  back, but no exit wound.

9  Q.  And did you learn the lasting impact of that injury to his

10 back?

11 A.  Several days later we found out Mr. Cheeks was paralyzed.

12 Q.  That address, 14 Hunterfly, is that part of Smurf Village?

13 A.  Yes, it is.

14 Q.  Were you personally assigned as the case detective for that

15 case?

16 A.  No, I wasn't.

17 Q.  Did you assist in the investigation of that case?

18 A.  Yes, I did.

19 Q.  What did you do in assisting in the investigation?

20 A.  I assisted my partner, Detective Yi, looking for any

21 witnesses and any cameras or videos in regards to that

22 incident.

23 Q.  You said that there was a second incident that happened

24 shortly after, at about 9:15 that evening, is that correct?

25 A.  Yes.

1    Q.  Can you tell us about that incident.

2    A.  While I was at 14 Hunterfly Place in regards to Mr. Cheeks

3    being shot, a radio broadcast came over of someone being shot

4    at -- more shots fired at 1700 Fulton or Fulton Park, which is

5    opposite 1700 Fulton Street.

6    Q.  Is that address that you mentioned Fulton Park part of the

7    Smurf Houses?

8    A.  No, it is not.

9    Q.  Is it near the Smurf Houses?

10   A.  Yes.

11   Q.  Around how many blocks away?

12   A.  Approximately about three blocks away.

13   Q.  And are you aware of whether any ballistics or other

14   evidence was recovered in that area?

15   A.  There was shell casings recovered from that one and also a

16   firearm.

17   Q.  When you say shell casings, can you just explain to the

18   jury what that means?

19   A.  Shell casings meaning after someone fires a gun, depending

20   if it's a revolver or semiautomatic, revolver meaning there

21   will be no shell casings if the gun is fired, semiautomatic

22   meaning when the gun is fired shell casings would be ejected

23   from the gun, and they will be pretty much laying around if you

24   see them.

25   Q.  Is it your testimony that just over an hour after that

J9HMMAC2                          Deck - Direct

1    another incident occurred, at about 10:20, 10:21 p.m.?

2    A.  Yes.

3    Q.  Where were you at that time?

4    A.  At the time I was at the corner of a bodega on Rochester

5    and Herkimer Street, about a block away from 14 Hunterfly.

6    While I was downloading video for the shooting of the first

7    incident at 14 Hunterfly, I was approached by a gentleman in a

8    store to come outside.  There was a gentleman who was slashed

9    across the face and was bleeding.

10   Q.  What did you do when the person came to the store?

11   A.  I walked outside to the front of 781 Herkimer Street.  I

12   observed a male there who was bleeding heavily from his face.

13   Q.  Can you describe what happened when you saw that

14   individual?

15   A.  The male couldn't talk.  He was -- his face was covered in

16   blood.  He was holding a shirt or rag on his face.  Blood was

17   coming out of his mouth.

18   Q.  What happened next?

19   A.  I broadcast -- I picked up my radio, and I asked for an

20   ambulance to respond to help the victim.

21   Q.  Was the victim taken to a hospital?

22   A.  Yes, he was.

23   Q.  What hospital?

24   A.  He went to Kings County Hospital.

25   Q.  Did you observe him there?

1    A.  Yes, I did.

2    Q.  Did you do anything to memorialize his condition?

3    A.  Yes.

4    Q.  What did you do?

5    A.  While I was there, before the victim was treated, I took

6    photos before and after it was cleaned up by the doctor there.

7    Q.  What was the name of the victim of the slashing?

8    A.  The victim's name was Mr. Mark Hobdy.

9    Q.  Just in case I didn't elicit it earlier, what was the

10   building address where you first saw Mr. Hobdy on the street?

11   A.  When I first encountered Mr. Hobdy, it was in front of 781

12   Herkimer Street.

13   Q.  Is that address part of Smurf Village?

14   A.  Yes, it is.

15            MR. REBOLD:  Your Honor, I'd like to show the witness

16   what's been marked for identification as Government Exhibit 6.

17            THE COURT:  You may.

18   Q.  Detective Deck, do you recognize the individual depicted in

19   Government Exhibit 6?

20   A.  Yes, I do.

21            THE COURT:  Counsel, before you proceed let me just

22   explain something to the jury.

23            Before you can see an exhibit I have to receive it in

24   evidence.  And before it is received in evidence counsel will

25   ordinarily show it to the witness and ask some foundational

1    questions.  That's the reason why at this point the lawyers and

2    the witness and I are seeing the exhibit but you are not.  If I

3    rule that it is properly received in evidence, then you will

4    see it.

5            Go ahead.

6    Q.  Do you recognize the individual depicted in Government

7    Exhibit 6 marked for identification?

8    A.  Yes, I do.

9    Q.  Who is that?

10   A.  That's Mr. Mark Hobdy.

11           MR. REBOLD:  Your Honor, I'm offering Government 6 for

12   identification into evidence.

13           THE COURT:  Any objection?

14           MR. SCHOLAR:  No objection.

15           MR. FASULO:  No objection.

16           THE COURT:  Received.

17           (Government Exhibit 6 received in evidence)

18           MR. REBOLD:  Your Honor, can we publish Government 6

19   for the jury?

20           THE COURT:  Yes.

21           Ladies and gentlemen, when Mr. Rebold says publish,

22   that is courtroom speak for may be displayed to the jury.

23           Go ahead, Mr. Smallman.

24           Ladies and gentlemen, can you all see it on the

25   screens in front of you?

1            JURORS:  Yes.

2            THE COURT:  Show of hands.  Is it visible on the

3    screen there?

4            Thank you.

5            MR. REBOLD:  Your Honor, I'm also offering into

6    evidence Government Exhibit 6A, which is essentially a name

7    plate for Mr. Hobdy.

8            THE COURT:  Any objection?

9            MR. SCHOLAR:  No objection.

10           MR. FASULO:  No objection.

11           THE COURT:  Received.

12           (Government Exhibit 6A received in evidence)

13   Q.   Detective Deck, you mentioned a series of locations where

14   incidents occurred on the evening of October 24, 2018.  Would

15   it be helpful in illustrating for the jury where these things

16   occurred and where they were in relation to one another to show

17   them on a map?

18   A.   Yes.

19   Q.   I'm showing you what's been marked for identification as

20   Government Exhibit 210.

21           Do you recognize Government Exhibit 210?

22   A.   Yes.

23   Q.   What do you recognize that to be?

24   A.   An aerial depicted map of the area inside the 81st

25   Precinct.

1   Q.   Does that include the confines of Smurf Village?

2   A.   Yes, it does.

3   Q.   To your knowledge, based on your familiarity with that

4   area, are the streets and avenues depicted accurately in

5   relation to one another as that area is actually --

6   A.   Yes.

7            MR. REBOLD:  Your Honor, I'm offering Government

8   Exhibit 210 for identification.

9            THE COURT:  Any objection?

10            MR. SCHOLAR:  No, your Honor.

11            MR. FASULO:  No, your Honor.

12            THE COURT:  Received.

13            (Government Exhibit 210 received in evidence)

14            MR. REBOLD:  If we may publish that.

15            THE COURT:  Yes, you may.

16   Q.   Now, Detective Deck, I believe that the screen in front of

17   you actually allows you to mark up this exhibit.  If you can

18   just draw a circle around where Smurf Village was located with

19   your finger.

20   A.   So pretty much Smurf Village, it will be along Atlantic

21   Avenue, which I am going to go east to west.  It runs along

22   where I am going up.  It's not listed, but that's Hunterfly

23   Place.  It comes back down towards Herkimer, to Rochester,

24   going north and south, and then I want to go back towards

25   Fulton Street, which runs east and west.  I am going to come

1    all the way back around to Utica Avenue, running north and

2    south, and come all the way back down to Atlantic.  In between

3    there is Herkimer Street.  That's in between Hunterfly Place

4    and Rochester.

5    Q.  Could you please draw a dotted line across where Herkimer

6    Street is.

7    A.  Yes.  So Herkimer starts on Rochester.  It's not listed,

8    but it does run from Utica Avenue and it does run straight

9    through to Rochester and it's where I'm going right now.

10   Q.  You said that the first incident that you responded to was

11   at 14 Hunterfly Place, correct?

12   A.  Yes.

13   Q.  Can you please draw the No. 1 in the general vicinity of 14

14   Hunterfly where you responded and saw Mr. Cheeks on the ground.

15   A.  Yes.

16   Q.  And you said that at about 25 minutes later there was an

17   incident of shots fired in Fulton Park opposite, I believe you

18   said, 1700 Fulton, is that correct?

19   A.  Yes.

20   Q.  Can you show us is where Fulton Park is.

21   A.  Fulton Park is where it's labeled all green Fulton Park.

22   1700 Fulton, which is Boys and Girls High School, the address

23   that's there.  Fulton Park would be where I'm putting the No. 2

24   now.

25   Q.  Can you just describe for the jury what the difference is

1   in sort of police talk between the phrase shots fired versus a

2   shooting.

3   A.   Shots fired is -- a lot of times it's just people could

4   call 911 saying they hear gunshots.   We don't know where they

5   are coming from.   We respond there.   Shooting, if people call

6   911 saying --

7            MR. FASULO:   Objection.

8            THE COURT:   Overruled.   You may answer.

9   A.   A lot of times we get calls, witnesses saying, you know,

10  people are shooting at someone or someone is shot.

11  Q.   Do you know where the third incident, the slashing,

12  occurred?

13  A.   Yes.

14  Q.   Where did it occur?

15  A.   So the third incident where I encountered Mr. Hobdy was 781

16  Herkimer Street, which is approximately on the corner of

17  Rochester and Herkimer.

18  Q.   Do you know where the actual slashing occurred?

19  A.   The actual slashing occurred on Utica and Herkimer.

20  Q.   Can you cross out the 3 that you wrote down and put the 3

21  where the slash is.

22       Now, the area that you crossed out, is that where you saw

23  Mr. Hobdy?

24  A.   That's where I first encountered Mr. Hobdy, at 781 Herkimer

25  Street.

1   Q.  Now, as part of your investigation of the various incidents

2   that night, did you and your fellow officers collect video?

3   A.  Yes, we did.

4   Q.  Do you know whether video was collected from an address 701

5   Herkimer Street?

6   A.  Yes.

7   Q.  Have you had an opportunity to view that video?

8   A.  Yes, I have.

9   Q.  Does that video depict anything relevant, from your

10  perspective, of anything that occurred that evening?

11  A.  Yes.

12  Q.  Can you please describe it.

13  A.  In the video it shows a male walking towards the address

14  701 Herkimer Street.  And then approximately a minute or two

15  later you see the same male going back in the same direction he

16  just came from.

17  Q.  Did you recognize the individual depicted in that video?

18  A.  Yes.

19  Q.  Who was that person?

20  A.  That male was Mr. Mark Hobdy.

21  Q.  Did he appear, based on his body frame, his skin color, the

22  clothing he was wearing, consistent on that video with the

23  person who was lying on the floor in front of 781 Herkimer

24  Street when you responded to the incident that evening?

25  A.  Yes.

J9HMMAC2                           Deck - Direct

1              MR. REBOLD:  If we can just clear the markings on the

2       map, please.

3              Your Honor, before I inquire further of this witness,

4       with the Court's permission, I would like to read in a

5       stipulation which is Government Exhibit 1000.

6              THE COURT:  I take it it's a fact stipulation.

7              MR. REBOLD:  Yes.  Regarding the video.

8              THE COURT:  Very good.

9              Ladies and gentlemen, Mr. Rebold is about to read

10      aloud to you a stipulation of fact.  I'll have more to say to

11      you about this at the end of the trial, but a stipulation is

12      simply an agreement between the parties.  When the parties

13      agree or stipulate that a fact is true, you are required to

14      treat that fact as true.  What significance or weight you give

15      to it is a matter for you to decide.

16             Go ahead.

17             MR. REBOLD:  Yes, your Honor.

18             In relevant part the stipulation states that:

19             It is hereby stipulated and agreed by the parties that

20      Government Exhibit 600 is a disk containing surveillance video

21      from 264 West 40th Street, Manhattan, New York, on April 3,

22      2018.  The date and time stamp of the surveillance video

23      contained in Government Exhibit 600 are correct.

24             Government Exhibit 602 is a disk containing

25      surveillance video from various locations in the vicinity of 40

J9HMMAC2                          Deck - Direct

1    Debevoise Street in Brooklyn, New York on April 21, 2018.

2              Government Exhibit 603 is a disk containing Government

3    Exhibits 603A and 603B, which are surveillance videos from the

4    Barclays Center in Brooklyn, New York, on April 21, 2018.  The

5    date and time stamps on Government Exhibits 603A and 603B are

6    correct.

7              Government Exhibit 604 is a disk containing audio and

8    video recording from inside a Chevy Tahoe driven by Jorge

9    Rivera on July 22, 2018.  The parties stipulate that the

10   transcription of the audio contained in Government Exhibit 604,

11   which is also separately marked as Government Exhibit 604T, is

12   accurate.

13             Government Exhibit 605 is a disk containing Government

14   Exhibit 605A and 605B, which are surveillance videos from the

15   New York City Police Department pole camera located in front of

16   31 Kingston Avenue, Brooklyn, New York on July 22, 2018.

17             Government Exhibit 606 it is a disk containing

18   surveillance video from the front of 701 Herkimer Street,

19   Brooklyn, New York, on October 24, 2018.

20        Your Honor, if I have not done so already, I now offer

21   Government Exhibit 1000, that stipulation, into evidence.

22             THE COURT:  The stipulation is Government Exhibit

23   1000?

24             MR. REBOLD:  Yes, your Honor.

25             THE COURT:  It is received.

1          (Government Exhibit 1000 received in evidence)

2     Q.  Detective Deck, prior to coming to court today, did you

3     have a chance to review a disk containing the video, a portion

4     of the video from 701 Herkimer Street that was recovered on

5     October 24, 2018?

6     A.  Yes, I did.

7     Q.  To your knowledge, does that video fairly and accurately

8     depict what you observed from the video that night?

9     A.  Yes.

10         MR. REBOLD:  Your Honor, if I may approach the

11    witness.

12         THE COURT:  You may.

13    Q.  I am going to show you what's been marked for

14    identification as Government Exhibit 606, which I'm also just

15    flashing to counsel.

16         Detective Deck, do you recognize Government Exhibit 606 for

17    identification?

18    A.  Yes.

19    Q.  What do you recognize that to be?

20    A.  This is the DVD that I had initialed prior to testifying

21    today.

22    Q.  Does that DVD contain the video from a portion of the

23    events of October 24, 2018?

24    A.  Yes, it does.

25    Q.  How do you know that?

1    A.  I watched the video and I initialed it.

2                MR. REBOLD:  Your Honor, I'm offering Government

3    Exhibit 606 for identification into evidence.

4                THE COURT:  Any objection?

5                MR. SCHOLAR:  No objection, your Honor.

6                MR. FASULO:  No objection.

7                THE COURT:  Received.

8                (Government Exhibit 606 received in evidence)

9    Q.  Detective Deck, before we play a portion of Government

10   Exhibit 606, can you just show us where the camera is actually

11   located and the direction in which it's pointed?

12   A.  Yes.

13   Q.  On Government Exhibit 210, which will be displayed to the

14   jury.

15   A.  Yes.  The camera would be located off the corner of

16   Herkimer and Utica Avenue.

17   Q.  If you could just point an arrow in the direction in which

18   the camera is pointing.

19   A.  The camera is going to be facing towards Rochester, which

20   is east.

21                MR. REBOLD:  Ms. Harney, if I can ask you to pull up

22   side by side with Government Exhibit 210 what is now in

23   evidence as Government Exhibit 606.

24                Again, if we can pause that right there at the

25   beginning of the video, the time stamp is 22:16:01 on the

J9HMMAC2                        Deck - Direct

1    video.

2    Q.  Detective Deck, if you can just show us where it is on the

3    left side of Government Exhibit 210 where the camera is

4    pointing towards.

5    A.  The camera, again, where it says the red dot, 701 Herkimer

6    Street, I'll put a dot there again.

7    Q.  Detective, can you point in the direction --

8    A.  Again, it's facing going down towards Rochester on

9    Herkimer.

10   Q.  You see all the way in the back left corner, like where the

11   number 12 is and where it says 701 Herkimer, if somebody was to

12   walk all the way down to the end of the video along the

13   sidewalk, where would they end up at the map?

14   A.  It would be at 781 Herkimer Street.

15   Q.  Can you put an X on Government Exhibit 210 as to where 781

16   Herkimer Street is.

17   A.  Yes.

18           MR. REBOLD:  Now, Ms. Harney, I am going to ask you to

19   momentarily please take down Government Exhibit 210 and blow up

20   Government Exhibit 606 so that it takes up the full screen.

21           If you can please start at about one minute and two

22   seconds into the video.

23           THE COURT:  Before you do, let me make sure that every

24   member of the juror has a screen working and you've got it up

25   on the screen.

1    Q.  By the way, Detective Deck, do you see how the date stamp

2    says October 24, 2018?

3    A.  Yes.

4    Q.  To your knowledge, is the date correct?

5    A.  Yes.

6    Q.  You see how the time stamp says right now 22:17:01?

7    A.  Yes.

8    Q.  Can you speak to the accuracy of the time stamp?

9    A.  Usually, when we go look at video I'll cross-reference the

10   time on the video with my cell phone, but in this case I didn't

11   download the video.  So the video is accurately probably within

12   one to two minutes of the actual real time that's listed on the

13   video.

14   Q.  What are you basing on that?

15   A.  I had spoken to a lady from Smurf Village --

16            MR. FASULO:  Objection.

17            THE COURT:  Sustained.

18   Q.  Detective Deck, you said that a person responded, ran into

19   a bodega where you were collecting video, correct?

20   A.  Yes.

21   Q.  What time did that person run into the bodega?

22   A.  Approximately 9 -- I'm sorry.  10:20 p.m.

23   Q.  And based on that, did you draw a conclusion as to whether

24   the video was accurate within a few minutes?

25   A.  Yes.

1   Q.  Was it accurate within a few minutes?

2   A.  Yes, it was.

3            MR. REBOLD:  Ms. Harney, now that we are about a

4   minute and two seconds into the video, I will just note for the

5   record that the time stamp at the top of the video is 22:17:01.

6   Q.  I am going to have Ms. Harney hit play and, Detective Deck,

7   if you can say the word stop when you first see Mr. Hobdy.

8        (Video played)

9   A.  Stop.

10  Q.  If you can just draw a circle around Mr. Hobdy for us, sir.

11  A.  Yes.

12           MR. REBOLD:  For the record, the time stamp on the

13  video now is 22:17:16.  Detective Deck has drawn a circle

14  around what appears to be the only person depicted on the

15  video, which is a person in the foreground of the video walking

16  on the sidewalk in the direction of the front of the video

17  screen.

18           Ms. Harney, if you can just hit play.

19           I'm sorry.  I think we jumped forward about 10

20  seconds.  If we can hit play from here.

21       (Video played)

22  Q.  In what direction is this person walking, towards what

23  street?

24  A.  He is walking on Herkimer Street west towards Utica Avenue.

25  Q.  Just so the jury knows where you fix their attention, where

J9HMMAC2                        Deck - Direct

1   should they be looking about a minute from now on the video?

2   A.  Mr. Hobdy is going to be walking now in the street heading

3   east towards the same direction that he just came from.

4   Q.  You said in the street as opposed to the sidewalk?

5   A.  Yes.

6   Q.  Will he be walking or running?

7   A.  Slow jog.

8   Q.  You can let the video play through.

9           (Video played)

10  Q.  Detective Deck, the next time you see Mr. Hobdy appear on

11  this video, can you just say the word stop?

12  A.  Yes.

13  Q.  Thank you.

14          (Video played)

15  A.  Stop.

16  Q.  Can you please draw a circle around where you see

17  Mr. Hobdy.

18  A.  Yes.

19          MR. REBOLD:  For the record, the time stamp is now

20  22:18:12.  The witness has drawn a circle around an individual

21  who is in the street running from the right side of the video

22  to the left side.  He is currently behind the very first car in

23  front of the video.

24          If we can just now play through just the next few

25  seconds, Ms. Harney.

1          (Video played)

2          MR. REBOLD:  Ms. Harney, can you please pull back up

3   Government Exhibit 210.

4   Q.  Detective Deck, if you can just, using your finger, draw

5   first the direction in which you see Mr. Hobdy going in the

6   first clip of video at about 22:17, or 10:17 p.m.

7   A.  Yes.

8   Q.  If you can now just have your finger draw where you see him

9   go about a minute or so later, about 10:18 and 20 seconds, on

10  the video.

11  A.  Yes.

12  Q.  Thank you, sir.

13          Detective Deck, you said that you visited Mr. Hobdy while

14  he was in the hospital at Kings County Hospital, is that

15  correct?

16  A.  Yes, I did.

17  Q.  You said that you photographed his injury before he was

18  attended to by the medical staff?

19  A.  Yes, I did.

20  Q.  I'm showing you what's been marked for identification as

21  Government Exhibit 200.

22          Do you recognize Government Exhibit 200 for

23  identification?

24  A.  Yes, I do.

25  Q.  And what do you see in Government Exhibit 200?

1    A.  That is a picture of Mr. Hobdy before he was being treated

2    by the doctors at Kings County Hospital.

3    Q.  Does that fairly and accurately depict the way he appeared

4    that night when you were with him?

5    A.  Yes.

6            MR. REBOLD:  I'm offering Government Exhibit 200 for

7    identification into evidence.

8            THE COURT:  Any objection?

9            MR. SCHOLAR:  No objection.

10           MR. FASULO:  No objection.

11           THE COURT:  It's received.

12           (Government Exhibit 200 received in evidence)

13           MR. REBOLD:  Your Honor, may we publish Government

14   Exhibit 200 for the jury?

15           THE COURT:  You may.

16           MR. SCHOLAR:  That was transcribed as no objection.

17           THE COURT:  You had an objection.  Overruled.

18   Q.  Can you just describe, to the extent it's not clear from

19   this video, this photograph itself, the depth of the injury

20   that you observed on Mr. Hobdy's face then?

21           MR. SCHOLAR:  Objection, Judge.

22           THE COURT:  Overruled.

23           Briefly.

24   A.  Mr. Hobdy was cut pretty much from the ear down to his chin

25   fairly deep, pretty much through his cheek to his mouth.

1              MR. REBOLD:  If we can remove Government Exhibit 200,

2      please.

3  Q.   Detective Deck, did you have occasion to visit Mr. Hobdy

4      sometime after this incident?

5  A.   Yes, I did.

6  Q.   Did you observe his injuries at that time?

7  A.   Yes, I did.

8  Q.   How much time had passed from the night of October 24

9      until --

10  A.   Three days.

11  Q.   Do you know what procedure Mr. Hobdy received in the

12      hospital that day?

13  A.   Yes.

14  Q.   Can you describe that for the jury.

15              MR. FASULO:  Objection.

16              MR. SCHOLAR:  Objection.

17              THE COURT:  Sustained.

18  Q.   Do you know whether his injuries were tended to?

19  A.   Yes.

20  Q.   Did you see his injuries being tended to?

21  A.   Yes.

22  Q.   Did you see the result of his injuries being tended to?

23  A.   Yes.

24  Q.   Can you please describe what you saw.

25  A.   Mr. Hobdy, when I was at Kings County Hospital, the doctors

J9HMMAC2                          Deck - Direct

1   had started suturing, stitching his face up.  I left because it

2   was going to take a while.

3           Three days later, October 27, when I reinterviewed

4   Mr. Hobdy at his apartment, is when I had seen, so to speak,

5   final product of the doctor stitching up his face and closing

6   his wound.

7   Q.  I am showing you what's been marked for identification as

8   Government Exhibit 201.

9           Do you recognize Government Exhibit 201 for identification?

10  A.  Yes, I do.

11  Q.  And what are we looking at in Government Exhibit 201?

12  A.  A photo of Mr. Hobdy I took when I reinterviewed him on

13  October 27.

14  Q.  Does that fairly and accurately depict the way he appeared

15  when you visited that day?

16  A.  Yes.

17          MR. REBOLD:  I'm offering Government Exhibit 201 for

18  identification into evidence.

19          THE COURT:  Any objection?

20          MR. SCHOLAR:  No objection.

21          MR. FASULO:  No objection.

22          THE COURT:  Received.

23          (Government Exhibit 201 received in evidence)

24          MR. REBOLD:  If we may publish that for the jury, your

25  Honor.

J9HMMAC2                          Deck - Cross

1            THE COURT:  You may.

2            MR. REBOLD:  I have no further questions for this

3     witness.

4            THE COURT:  Let's take the photograph down, please.

5            Cross-examination.  Mr. Fasulo.

6            MR. FASULO:  Thank you, Judge.

7     CROSS-EXAMINATION

8     BY MR. FASULO:

9     Q.  Good morning, Detective.

10            THE COURT:  Mr. Fasulo before you begin, Mr. Smallman

11     has a point that I want to give to the witness.  If you speak

12     to the side of the microphone, it's not picking you up.  Speak

13     straight into it.  It works better.  Thank you.

14            MR. FASULO:  May I inquire, Judge?

15            THE COURT:  That goes for the advocates' mic as well.

16     Q.  Good morning.

17     A.  Good morning.

18     Q.  Detective, you've been a detective for about five years,

19     you stated?

20     A.  Yes.

21     Q.  Prior to becoming a detective you had an opportunity to go

22     through a bunch of training, right?

23     A.  Yes.

24     Q.  Some of that training had to do with investigative

25     techniques?

```
 1   A.  Yes.
 2   Q.  And during the course of your employment with the New York
 3   City Police Department, you have engaged in a number of
 4   investigative techniques, correct?
 5   A.  Yes.
 6   Q.  Including forensic evidence, right, collecting forensic
 7   evidence?
 8   A.  Yes.
 9   Q.  Sending evidence out for fingerprinting?
10   A.  I didn't hear you.
11   Q.  Sending evidence out for fingerprinting.
12           THE COURT:  Try that again.
13   Q.  Vouchering evidence?
14   A.  Vouchering evidence, yes.
15   Q.  Reviewing pole camera videos?
16   A.  Yes.
17   Q.  Interviewing witnesses?
18   A.  Yes.
19   Q.  Collecting evidence at the scene?
20   A.  Yes.
21   Q.  Following up on your interviews with other witnesses,
22   correct?
23   A.  Yes.
24   Q.  In this case you opened an investigation on October 24 of
25   that year, correct?
```

1    A.  Yes.

2    Q.  That was the day that you responded to the incident,

3    correct?

4    A.  Yes.

5    Q.  And after you opened that investigation you had an

6    opportunity to speak to the complainant, the victim?

7    A.  Which incident are you talking about?

8    Q.  The incident that we -- Mr. Hobdy.

9    A.  Yes.

10   Q.  You spoke with Hobdy the night of the incident?

11   A.  Yes.

12   Q.  You spoke to him subsequent to that night, correct?

13   A.  Yes.

14   Q.  In fact, you visited his home, correct?

15   A.  I didn't understand you.

16   Q.  You visited his home, correct?

17   A.  On October 27, yes.

18   Q.  So sometime after.

19   A.  Yep.

20   Q.  At that time you took a photograph of him, correct?

21   A.  Yes.

22   Q.  And prior to that you had an opportunity to seek any kind

23   of videos that would be available to you, correct?

24   A.  Yes.

25   Q.  And interview other witnesses, correct?

J9HMMAC2                          Deck - Cross

1   A.  Yes.

2   Q.  You talked about the pole cam before.  For my edification,

3   a pole cam is placed by the New York City Police Department all

4   across the city, correct, there are pole cams all over the

5   city?

6   A.  I didn't talk about a pole camera.

7   Q.  The videos that we just saw were from where?

8   A.  Those are from the development.  Those are their cameras.

9   That is not an NYPD pole camera.

10  Q.  Those are placed in that development by the development or

11  by the city?  Do you know?

12  A.  By the development itself.

13  Q.  And you had access to those videos, correct?

14  A.  I don't personally have access to them.  We have to call

15  someone from the development to have them downloaded.

16  Q.  And you did that?

17  A.  I didn't call and have them downloaded.

18  Q.  You had that done for your investigation?

19  A.  It was done for my investigation, yes.

20  Q.  And then you had an opportunity to see the video?

21  A.  Yes.

22  Q.  And then any other relevant videos, correct?

23  A.  Yes.

24  Q.  You did a thorough investigation in this case, right?

25  A.  Yes.

J9HMMAC2                              Deck – Cross

1    Q.  And your investigation opened on the 24th of October and

2    ended on December 26 of that year, is that correct?

3    A.  I don't remember the exact date that I closed the case.

4    Q.  If I show you a document, would it help to refresh your

5    recollection?

6    A.  Yes.

7              MR. FASULO:  May I approach, Judge?

8              THE COURT:  You may.

9    Q.  Detective, do you recognize that document?

10   A.  Yes.

11   Q.  And does it refresh your recollection as to the date that

12   the case was closed by yourself?

13             MR. REBOLD:  Your Honor, I am going to object to

14   relevance of when the investigation was closed.

15             THE COURT:  Objection overruled.

16             Mr. Fasulo, just for the record, would you identify by

17   number what the document is.

18             MR. FASULO:  We will make it Defense 1 for

19   identification.

20             THE COURT:  Thank you.

21   Q.  Does it refresh your recollection as to the date that you

22   closed your investigation of this matter?

23   A.  Yes.

24   Q.  And what was the reason that you closed the investigation

25   on that date, Officer?

J9HMMAC2                              Deck - Cross

1  A.  Based on my investigation at the time.  I had no witness to

2  the incident, but Mr. Hobdy being cut across the face.

3  Mr. Hobdy stated to me --

4            MR. REBOLD:  Objection.

5            THE COURT:  Sustained.

6  Q.  At the time that you closed the investigation, did you

7  learn of the perpetrator of Mr. Hobdy's slashing on that day?

8            MR. REBOLD:  Objection.

9            THE COURT:  Sustained.

10 Q.  Prior to closing the investigation on the 26th, had you had

11 an opportunity to speak with Mr. Hobdy other than on the 27th

12 in his apartment, as you spoke about earlier?

13 A.  Not that I remember, no.

14 Q.  So you spoke to him one time?

15 A.  Twice.

16 Q.  Once in the hospital on the date of the incident?

17 A.  Right.

18 Q.  And once on the 27th?

19 A.  Yes.

20 Q.  After that you didn't speak to him again?

21 A.  No.

22 Q.  What did it mean to yourself?  What does it mean when you

23 wrote closed the investigation?  What did that mean to you?

24 A.  That the case was going to be closed at the time.  I didn't

25 have any perpetrators at the time.

1    MR. FASULO:  Thank you.  No further questions.

2    THE COURT:  Mr. Scholar, cross-examination.

3    CROSS-EXAMINATION

4    BY MR. SCHOLAR:

5    Q.  Good morning.

6    A.  Good morning.

7    Q.  Now, on October 24, 2018, when you received the word of the

8    slashing, you were at 22 Rochester?

9    A.  I don't remember the exact address.  I was in a bodega at

10   Rochester and Herkimer on the corner.

11   Q.  That's directly across the street from 781 Herkimer,

12   correct?

13   A.  Yes.

14   Q.  And where did you first see Mr. Hobdy?

15   A.  In front of 781 Herkimer Street.

16   Q.  Was he laying on the floor or was he standing?

17   A.  Mr. Hobdy was standing up.

18   Q.  On the videotape that we saw, I believe it was 606, you

19   indicated that the first time you saw Mr. Hobdy on the video he

20   was walking towards Utica?

21   A.  The first time I saw him on the video?

22   Q.  Yes.

23   A.  When I did get the video, it was downloaded.  The first

24   time I seen him was, yes, walking towards Utica and Herkimer.

25   Q.  Towards the left would have been 1700 Fulton?

1   A.   The direction Mr. Hobdy was first walking towards when we

2   first seen him?

3   Q.   Yes.

4   A.   On the sidewalk?

5   Q.   Yes.

6   A.   If you would keep walking straight, you would get to Utica.

7   You are going to walk for the block, but it's in the same

8   vicinity of going towards 1700 Fulton Street or Fulton Park.

9   Q.   That's where you received a report of another shooting?

10  A.   Couple of blocks away, two, three blocks away.

11  Q.   The other shooting you reported or testified to was across

12  the street from 1700 Fulton, correct?

13  A.   I mean, which shooting are you talking about, the first one

14  or were you talking about the second one?

15  Q.   The first shooting, where was that?

16  A.   14 Hunterfly.

17  Q.   That's within the Smurf Houses?

18  A.   Yes.

19  Q.   Where in relation to where you observed Mr. Hobdy for the

20  first time was 14 Hunterfly?

21  A.   Did I observe at 14 Hunterfly?

22  Q.   Let me repeat that.  The first time that you observed

23  Mr. Hobdy on the 24th of October in 2018, in relation to that

24  position, where is 14 Hunterfly?

25  A.   If we were looking at the video, I would say, if you look

J9HMMAC2                        Deck - Cross

1    to the right, to the houses to the right of where Mr. Hobdy,

2    where I first circled him, there is a little breezeway there.

3    You walk through there.  Behind there is 14 Hunterfly.

4    Q.  That's within walking distance?

5    A.  Yes.

6    Q.  The second shooting was at 1700 Fulton?

7    A.  Yes.

8    Q.  That was across the street at a park?

9    A.  Right.  1700 Fulton was Boys and Girls.  And Fulton Park is

10   opposite 1700 Fulton Street.

11   Q.  Is it fair to say that other police officers were in the

12   area when you were in the area on October 24, 2018?

13   A.  Yes.

14   Q.  And other police vehicles?

15   A.  Yes.

16   Q.  Is it fair to say that there were police vehicles at 1700

17   Fulton?

18   A.  I believe so, yes.

19   Q.  Was there any police presence at 1414 Hunterfly?

20   A.  Yes.

21   Q.  Now, you testified on direct from the prosecution that the

22   buildings, the Smurf Houses there, are low-rise apartment

23   buildings?

24   A.  Yes.

25   Q.  About three to four floors?

1    A.  Yes.

2    Q.  On the buildings themselves you have stationary lights

3    affixed to the buildings, correct?

4    A.  I'm sorry.  I didn't hear the first part.

5    Q.  With respect to the Smurf Houses, on the buildings

6    themselves, you have stationary lights affixed to the outside

7    of the buildings.

8    A.  Outside the Smurf Houses?

9    Q.  Yes.

10   A.  Yes.

11   Q.  On the front door for every building there are two lights

12   on either side of the door, the front doors of the Smurf

13   Houses, right?

14   A.  I don't remember that particular.

15   Q.  What about street lamps?  Were there also street lamps in

16   the area?

17   A.  Yes.

18   Q.  Security cameras as well on the outside of the buildings of

19   the Smurf Houses?

20   A.  Yes.

21   Q.  Now, the first time you spoke to Mr. Hobdy was at the

22   hospital?

23   A.  I tried to talk to Mr. Hobdy at 781 Herkimer, but the first

24   time I actually got words out of him was at Kings County

25   Hospital.

1  Q.  When you saw him at the scene at 781 Herkimer, when you

2  spoke with Mr. Hobdy, what was his demeanor?

3  A.  I'm sorry.  I am having a hard time hearing you.

4  Q.  What was the demeanor when you first saw Mr. Hobdy?

5  A.  At 781 Herkimer Street?

6  Q.  Yes.

7  A.  Mr. Hobdy was holding a shirt or rag to his left side of

8  face, bleeding heavily with blood coming out of his mouth.  He

9  wasn't really saying much.  He wasn't telling me what happened.

10 Q.  Was he excited?

11 A.  No.  He seemed pretty calm.

12 Q.  What was his demeanor at the hospital?

13 A.  He was laying in the bed.  He was still pretty calm.  He

14 was in pain.

15 Q.  And did you ask him who did it?

16 A.  I did.

17            MR. REBOLD:  Objection.

18            THE COURT:  One moment.

19            Overruled.  The answer, however, will be hearsay, so

20 don't ask it.

21            MR. SCHOLAR:  I was going to propose it as an 803(1)

22 204 exception.

23            THE COURT:  Let me see counsel at the sidebar.

24            (Continued on next page)

25

J9HMMAC2                          Deck - Cross

1                (At sidebar)

2                THE COURT:  You were intending to ask the witness what

3     Mr. Hobdy said in the hospital in response to the question, who

4     did it?

5                MR. SCHOLAR:  Yes.

6                THE COURT:  What do you understand the answer to be?

7                MR. SCHOLAR:  The answer will be he didn't answer the

8     question.

9                THE COURT:  Government, why is that hearsay?  It's not

10    for the truth of the matter asserted.  There is no matter

11    asserted.  It would be a different issue if he gave an answer,

12    but if he didn't give one, while that is subject to all sorts

13    of alternative inferences, it doesn't appear to me that there

14    is any matter being asserted.

15               MR. REBOLD:  OK.

16               THE COURT:  Overruled.  It is overruled.

17               Let me go back to a question that I made a note to

18    raise with you at the next break, which is, during the

19    investigation, at a later point, I understand that the witness

20    inquires of Mr. Hobdy who did it, and Mr. Fasulo was not

21    permitted to elicit that answer.

22               What would, Mr. Fasulo, the answer have been, as you

23    understand it?

24               MR. FASULO:  No answer.

25               THE COURT:  No answer as well.

1           MR. FASULO:  He is going to ask the question, Judge.

2   I defer to his questions.

3           THE COURT:  In other words, it's not that you're

4   eliciting a statement, I don't know, it's not that you're

5   eliciting a statement of an alternative perpetrator, but simply

6   silence or a refusal to answer.

7           MR. REBOLD:  Can I propose that Mr. Scholar ask this

8   question in a leading way so if there is some answer that would

9   have come out of Mr. Hobdy's mouth that would surprise us all

10  that it doesn't come before the jury.

11          THE COURT:  That may well be a very wise approach, not

12  knowing what we may be bumping into.

13          Mr. Scholar, are you comfortable putting the question,

14  when you asked the question he did not give an answer, are you

15  comfortable with that?  And everybody understands the answer to

16  that question will be a simple yes or no.  You may want to

17  preface it with yes or no, is it correct that.

18          Very good.  Thank you.

19          (Continued on next page)

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  At the sidebar I determined to overrule

3     the objection.

4          Given the passage of time, Mr. Scholar, why don't you

5     rephrase or ask it again.

6          MR. SCHOLAR:  May I have my last question read back,

7     my last question that was answered?

8          THE COURT:  The question I anticipated you going to

9     next would be hearsay.  I don't think you ever got it precisely

10    formulated, so why don't you formulate it now.

11         MR. SCHOLAR:  Sure, Judge.

12    Q.  At the hospital you spoke to Mr. Hobdy, correct?

13    A.  Yes.

14    Q.  And you asked him who did it, correct?

15    A.  Yes.

16    Q.  I'd like to ask you a yes or no question.  Did he tell you

17    who slashed him?

18    A.  No.

19    Q.  Now, in December of 26 of 2018, you filed a report asking

20    the case to be closed, correct?

21    A.  Yes.

22    Q.  And you indicated that you had exhausted all investigative

23    aids, correct?

24    A.  Yes.

25    Q.  And you used a code C4?

J9HMMAC2

1    A.  Yes.

2    Q.  What is C4?

3    A.  C4 is just a code we used for the detectives that all

4    investigative leads have been exhausted at the time.

5    Q.  You never made an arrest, right?

6    A.  I'm sorry.  I didn't hear you.

7    Q.  You didn't arrest anybody, correct?

8    A.  Yes, I did.

9    Q.  Let me withdraw that.

10        On December 26, 2018, you asked to close the case.  No

11   arrests had been made.

12   A.  No.

13   Q.  That request was approved by your supervisor to close the

14   case?

15   A.  On December 26, yes.

16            MR. SCHOLAR:  I have nothing further, Judge.

17            THE COURT:  Redirect.

18            MR. REBOLD:  No, your Honor.

19            THE COURT:  Detective Deck, you may step down.  Your

20   testimony is concluded.

21            (Witness excused)

22            THE COURT:  Government, call your next witness.

23            MR. WARREN:  Your Honor, with the Court's permission,

24   we would like to read some stipulations.

25            THE COURT:  By all means.

J9HMMAC2

1           MR. WARREN:  Your Honor, this is Government Exhibits

2    1001 through 1005.

3           THE COURT:  Kindly speak into the mic.  I think we are

4    discovering that if counsel speaks directly into the mic, it's

5    easier for the court reporter and everyone to hear.

6           Go ahead.

7           MR. WARREN:  Yes, your Honor.

8           Government Exhibit 1001.  The parties stipulate as

9    follows:

10          1.  Government Exhibit 800, including the subdivisions

11   thereof, contains true and accurate copies of materials stored

12   on an Apple iPhone that was recovered from Anthony Ellison on

13   or about November 6, 2018.

14          2.  Government Exhibit 801, including the subdivisions

15   thereof, contains true and accurate copies of materials stored

16   on an Apple iPhone that was in the possession of Jorge Rivera

17   on or about July 2, 2018.

18          3.  Government Exhibit 802, including the subdivisions

19   thereof, contains true and accurate copies of materials stored

20   on an Apple iPhone that was recovered from Kifano Jordan, a/k/a

21   "Shotti" on or about May 11, 2018.

22          4.  Government Exhibit 803, including the subdivisions

23   thereof, contains true and accurate copies of materials stored

24   on an LG phone that was recovered from Aljermiah Mack on or

25   about January 19, 2019.

J9HMMAC2

1          It further stipulated and agreed that this

2     stipulation, has Government Exhibit 1001, may be received in

3     evidence at trial."

4          At this time, your Honor, the government offers

5     Government Exhibit 1001.

6          THE COURT:  Exhibit 1001 is received.

7          (Government Exhibit 1001 received in evidence)

8          MR. WARREN:  The next stipulation is Government

9     Exhibit 1002.  The parties stipulate as follows:

10          1.  If called as a witness, a representative of AT&T

11     Wireless would testify that Government Exhibit 900 is a disk

12     containing true and accurate copies of business records

13     maintained by AT&T Wireless for the cellular telephone assigned

14     telephone number 201-745-4343 for the period of September 1,

15     2017 through October 25, 2018.

16          b.  Government Exhibit 900 contains records of

17     regularly conducted activity that were:  (1) made at or near

18     the time of the occurrence of the matters set forth by or from

19     information transmitted by a person with knowledge of those

20     matters;  (2) kept in the course of regularly conducted

21     activity of AT&T Wireless; and (3) made by the regularly

22     conducted activity of AT&T Wireless as a regular practice.

23          2.  The cellular phone assigned the telephone number

24     201-745-4343 belonged to Anthony Ellison between September 1,

25     2017 and October 25, 2018.  3.

J9HMMAC2

If called as a witness, a representative of T-Mobile, Inc. would testify that:

a.   Government Exhibit 901 contains true and accurate copies of business records maintained by the T-Mobile, Inc. for the cellular telephone assigned telephone number 917-402-0256 for the period October 1, 2018 through August 6, 2019.

b.   Government Exhibit 901 contains records of regularly conducted activity that were: (1) made at or near the time of the occurrence of the matters set forth by or from information transmitted by a person with knowledge of those matters; (2) kept in the regularly course of activity of T-Mobile; and (3) made by the regularly conducted activity of T-Mobile as a regular practice.

4.   The cellular phone assigned telephone number 917-402-0256 belonged to Jazlyn Ramirez between October 1, 2018 and August 6, 2019.

5.   Government Exhibit 902 contains true and accurate copies of records maintained by the National Domestic Communications Assistance Center.  The records in Government Exhibit 902 fairly and accurately depict the location of cellular towers on the AT&T Wireless network as of August 2018.

It is further stipulated and agreed that this stipulation as Government Exhibit 1002, as well as Government Exhibits 900, 901, and 902, may be received in evidence at trial.

J9HMMAC2

1             Your Honor, the government asks to admit Government

2        Exhibit 1002 and Exhibits 900, 901, and 902.

3             THE COURT:  Any objection?

4             MR. FASULO:  No objection.

5             MR. CANNICK:  No objection.

6             THE COURT:  I'll receive the stipulation, Exhibit

7        1002, and Exhibits 900, 901, and 902.

8             (Government Exhibits 1002, 900, 901, and 902 received

9        in evidence)

10            MR. WARREN:  This is Government Exhibit 1003.  The

11       parties stipulate as follows:

12            1.  Law enforcement agents conducting judicially

13       authorized wiretap intercepts of cellular telephones in this

14       case.  The call numbers for the phones as well as the time

15       periods of the interceptions are as follows:

16            a.  917-893-1550, from November 1, 2018 to November

17       19, 2018 (the "Jamel Jones phone");

18            b.  917-680-4901, from on or about September 27, the

19       2018 to November 21, 2018 (the Kristian Cruz phone").

20            2.  The content of each intercepted communication is

21       recorded at the time of the communication, along with the date

22       and time of communication.  The recorded communications were

23       then transferred to the computer system under the custody and

24       control of the United States Department of Homeland Security

25       Homeland Security Investigations ("HSI").

J9HMMAC2

1          3.   Government Exhibits 312, 314, 315, 316, and 319

2     are true and accurate copies of recordings of communications

3     that were intercepted over the wiretap described in paragraph

4     1.  Government Exhibits 313, 317, and 320 are true and accurate

5     copies of portions of recordings of communications that were

6     intercepted from our accounts described in paragraph 1.

7          4.   Government Exhibits 312T through 317T and 319T

8     320T are true and accurate transcripts related to the

9     corresponding recording exhibits.  Each transcript contains a

10    header that truly and accurately reflects the following

11    information:  a) the date of the call; b) the time of the

12    commencement of the recording; c) the phone number over which

13    the phone call was intercepted; and d) the participants on the

14    call.

15         5.   In or about 2016, the New York City Police

16    Department was conducting a separate investigation that

17    utilized wiretap intercepts over cellular telephones.  A

18    cellular telephone assigned call number 646-689-4370 that was

19    used by Kristian Cruz was the subject of the 2016

20    investigation.

21         6.   Government Exhibits 301 and 302 are true and

22    accurate copies of portions of recordings of communications

23    that were intercepted over the wiretaps described in paragraph

24    5.

25         7.   Government Exhibits 301T and 302T are true and

J9HMMAC2

1   correct transcripts relating to the corresponding recording

2   exhibits.  Each transcript contains a header that truly and

3   accurately reflects the followings information:  a) the date of

4   the call; b) the time of the commencement of the recording; and

5   c) the participants on the call.

6            It is further stipulated and agreed that this

7   stipulation, as Government Exhibit 1003, may be received into

8   evidence at trial.

9            Your Honor, the government asks that Exhibit 1003 be

10   admitted.

11            THE COURT:  I'll receive Exhibit 1003, the

12   stipulation.

13            (Government Exhibit 1003 received in evidence)

14            MR. WARREN:  Government Exhibit 1004.

15            The parties stipulate as follows:

16            1.  If called as a witness, the representative of

17   Facebook, Inc. would testify that:

18            a.  Government Exhibits 500 through 502, including

19   subdivisions thereof, contain true and accurate copies of

20   statements and photographs shared on social media, social

21   networking website Instagram, which is owned by Facebook, Inc.

22            2.  Government Exhibit 500, including subdivisions

23   thereof, contain true and accurate copies of statements and

24   photographs from the Instagram account with user name 6ix9ine

25   belonging to Daniel Hernandez a/k/a Tekashi 6ix9ine.

J9HMMAC2

1          3.   Government Exhibit 501, including the subdivisions

2     thereof, contains true and accurate copies of statements and

3     photographs from the Instagram account with user name

4     "wavybay3" belonging to Aljermiah Mack (the "wavybaby3

5     account").   Government Exhibit 501 contains 23,465 pages of

6     Instagram messages and photographs.   Government Exhibits 501-AA

7     through 501-JJ are summary charts prepared by a paralegal

8     specialist of the United States Attorney's Office.

9          a.   Table 1 of Government Exhibit 501-AA accurately

10     reflects all direct message communications on May 29, 2018

11     between 12:32:57 Coordinated Universal Time ("UTC") and 15:55

12     01 UTC between the wavybaby3 account and an Instagram account

13     with the user name hatiancrook.

14          b.   Table 1 of Government Exhibit 501-BB accurately

15     reflects all direct message communications on April 18, 2018

16     between 04:15:53 UTC and 04:21:36 UTC between the wavybaby3

17     account and an Instagram account with the user name

18     luch_da_grownsta.

19          c.   Table 1 of Government Exhibit 501-DD accurately

20     reflects all direct message communications on January 24, 2018

21     between 04:19:52 UTC and 04:24:37 UTC between the wavybaby3

22     account and an Instagram account with the user name numbba_93.

23     Table 2 of Government Exhibit 501-DD accurately reflects all

24     direct message communications on January 24, 2018 between

25     04:32:52 UTC and 04:36:18 UTC between the wavybaby3 account and

J9HMMAC2

1     an Instagram account with the user name of numbba_93.  Table 3

2     of Government Exhibit 501-DD accurately reflects all direct

3     message communications on January 24, 2018 between 04:40:48 UTC

4     and 04:56:51 UTC between the wavybaby3 account and an Instagram

5     account with the user name numbba_93.  Table 4 of Government

6     Exhibit 501-DD accurately reflects all direct message

7     communications on January 24, 2018 between 13:09:04 UTC and

8     13:13:07 UTC between the wavybaby3 account and an Instagram

9     account wit the user name numbba_93.

10            D.  Table 1 of Government Exhibit 501-EE accurately

11     reflects all direct message communications on April 14, 2018

12     between 16:04:01 UTC and 16:27:24 UTC between the wavybaby3

13     account and an Instagram account with user name

14     paperboy_slick3.

15            E.  Table 1 of Government Exhibit 501-FF accurately

16     reflects all direct message communications on April 18, 2018

17     between 04:16:26 UTC and 04:17:36 UTC between the wavybaby3

18     account and Instagram account with the user name

19     bankrollzroyce.

20            F.  Table 1 of Government Exhibit 501-GG accurately

21     reflects all direct message communications on April 14, 2018

22     between the wavybaby3 account and an Instagram account with the

23     user name billyeyez93.  Table 2 of Government Exhibit 501-GG

24     accurately reflects all direct message communications on April

25     18, 2019 between 05:25:50 UTC and 05:38:08 UTC between the

J9HMMAC2

wavybaby3 account and an Instagram account with the user name
billyeyez93.  Table 3 of Government Exhibit 501-GG accurately
reflects all direct message communications on April 21, 2018
between 15:54:55 UTC and 17:38:14 UTC between the wavybaby3
account and an Instagram account with the user name
billyeyez93.

     G.  Table 1 of Government Exhibit 501-HH accurately
reflects all direct message communications on April 18, 2018
between 05:39:37 UTC and 05:52:11 UTC between the wavybaby3
account and an Instagram account with user name cokeboymadmax.

     (Continued on next page)

J9hWmac3

1          MR. WARREN:  "H.  Table 1 of Government Exhibit 501-II

2    accurately reflects all direct message communications on

3    February 16, 2018, between 20:39:43 UTC and 20:44:51 UTC

4    between the wavybaby3 account and an Instagram account with the

5    username riot_reel.

6          "I.  Table 1 of Government Exhibit 501-JJ accurately

7    reflects all direct message communications on April 18, 2018,

8    between 14:36:50 UTC between the wavybaby3 account and an

9    Instagram account with user name star_brim5.

10         "4.  Government Exhibit 502, including the

11   subdivisions thereof, contains true and accurate copies of

12   statements and photographs from the Instagram account with

13   username billyadothekid belonging to Adonijah Fields, a/k/a

14   "Billy Ado."

15         "5.  The records reflected on Government Exhibits 500

16   through 502 were retrieved from the computer archive system of

17   Facebook Inc.  The records reflected on Government Exhibits 500

18   through 502 were created with person with knowledge of, or

19   created from information transmitted by a person with knowledge

20   of, the information shown; were created at or near the time

21   information became available to Facebook Inc.; and were created

22   and maintained by Facebook Inc. as part of their regularly

23   conducted business activities.

24         "It is further stipulated and agreed that this

25   stipulation, Government Exhibit 1004, may be received in

J9hWmac3

1    evidence at trial."

2            At this time, your Honor, the government offers

3    Government Exhibit 1004.

4            THE COURT:  All right.  Government Exhibit 1004 is

5    received.

6            (Government Exhibit 1004 received in evidence)

7            MR. WARREN:  Finally, Government Exhibit 1005.

8            The parties stipulate as follows:

9            "1.  The government exhibits identified herein are

10   true and correct copies of portions of certain calls made by

11   Aljermiah Mack that were lawfully recorded while Mack was in a

12   New York State correctional facility on a parole violation,

13   which was for an unrelated matter that the parties agree has no

14   connection to the conspiracy charged herein.  At the beginning

15   of each call, a recording is played stating that the call is

16   being recorded.  The calls took place on July 13, 2016, through

17   August 21, 2016:

18           "a.  Government Exhibit 303, and the subdivisions

19   thereof, are portions of a telephonic conversation between

20   Aljermiah Mack and Kristian Cruz on July 16, 2016, beginning at

21   approximate am 8:31 p.m.;

22           "b.  Government Exhibit 304, and the subdivisions

23   thereof, are portions of a telephonic conversation between

24   Aljermiah Mack and Kristian Cruz on July 21, 2016, beginning at

25   approximately 2:36 p.m.;

J9hWmac3

"c.  Government Exhibit 305, and the subdivisions thereof, are portions of a telephonic conversation between Aljermiah Mack and Kristian Cruz on July 31, 2016, beginning at approximately 1:38 p.m.;

"d.  Government Exhibit 306, and the subdivisions thereof, are portions of a telephonic conversation between Aljermiah Mack and Kristian Cruz on August 6, 2016, beginning at approximately 1:34 p.m.;

"e.  Government Exhibit 307, and the subdivisions thereof, are portions of a telephonic conversation between Aljermiah Mack and Kristian Cruz on August 16, 2016, beginning at approximately 3:27 p.m.;

"2.  Government Exhibit 308, and the subdivisions thereof, are true and correct copies of portions of a prison call made by Angel Garcia to Anthony Ellison January 13, 2018, at approximately 8:06 p.m.  The call was lawfully recorded while Garcia was in New York State custody.

"3.  The government exhibits identified herein are true and correct copies of portions of prison calls made by Fuguan Lovick to Jamel Jones that were lawfully recorded while Lovick was in New York State custody:

"a.  Government Exhibit 321, and the subdivisions thereof, are portions of a telephonic conversation between Fuguan Lovick and Jamel Jones on August 2, 2018, beginning at approximately 4:55 p.m.;

J9hWmac3

1      "b.  Government Exhibit 323 is a portion of a

2  telephonic conversation between Fuquan Lovick and Jamel Jones

3  on July 24, 2018, beginning at approximately 4:57 p.m.

4      4.  Government Exhibits 303-T through 308-T, 321-T and

5  323-T are true and correct transcripts relating to the

6  corresponding recording exhibits identified above.  Each

7  transcript contains a header that truly and accurately reflects

8  the following information:  (a) the date of the call; (b) the

9  time of commencement of the recording; (c) the phone number

10  over which the phone call was intercepted; and (d) the

11  participants on the call.

12      "5.  Government Exhibits 405 through 408 are true and

13  correct copies of prison visitation records for Angel Garcia

14  while Garcia was in New York State custody.  If called to

15  testify, a representative of the New York State Department of

16  Corrections would testify that the records contained in

17  Government Exhibits 405 through 408 were retrieved from a New

18  York State Department of Corrections computer system.  The

19  records reflected on Government Exhibits 405 through 408 were

20  created by a person with knowledge of, or created from

21  information transmitted by a person with knowledge of, the

22  information shown; were created at or near the time the

23  information became available to the New York State Department

24  of Corrections; and were created and maintained by the New York

25  State Department of Corrections as part of its regularly

1   conducted business activities.

2                "It is further stipulated and agreed that this

3   stipulation, Government Exhibit 1005, may be received in

4   evidence at trial."

5           And at this time, your Honor, the government offers

6   exhibit 1005.

7           THE COURT:  All right.  It's received.

8           (Government Exhibit 1005 received in evidence)

9           MR. WARREN:  Thank you, your Honor.

10          THE COURT:  Ladies and gentlemen, I have an

11  instruction to give you with respect to an aspect of the

12  stipulation Mr. Warren just read.

13          You just heard a stipulation reflecting that Mr. Mack

14  was in prison on an unrelated matter at the time of certain

15  phone calls, and the stipulation also reflects that other

16  persons were in prison at the time of certain phone calls.

17          The evidence concerning Mr. Mack's presence in jail is

18  being received solely to explain his whereabouts at the time.

19  You are not to consider the evidence for any other purpose.

20  You, the jury, are not to consider that Mr. Mack was

21  incarcerated in your deliberations, and the same is true with

22  respect to the presence in jail of the other people referred to

23  in the stipulation.

24          With that, let me ask counsel if this is a good time

25  for our midmorning break.  We've covered a lot of ground today.

J9hWmac3

1              MR. REBOLD:  We think it is, your Honor.

2              THE COURT:  Ladies and gentlemen, we're going to take

3     our midmorning, 15-minute comfort break.  As always, I'm going

4     to instruct you not to discuss the case with anyone, including

5     your fellow jurors.

6              Mr. Smallman will come get you when we're ready.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J9hWmac3

```
1            (Jury not present)
2            THE COURT:  Be seated.
3            Counsel, I added to the stipulation as to prior
4    incarceration a reference to the incarceration of the other
5    people on the call for the same reason.  I take it there's no
6    objection.
7            MR. CANNICK:  No objection.
8            MR. FASULO:  No objection.
9            THE COURT:  Let me take care of a few housekeeping
10   matters.
11           To begin with, let me commend counsel on all of those
12   stipulations, in particular the long last one.  It's punishing
13   to read them, Mr. Warren, and to hear them, but I'm mindful of
14   all the hard work and collegial cooperation that is reflected
15   therein.  And listening to that stipulation, I had the reaction
16   that we probably just saved us a half day, if not more, of
17   trial with that work.  Thank you all for the collegiality and
18   professionalism in constructively working that out.
19           Second of all, I just want to amplify a little bit on
20   the ruling I made at the sidebar with respect to the questions
21   put to Mr. Hobdy by the detective.  When I originally sustained
22   the objection, I was under the impression, which turned out to
23   be inaccurate, that Mr. Hobdy's answer to the question would
24   have had context that he would have identified, perhaps,
25   somebody else than your clients.  Were that the case, the
```

J9hWmac3

statement would have been, offered for the truth of the matter

asserted, clear hearsay.  I would have reserved the right to

return to it if and when Mr. Hobdy testified, and perhaps my

sense to the contrary, then there would be an issue about its

use potentially as a matter of beat.  As it happened, at the

sidebar, counsel proffered to me that Mr. Hobdy had been silent

in response to those questions, and as such, the hearsay rule I

determine is simply not implicated because there is no matter

being asserted let alone one for the truth of the matter

therein.  But that's the reason for the sequential rulings

there.

          Third of all, pretrial, as you know, I made rulings

with respect to exhibits 200 and 201.  Those were the

photographs of Mr. Hobdy.  I received those in evidence but

with the general admonition that they should not be displayed

unduly long.  I just want to make the record that the

government was in full compliance with that directive.  Exhibit

200 was displayed, by my watch, for 45 seconds.  Exhibit 201

was on the screen for 15 seconds.  In no way, shape or form was

undue attention given to the exhibits.

          Before we give counsel a comfort break, anything,

going around the horn, from any side?

          MR. LONGYEAR:  Just in terms of timing, your Honor,

for witness logistics, when does your Honor expect to take the

lunch break?

J9hWmac3

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | THE COURT:  I would assume an hour and 20, an hour and             |
| 2  | 30 to the next examination.                                        |
| 3  | MR. LONGYEAR:  OK.                                                 |
| 4  | THE COURT:  But I'm looking for a natural break point.             |
| 5  | Will you be conducting the direct?                                 |
| 6  | MR. LONGYEAR:  Not for the next witness but the                   |
| 7  | witness after that.  The next witness is Ms. Ramirez, and then     |
| 8  | we will have another witness after that that requires a little     |
| 9  | bit of logistics.                                                  |
| 10 | THE COURT:  I'm sorry.  I misunderstood.  About an                 |
| 11 | hour 20, an hour 30 from when we resume we'll take the break.      |
| 12 | I'll give counsel leave logistically to identify a natural         |
| 13 | break point.                                                       |
| 14 | MR. LONGYEAR:  Thank you, your Honor.                             |
| 15 | MR. FASULO:  Judge, just one thing.  I showed the                 |
| 16 | witness an exhibit I labeled as defense 1.  I think it would be    |
| 17 | more proper to mark it defense A for clarity, so I'm going to      |
| 18 | ask to rename that exhibit.                                        |
| 19 | THE COURT:  That's fine.  It's always good to have a              |
| 20 | record what is shown.  To the extent it's 3500 material, it's      |
| 21 | worth your making a record, even outside the presence of the       |
| 22 | jury, what of the 3500 material you're talking about.  At the      |
| 23 | next opportunity you find, please do that.                         |
| 24 | Mr. Cannick.                                                       |
| 25 | MR. CANNICK:  Nothing, your Honor.                                |

J9hWmac3

1          THE COURT:  All right.  Very well.  I'll see you in

2   ten minutes.

3          (Recess)

4          THE COURT:  All right.  Be seated.

5          Mr. Smallman is getting the jury.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J9hWmac3                          Ramirez - Direct

1            (Jury present)

2            THE COURT:  All right.  Be seated.

3            Welcome back, ladies and gentlemen.

4            Government, please call your next witness.

5            MR. REBOLD:  The government calls Jazlyn Ramirez.

6            THE COURT:  Counsel, is somebody getting the witness?

7    JAZLYN RAMIREZ,

8         called as a witness by the government,

9         having been duly sworn, testified as follows:

10           THE COURT:  Good morning, Ms. Ramirez.  Please get

11   close to the microphone and keep your voice up so everyone in

12   the courtroom can hear you.

13           Counsel may inquire.

14   DIRECT EXAMINATION

15   BY MR. REBOLD:

16   Q.  Good morning, Ms. Ramirez.

17   A.  Good morning.

18   Q.  How old are you?

19   A.  21.

20   Q.  Ms. Ramirez, do you want to be here today?

21   A.  No.

22   Q.  Are you testifying pursuant to subpoena?

23   A.  Yes.

24   Q.  What do you do for work?

25   A.  I'm a hairstylist.

J9hWmac3                          Ramirez - Direct

1    Q.  What did you do for work back in the summer of 2018?

2    A.  I was a delivery coordinator at a Honda dealership.

3    Q.  You mean the car Honda?

4    A.  Yes.

5    Q.  And where was the dealership located?

6    A.  In Brooklyn.

7    Q.  Do you know an individual named Anthony Ellison?

8    A.  Yes.

9    Q.  How do you know Mr. Ellison?

10   A.  He came to my job to ask for my number, and we became

11   romantically involved for some time.

12   Q.  When was that?

13   A.  This was the -- probably the ending of 2018, the summer.

14   Q.  OK.  Do you know Mr. Ellison by any nicknames?

15   A.  Yes.

16   Q.  What do you call him?

17   A.  Harvey.

18   Q.  Excuse me?

19   A.  Harvey.

20   Q.  Harvey?

21   A.  Yes.

22   Q.  Looking around the courtroom, do you see Mr. Ellison here

23   today?

24       Do you have trouble seeing, Ms. Ramirez?

25   A.  I'm sorry?

1    Q.  I see you're squinting your eyes.  Do you have any

2    difficulty seeing right now?

3    A.  Yes.

4        I can identify him by, like, a color of his shirt.

5    Q.  You can identify him today?

6    A.  Yes, but if you tell me the color of his shirt.

7             MR. FASULO:  Objection.

8             MR. CANNICK:  Objection.

9             THE COURT:  Sustained.

10            Ms. Ramirez, the question is this.  Looking around the

11   courtroom, do you see Mr. Ellison here?

12            MR. REBOLD:  Your Honor, could we approach?

13            THE WITNESS:  I'm really having a hard time seeing.

14            THE COURT:  Let's see counsel at the sidebar.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              THE COURT:  What's going on?

3              MR. REBOLD:  I just wonder if my --

4              THE COURT:  Mr. Cannick.

5              MR. CANNICK:  My concern is that --

6              THE COURT:  I didn't call on you.  I just asked a

7    question.  You weren't at the sidebar.  Let me find out what's

8    happening, and then I'll be glad to get your opinion.  Sorry,

9    but you weren't here when we started.

10             What's happening, government?

11             MR. REBOLD:  I'm wondering if it might be helpful at

12   some point -- it doesn't have to be now -- to have Ms. Ramirez

13   move.  Clearly she's having difficulty seeing across the

14   courtroom where Mr. Ellison is.  I want to put her in a

15   position where she can make an identification if sight is

16   really a problem.

17             THE COURT:  Let's back this up.  Has she been a

18   participant in any prep session?

19             MR. REBOLD:  She has.  I'm always careful with

20   witnesses not to say whether someone will be in the courtroom,

21   but she's seen photographs of him and can identify him.  That's

22   going to happen, she's seen video.  I think she may be

23   genuinely having difficulty seeing him.

24             THE COURT:  When you met her, did she have eyeglasses?

25             MR. REBOLD:  She did not, but I think she has said she

1    has difficulty seeing long distances.  I can't swear to that,

2    but I believe she said that, and I think that that's -- I don't

3    think she's trying to avoid an identification, although it's

4    possible, but I do think she is genuinely having difficulty

5    seeing.

6              THE COURT:  Do you have a proposal how to deal with

7    that?

8              MR. REBOLD:  I don't know if it's possible to have her

9    walk around the well or have her seated, an opportunity to sit

10   here, but I want to make sure she has an opportunity, if her

11   issue is really the eyesight, to make the identification.

12   Perhaps it would make sense to proceed with the direct without

13   her making a corporeal ID, and at the end of the testimony, we

14   can give her an opportunity.  Maybe we can all think on the

15   best resolution in the interim.

16             THE COURT:  Are you going to be showing her

17   photographs of Mr. Ellison?

18             MR. REBOLD:  She will see a photograph of Mr. Ellison.

19   In fact, I can bring it up now and ask her if she recognizes

20   him, and I can bring up the face plate, and that will clearly

21   be something right in front of her, and then we all may have an

22   indication what we're dealing with.

23             THE COURT:  Mr. Cannick, what's your perspective?

24             MR. CANNICK:  Your Honor, I was delayed in coming over

25   here because I didn't know where this was going and I don't

1   know where this is going, and I was concerned about leaving Mr.

2   Ellison alone.  If she has problems identifying him, I didn't

3   want to leave him alone over at the table, thinking that it

4   would be obvious --

5            THE COURT:  He's not alone.

6            MR. CANNICK:  Yes, but I wanted to make sure that's

7   taken care of.

8            THE COURT:  What's your perspective?

9            MR. CANNICK:  I think we should wait and see whether

10  an identification is, in fact, taking place.

11           THE COURT:  I think we should move on with the

12  examination.  If you, at the end of the examination, want to

13  attempt some other form of in-courtroom ID, I would offer you a

14  sidebar.

15           MR. REBOLD:  Yes.

16           THE COURT:  Just to cut to the chase here, is it going

17  to be disputed that she knew and would have been in a position

18  due to personal contact in the past with Mr. Ellison, is it

19  going to be disputed that she's able to identify him?

20           MR. CANNICK:  That was not where we were going, your

21  Honor.

22           THE COURT:  OK.

23           MR. CANNICK:  But I don't know where we're going to go

24  now.

25           THE COURT:  Understood.

J9hWmac3                    Ramirez - Direct

1            MR. REBOLD:  Just to be clear, I think she's already

2     said earlier in the examination that she was romantically

3     involved with him.

4            THE COURT:  Right.

5            MR. REBOLD:  I think she's going to say they've been

6     in contact up until, and even after she was subpoenaed, the

7     last month or two by the government.  I think there's one of

8     two possibilities.  One is that she's got stage fright, and the

9     other is that she's genuinely having an issue seeing.

10           THE COURT:  You're welcome to probe that.  Let hold

11    off on the courtroom ID without prejudice to your revisiting

12    it.

13           (Continued on next page)

1              (In open court)

2              THE COURT:  Mr. Rebold, you may resume.

3    BY MR. REBOLD:

4    Q.  Ms. Ramirez, you said that you, starting in the summer,

5    became romantically involved with Mr. Ellison?

6    A.  The end of the summer.

7    Q.  OK.  That's 2018?

8    A.  Yes.

9    Q.  And would you recognize Mr. Ellison if you saw him again?

10   A.  Yes.

11   Q.  I'm going to show you what's been marked for identification

12   as Government Exhibit 2.

13          Do you recognize Government Exhibit 2 for identification?

14   A.  Yes.

15   Q.  What do you recognize that to be?

16   A.  Harvey.

17   Q.  Harvey?

18   A.  Yes.

19   Q.  OK.  Is that a photograph of him?

20   A.  Yes.

21              MR. REBOLD:  Your Honor, I'm offering Government

22   Exhibit 2 for identification into evidence.

23              THE COURT:  Any objection?

24              MR. CANNICK:  None, your Honor.

25              MR. FASULO:  None, your Honor.

J9hWmac3                    Ramirez - Direct

1            THE COURT:  Received.

2            (Government Exhibit 2 received in evidence)

3   BY MR. REBOLD:

4   Q.  Ms. Ramirez, did there --

5            THE COURT:  Do you want it published to the jury?

6            MR. REBOLD:  I'm sorry, your Honor.  Yes.  May we

7   publish Government Exhibit 2 to the jury?

8            THE COURT:  Go ahead.

9   BY MR. REBOLD:

10  Q.  Ms. Ramirez, did there come a time when you learned that

11  Harvey, Mr. Ellison, was involved in a gang?

12  A.  Yes.

13           MR. CANNICK:  I'm sorry.  I didn't hear.  The voice

14  trailed off.

15  Q.  Did there come a time that you learned whether or not

16  Mr. Ellison, or Harvey, as you know him, was involved in a

17  gang?

18  A.  Yes.

19           MR. CANNICK:  Objection.

20           MR. FASULO:  Objection.

21           THE COURT:  Sustained.  The jury will disregard the

22  answer.  I think you need to establish the source before we get

23  to the content.

24  Q.  Ms. Ramirez, for how long did you date Mr. Ellison?

25  A.  I'm going to say about a month or two.

1    Q.  OK.  And how regularly did you see him?

2    A.  I'm sorry?

3    Q.  And how regularly did you see him?

4    A.  Often.

5    Q.  Did you communicate with him other than in person?

6    A.  Yes.

7    Q.  How did you communicate with him?

8    A.  Over the phone.

9    Q.  And when you say by phone, do you mean phone calls?

10   A.  Yes.

11   Q.  Does that also include text messages?

12   A.  Yes.

13   Q.  Did you guys share details about your lives together?

14   A.  Sometimes.

15   Q.  Did you learn about the people with whom Mr. Ellison

16   affiliated?

17            MR. CANNICK:  Objection.

18            THE COURT:  Source.  Did you learn from him?

19   BY MR. REBOLD:

20   Q.  Did you learn from Mr. Ellison -- did there come a time

21   when you spoke with Mr. Ellison about whether he was in a gang?

22            MR. CANNICK:  Objection.

23   A.  Yes.

24            THE COURT:  One moment.

25            Overruled.

1    Q.  Can you tell us about that?

2    A.  So, one day we were in his car.  This was last year, in

3    2018.  We were listening to a song of an artist on another

4    rival gang, and he basically told me that he doesn't like that

5    kind of music because it's a part of a different gang.

6    Q.  What gang -- to your knowledge, what gang was -- withdrawn.

7        Ms. Ramirez, you testified just now that you learned about

8    Mr. Ellison's gang affiliation because you were in a car with

9    him listening to a song where the artist was affiliated with a

10   rival gang.  Is that correct?

11   A.  Yes.

12   Q.  To your knowledge, what gang was the rival member, the

13   artist on the song, affiliated with?

14   A.  Crips.

15   Q.  And what did you learn about Mr. Ellison's affiliation at

16   that time?

17   A.  I learned that he was part of the Bloods.

18   Q.  How did you learn that?

19   A.  He told me.

20   Q.  What did he say?

21   A.  He said he was a part of TreyWay.

22   Q.  I'm sorry?

23   A.  He was a part of TreyWay.

24   Q.  And what did you understand TreyWay to mean?

25   A.  Just a part of the Bloods gang.

1          THE COURT:  I'm going to ask the witness to move back

2    just an inch or two from the mike.  You're so close to it that

3    it's creating feedback.

4          THE WITNESS:  OK.

5    Q.  Did Mr. Ellison indicate what role, if any, he played

6    within TreyWay, which you understand was part of the Bloods

7    gang?

8    A.  Yes.

9    Q.  What did he say?

10   A.  He said he was a big blood.

11   Q.  What did you understand Mr. Ellison to mean when he told

12   you that he was a big blood?

13   A.  Just a higher rank.

14   Q.  I'm sorry?

15   A.  A higher rank.

16   Q.  A high rank?

17   A.  Yes.

18   Q.  Ms. Ramirez, do you remember the evening of October 24,

19   2018?

20   A.  Yes.

21   Q.  What were your plans supposed to be that evening?

22   A.  Me and Harvey were supposed to go to a hotel that night.

23   Q.  You were supposed to go to a hotel?

24   A.  Yes.

25   Q.  OK.  And were you in touch with Mr. Ellison, or Harvey,

1  that day?

2  A.  Yes.

3  Q.  How were you in contact with him during the day?

4  A.  Through text message and phone calls.

5  Q.  OK.  And do you remember what your phone number was at that

6  time?

7  A.  Yes.

8  Q.  What was your phone number?

9  A.  It was 917-402-0256.

10  Q.  You said that the plan that night was to go to a hotel,

11  correct?

12  A.  Correct.

13  Q.  Did things work out as you expected them to?

14  A.  No.

15  Q.  Can you please explain what happened?

16  A.  So, he had contacted me throughout the day, and he

17  basically told me that he needed me back in Brooklyn, so I took

18  a cab over there and ended up meeting up with him.

19  Q.  Did he tell you why he needed you back in Brooklyn?

20  A.  Yes.

21  Q.  What did he say?

22  A.  He said that his friend had gotten shot.

23  Q.  Where were you when Mr. Ellison told you that his friend

24  had gotten shot?

25  A.  Where was I?

1   Q.  Yes.

2   A.  When he told me?

3   Q.  Yes.

4   A.  I was in the Bronx.

5   Q.  Did he tell you the name of his friend?

6   A.  No.

7   Q.  Did he tell you where, in what borough, his friend was

8   shot?

9   A.  In Brooklyn.

10  Q.  Did he tell you where in Brooklyn his friend was shot?

11  A.  By Utica.

12  Q.  Did he give you a cross-street?

13  A.  No.

14  Q.  And did he indicate where on his body his friend was shot?

15  A.  Yes.

16  Q.  Where was his friend shot?

17  A.  In his back.

18  Q.  When Mr. Ellison told you that he wanted to meet with you

19  in Brooklyn, how did you respond?

20  A.  I said yes.

21  Q.  And did you actually go to meet with Mr. Ellison in

22  Brooklyn?

23  A.  I did.

24  Q.  Where did you go?

25  A.  I went to the Utica Avenue, like by the Utica Avenue train

J9hWmac3                          Ramirez - Direct

1   station.

2   Q.   Do you remember what the cross-street was?

3   A.   Fulton Street.

4   Q.   And how did you get from the Bronx to Utica Avenue and

5   Fulton Street?

6   A.   I took a cab.

7   Q.   And how did you pay for the cab?

8   A.   Harvey paid for it.

9   Q.   Do you remember where you were at about 10:17 in the

10  evening on October 24, 2018?

11  A.   Yes.

12  Q.   Where were you?

13  A.   I had literally gotten to Brooklyn.

14  Q.   Where in Brooklyn?

15  A.   In Utica.

16  Q.   Utica and where?

17  A.   Fulton.

18  Q.   And how do you know that that's where you were on October

19  24, 2018, at 10:17 p.m.?

20  A.   Because I had dropped my pin in a text message with me and

21  Harvey.

22  Q.   And can you just explain to the members of the jury what it

23  means to drop a pin in a text message to Harvey?

24  A.   It just means to send him my current location, where I'm

25  at.

1    Q.  You said that you were in touch with Mr. Ellison by phone

2    and by text that night?

3    A.  Yes.

4    Q.  Prior to coming to court, did you have an opportunity to

5    review your text communications with Mr. Ellison on the evening

6    of October 24 and into the early morning hours of October 25 of

7    2018?

8    A.  Yes.

9    Q.  I'm showing you what's been marked for identification as

10   Government Exhibit 800I.

11            MR. REBOLD:  Ms. Harney, if you could just scroll

12   through the pages of 800I.

13   Q.  Do you recognize Government Exhibit 800I for

14   identification?

15   A.  Yes.

16   Q.  What do you recognize that to be?

17   A.  Those are our text messages throughout the day.

18   Q.  When you say our text messages, messages between you and

19   whom?

20   A.  Me and Harvey.

21   Q.  And to your knowledge, does that text-message exchange

22   fairly and accurately depict your text communications with

23   Mr. Ellison on the evening of October 24 into the early morning

24   hours of October 25 of 2018?

25   A.  Yes.

1          MR. REBOLD:  I'm offering Government Exhibit 800I for

2     identification into evidence.

3          THE COURT:  Any objection?

4          MR. CANNICK:  No, your Honor.

5          MR. FASULO:  No, your Honor.

6          THE COURT:  Received.

7          (Government Exhibit 800I received in evidence)

8          MR. REBOLD:  What I'd like to do, Ms. Harney, is,

9     starting on page 1, if you could just go to the participants'

10    portion of the extraction report and just zoom in on that.

11         THE COURT:  Do you want these published?

12         MR. REBOLD:  Oh, your Honor, I keep forgetting to do

13    that.

14         Your Honor, may we publish this to the jury?

15         THE COURT:  Yes.

16         MR. REBOLD:  Ms. Harney, can you just zoom in on the

17    top portion of 800I, where it says participants.

18    Q.  And the second participant, is that your name?

19    A.  Yes.

20    Q.  Is that how you spell your name?

21    A.  Yes.

22    Q.  Can you read the phone number into the record?

23    A.  917-402-0256.

24    Q.  And below that do you see the name "Harv new"?

25    A.  Yes.

J9hWmac3                         Ramirez - Direct

1   Q.  Can you please read into the record the phone number?

2   A.  201-745-4343.

3           MR. REBOLD:  Thank you.

4           Ms. Harney, if you could now please zoom in to the

5   conversation portion of this exhibit.

6   Q.  Now, do you see how some messages here are in green and one

7   message is in blue?

8   A.  Yes.

9   Q.  Do you know whose messages are in green and whose message

10  is in blue?

11  A.  Yes.

12  Q.  Can you please tell us?

13  A.  The blue ones are mine and the green ones are Harvey's.

14          THE COURT:  Before you go any farther, let me just see

15  from the jury, do people need this blown up further, or can you

16  read the language as it is?  Are you OK?

17          If anyone's having difficulty, hold up your hand and

18  the government will zoom in.

19          Go ahead.

20  BY MR. REBOLD:

21  Q.  Ms. Ramirez, the first message, which is on the bottom

22  right of that page, with the date stamp of October 24, 2018,

23  and the time stamp of 5:44 p.m., that green message, who sent

24  that message?

25  A.  Harvey.

1    Q.   What did he say?

2    A.   "Baby."

3    Q.   What was your response at 5:46 p.m.?

4    A.   I said, "Talk to me."

5    Q.   And do you see below that, at 5:46:32 p.m., a response that

6    says WYD?

7    A.   Yes.

8    Q.   What did you understand WYD to stand for?

9    A.   What are you doing?

10   Q.   And a message is sent four minutes later, at the bottom of

11   that page, where it says, Yotel in city," what did you

12   understand that to be?

13   A.   A hotel.

14   Q.   What did you understand Mr. Ellison to be communicating to

15   you?

16   A.   The hotel we were going to stay in.

17           MR. REBOLD:  Ms. Harney, if you could turn to, I

18   guess, page 2 of this document.  OK.  And page 3, and if you

19   could just scroll through, all the way through, slowly, to page

20   7.

21   Q.   Ms. Ramirez, without reading into the record every single

22   message that you exchanged between one another from pages 1 to

23   7, covering a time span of 5:46 p.m. until 8:30 p.m., can you

24   tell us the general gist of what the two of you are

25   communicating about via text message during that period of

1    time?

2    A.  We were communicating on which hotel we were planning on

3    staying that night.

4         MR. REBOLD:  Ms. Harney, could you please turn to page

5    8, and if we can zoom in at time stamp starting at 9:47 p.m.,

6    the bottom four messages.  OK.

7    Q.  Now, do you see the message at 9:47:25 p.m. in blue that

8    says, "I am OMW"?

9    A.  Yes.

10   Q.  Who sent that message at 9:47 p.m.?

11   A.  I did.

12   Q.  And what were you communicating by I'm OMW?

13   A.  I was telling him I'm on my way to him.

14   Q.  Where were you going to?

15   A.  I was going to Brooklyn.

16   Q.  That's to Utica and Fulton?

17   A.  Yes.

18   Q.  And where were you when you sent that message?

19   A.  In the cab.

20   Q.  And do you know where the cab was at that time?

21   A.  In the Bronx.

22   Q.  Do you see the response from Mr. Ellison at 9:49 p.m.?

23   A.  Yes.

24   Q.  What is his response?

25   A.  "OK."

1    Q.  And what was your response to that at 9:50 p.m., the next

2    message in blue?

3    A.  I said, "Is he alive?"

4    Q.  And what did you mean when you sent the message is he

5    alive?

6    A.  I wanted to know if his friend was still alive.

7    Q.  OK.  And did you send another message at about -- just

8    before 10:50 p.m. at the bottom of the screen?

9    A.  Yes.

10   Q.  What did you send there?

11   A.  "I'm here."

12        MR. REBOLD:  Ms. Harney, could you please turn to the

13   next page and just zoom in on the very first message.

14   Q.  Can you tell us what message is being communicated by you

15   on October 24 at 10:17 p.m.?

16   A.  I was sending him my location.

17   Q.  Prior to coming to court, did you see a map of the

18   corresponding location as to where your pin was when you sent

19   it to Mr. Ellison at 10:17 p.m.?

20   A.  Yes.

21   Q.  Ms. Ramirez, I'm showing you what's been marked for

22   identification as Government Exhibit 800I1.

23        Do you recognize 800I1 for identification?

24   A.  Yes.

25   Q.  What do you recognize that to be?

1    A.  That's where I got dropped off at.

2    Q.  Is that the map containing the pin that you dropped for

3    Mr. Ellison in the text message at 10:17 p.m.?

4    A.  Yes.

5            MR. REBOLD:  I'm offering Government Exhibit 800I1 for

6    identification into evidence.

7            THE COURT:  Any objection?

8            MR. CANNICK:  No, your Honor.

9            MR. FASULO:  None.

10           THE COURT:  Received.

11           (Government Exhibit 800I1 received in evidence)

12           MR. REBOLD:  Your Honor, may I publish 800I1?

13           THE COURT:  You may.

14           MR. REBOLD:  Ms. Harney, could you please zoom in on

15    the map portion.

16   Q.  Do you see that there's a red picture that's basically at

17    the corner of Utica Avenue and Fulton Street?

18   A.  Yes.

19   Q.  What is that red emblem there?

20   A.  That's where I was at that moment.

21   Q.  That's the pin you dropped to him?

22   A.  Yes.

23   Q.  What happened shortly after you sent that message sending

24    your location at 10:17 p.m. to Mr. Ellison?

25   A.  I met up with him across the street with some of his

1   friends.  We walked down the block -- I'm not sure which

2   block -- and after a short amount of time, he broke free from

3   the group and said he'll be right back.  But he went into a

4   completely different direction.

5   Q.  OK.  Can you describe Mr. Ellison's demeanor when you saw

6   him at that time?

7   A.  He seemed like he was frantic, in a rush.

8           MR. CANNICK:  Objection.

9           THE COURT:  Overruled.

10  Q.  When you met up with Mr. Ellison, who was he with, if you

11  know?

12  A.  I don't know.

13  Q.  How many people was he with?

14  A.  It had to be three to five.

15  Q.  Had you ever seen any of those people in your life before?

16  A.  No.

17  Q.  And after meeting up with Mr. Ellison and those three to

18  five people, how many of you, in addition to you and

19  Mr. Ellison, began walking?

20  A.  I don't remember the exact amount.

21  Q.  OK.  Around how many?  Was it all of those people, the

22  three to five people?

23  A.  Yes.

24  Q.  And you did not know any of those people?

25  A.  No.

1    Q.  You testified shortly after -- withdrawn.

2         You testified that you don't know what block you walked up.

3    Is that correct?

4    A.  I don't remember.

5    Q.  Do you know that neighborhood?

6    A.  No.

7    Q.  Are you from that neighborhood?

8    A.  No.

9    Q.  Had you been to that neighborhood prior to that evening?

10   A.  No.

11   Q.  And you said that it's your testimony that shortly after

12   walking, Mr. Ellison said he'd be right back and walked off in

13   the opposite direction?

14   A.  Yes.

15   Q.  What did you and Mr. Ellison's three to five friends do?

16   A.  I'm sorry?

17   Q.  What did you and Mr. Ellison's three to five friends you

18   were with do when he said he'd be right back and began walking

19   in the opposite direction?

20   A.  He started walking down the block, and I ended up going to

21   his aunt's house.

22   Q.  How did it strike you, how did you react when Mr. Ellison,

23   shortly after meeting up with him, told you that he'd be right

24   back and left you with this group of three to five people?

25           MR. CANNICK:  Objection.

1          THE COURT:  Sustained.

2   Q.  Ms. Ramirez, this behavior of Mr. Ellison at that time, was

3   that normal based on your interactions with him?

4          MR. CANNICK:  Objection.

5   A.  No.

6          THE COURT:  Overruled.  You may answer.

7   Q.  Can you please explain?

8   A.  Well, he never left me alone with any of his friends.  That

9   was the first time.

10  Q.  You said, testified that Harv said he'd be right back.  Is

11  that correct?

12  A.  That's correct.

13  Q.  Did he come right back?

14  A.  No.

15  Q.  Around how much time passed before you saw or spoke with

16  Mr. Ellison again?

17  A.  Hours.

18  Q.  And what did you do during those hours?

19  A.  I just waited.

20  Q.  Where?

21  A.  In his aunt's house.

22  Q.  Had you ever been to his aunt's house before?

23  A.  No.

24  Q.  And with whom were you waiting in his aunt's house?

25  A.  I don't remember.

1    Q.  What happened next?

2    A.  I'm sorry?

3    Q.  What happened after that?

4    A.  So, eventually he ended up contacting me and telling me to

5    meet up with him in a hotel, and his cousin drove me out there,

6    and we waited for him.

7    Q.  How did you know what hotel to go to?

8    A.  He texted me.

9            MR. REBOLD:  OK.  If we could please pull up again

10   Government Exhibit 800I and have it published to the jury, and

11   if we could go, Ms. Harney, to page 9.

12   Q.  Did you eventually meet up with Mr. Ellison again at the

13   hotel?

14   A.  Yes.

15           MR. REBOLD:  OK.  If we could please start with the

16   second, third –- the second through fifth messages, meaning the

17   top, the blue message and then the green messages.

18   Q.  Starting at 11:05 p.m., what message did you send to

19   Mr. Ellison?

20   A.  I said, "Please be safe."

21   Q.  And why did you write please be safe?

22   A.  Because I didn't know where he was at.

23   Q.  And can you please read into the record the first message

24   that you received in response from Mr. Ellison at 12:29 in the

25   morning on October 25, 2018?

1    A.  "136 Ludlow Street, New York, New York 10002.

2    Q.  Can you also read in the next message that was sent about

3    five seconds later, again, from Mr. Ellison?

4    A.  "Meet me here."

5    Q.  And what response did you send about 19 minutes later at

6    12:48 p.m.?

7    A.  I said, "We on our way."

8    Q.  And did you actually go to 136 Ludlow Street, New York, New

9    York?

10   A.  I did.

11   Q.  What was that address?

12   A.  That was a hotel.

13   Q.  I'm showing you what's been marked for identification as

14   Government Exhibit 211.

15       Ms. Ramirez, do you recognize Government Exhibit 211 for

16   identification?

17   A.  Yes.

18   Q.  What do you recognize that to be?

19   A.  That was -- that was the hotel that we stayed in.

20           MR. REBOLD:  OK.  I'm offering Government Exhibit 211

21   for identification into evidence.

22           THE COURT:  Any objection?

23           MR. CANNICK:  None, your Honor.

24           MR. FASULO:  No, your Honor.

25           THE COURT:  Received.

1              (Government Exhibit 211 received in evidence)

2              MR. REBOLD:  And may I publish that to the jury?

3              THE COURT:  You may.

4    BY MR. REBOLD:

5    Q.  When you arrived at the hotel, was Mr. Ellison there?

6    A.  No.

7    Q.  What happened?

8    A.  I waited for him to get there.

9    Q.  And were you in touch with him while you were waiting?

10   A.  Yes.

11   Q.  How were you in touch with him?

12   A.  Through text message.

13             MR. REBOLD:  If we could please pull back up

14   Government Exhibit 800I and please go to page 10.

15             OK.  If we could pull up first four messages.

16   Q.  Can you please read into the record the first message that

17   you sent to Mr. Ellison at 1:16 a.m.?

18   A.  I said, "My nigga."

19   Q.  Why did you send that message?

20   A.  I'm sorry?

21   Q.  What was the meaning of that message?

22   A.  Because he was taking really long.

23   Q.  At that time had he arrived at the hotel?

24   A.  No.

25   Q.  What message did Mr. Ellison send back at 1:18 in the

1     morning?

2     A.   "Almost there."

3     Q.   And below that?

4     A.   "Eight minutes."

5     Q.   And what did you write in response at 1:20 a.m.?

6     A.   I said, Are you?

7     Q.   Is that what Aii means?

8     A.   Yeah.

9              MR. REBOLD:   And Ms. Harney, could you please show the

10    bottom message.

11    Q.   Do you see the message that you sent at 1:36 in the

12    morning?

13    A.   Yes.

14    Q.   What did you say there?

15    A.   I said, "You blowing mine right now."

16    Q.   RN stands for right now?

17    A.   Yes.

18    Q.   What did you mean by, You're blowing your mind right now?

19    A.   Because he was taking longer than the eight minutes.

20    Q.   Had he arrived at the hotel by 1:36 in the morning?

21    A.   No.

22    Q.   Do you see the next text message that you sent at 1:56 in

23    the morning, about 20 minutes later?

24    A.   Yes.

25    Q.   What did you write at that time?

1   A.  I said, "Bring me a cup when you come back."

2   Q.  When you said bring me a cup when you come back, at 1:56

3   a.m., do you know whether something between the message you

4   sent at 1:36 in the morning and the message you sent at 1:56 in

5   the morning?

6   A.  He checked me in.

7   Q.  Checked you in where?

8   A.  The hotel.

9   Q.  Was he with you at that time?

10  A.  Yes.

11  Q.  Who else was with you?

12  A.  Just me and him.

13  Q.  What did you do after you checked into the hotel?

14  A.  I stayed in the hotel room.

15  Q.  And what did Mr. Ellison do?

16  A.  He left.

17  Q.  Do you know where he went?

18  A.  No.

19  Q.  Did there come a time when Harv returned to the hotel?

20  A.  Yes.

21  Q.  And when was that, approximately?

22  A.  I don't remember the time.

23  Q.  Was it minutes later or hours later?

24  A.  Hours.

25  Q.  Did you have a conversation at some point with Mr. Ellison

1    while you two were in the hotel together about what had

2    happened when you first parted ways at Utica, in the vicinity

3    of Utica and Fulton?

4    A.  Yes.

5    Q.  Can you please describe that conversation to the members of

6    the jury?

7    A.  He basically told me that he had gotten back at the guy

8    that shot his friend.

9    Q.  What did he say?

10   A.  He said that he had stabbed the guy in the face.

11   Q.  He said he stabbed the guy in the face?

12   A.  Yes.

13   Q.  Did he indicate when that happened?

14   A.  No.

15   Q.  Did he indicate where it happened?

16   A.  In Brooklyn.

17          MR. REBOLD:  Your Honor, I'm now offering into

18   evidence Exhibit 800J2, which is a sub-exhibit of Government

19   Exhibit 800.  I'll just confirm it came into evidence through

20   the stipulation marked as Government Exhibit 1001.

21          THE COURT:  Very good.  It's received.

22          (Government Exhibit 800J2 received in evidence)

23          MR. REBOLD:  Ms. Harney, if you could pull up

24   Government Exhibit 800J2, and I offer Government Exhibit 800J2

25   for identification into evidence.

1          THE COURT:  Received.

2          MR. REBOLD:  Ms. Harney, can you please zoom in on the

3   portion of exhibit J2 --

4          Your Honor, may I publish 800J2?

5          THE COURT:  Very well.  You may.

6          MR. REBOLD:  Ms. Harney, can you please zoom in on

7   everything from the word "videos" until the chart below.  I'd

8   just like to read into the record a small portion of what's

9   before the jury now.  The name is image, or "IMG_2872.MOV," and

10  this is something that's listed as being created on October 24,

11  2018, at 9:31:24 p.m.

12          I'll also just read in that there is something below

13  that regarding metadata that says "lat/lon/elev" that reads

14  "plus 40.7058/-074.0151/plus 006.651," and then if you look to

15  the right of that, there appears to be a still image under the

16  word "thumbnail."

17          THE COURT:  OK.

18  BY MR. REBOLD:

19  Q.  Now, Ms. Ramirez --

20          MR. REBOLD:  If I may approach the witness?

21          THE COURT:  You may.

22  Q.  -- I'm showing you what's been marked for -- I'm going to

23  show you what's been marked for identification as Government

24  Exhibit 800J1.

25          MR. REBOLD:  I'm also just displaying that to defense

J9hWmac3                          Ramirez - Direct

1    counsel as well.

2    Q.  Ms. Ramirez, do you recognize what's been marked for

3    identification as Government Exhibit 800J1?

4    A.  Yes.

5    Q.  What do you recognize that to be?

6    A.  This is a video.

7    Q.  OK.  Is it a video that depicts Mr. Ellison?

8    A.  Yes.

9    Q.  And how do you know that that's what's on the CD that

10   you're holding at 800J1?

11   A.  Because my initials are on it.

12   Q.  OK.  And did you initial that, that disk, 800J1, after

13   having an opportunity to view what was actually contained on

14   the disk?

15   A.  Yes.

16            MR. REBOLD:  I'm now offering into evidence Government

17   Exhibit 800J1.

18            THE COURT:  J1?

19            MR. REBOLD:  Yes, your Honor.

20            THE COURT:  Any objection?

21            MR. CANNICK:  No, your Honor.

22            MR. FASULO:  None, your Honor.

23            THE COURT:  Received.

24            (Government Exhibit 800J1 received in evidence)

25            MR. REBOLD:  And if we may publish the video and audio

1   that's now in evidence as 800J1.

2                THE COURT:  Go ahead.

3                (Video played)

4   BY MR. REBOLD:

5   Q.  Ms. Ramirez, do you recognize the person depicted in

6   Government Exhibit 800J1?

7   A.  Yes.

8   Q.  Who is that?

9   A.  That's Harvey.

10  Q.  And is that how Harvey appeared on the evening of October

11  24?

12  A.  Yes.

13  Q.  Of 2018?

14  A.  Yes.

15  Q.  In what ways?

16  A.  I remember the jacket.

17  Q.  He was wearing the same coat?

18  A.  Yes.

19  Q.  And in all other respects in terms of his face and his hair

20  and everything else, was that consistent with how he appeared

21  that evening?

22  A.  Yes.

23  Q.  Did you hear a voice on that video?

24  A.  Yes.

25  Q.  Whose voice is that?

J9hWmac3                       Ramirez - Direct

1    A.   Harvey.

2    Q.   And is that voice similar to how his voice normally is when

3    you're around him?

4    A.   Yes.

5    Q.   Ms. Ramirez, in addition to discussing events of October

6    24, 2018, with Mr. Ellison, did you -- did he ever discuss with

7    you any other acts of violence he committed in connection with

8    his involvement in the Nine Trey set of the Bloods gang?

9    A.   Yes.

10        MR. CANNICK:   I'm sorry, your Honor.   I couldn't hear.

11   BY MR. REBOLD:

12   Q.   In addition to the conversation that you had with

13   Mr. Ellison regarding the incident of October 24, 2018, did

14   Mr. Ellison discuss with you any other acts of violence he

15   committed in connection with his involvement in the TreyWay set

16   of the Bloods gang?

17        MR. CANNICK:   Objection.

18        THE COURT:   Overruled.

19   Q.   Did he?

20   A.   Yes.

21   Q.   Can you please describe that conversation?

22   A.   So, one day me and him and three of his friends were in his

23   car, and the topic of the rapper 6ix9ine came up, and

24   basically, he says -- Harvey had said that he had kidnapped

25   him.   I forgot what else he did, but he told me that he had

1    kidnapped him and robbed him for his chain.  And the other

2    three friends were saying how they don't want to associate

3    themselves with him because he's a rat and he's fake.

4    Q.  I'm sorry.  Can you please pull the microphone a little

5    closer to you and just repeat what three other people in the

6    car said?

7    A.  They said that they don't associate themselves anymore with

8    the rapper 6ix9ine because he's a rat and he's fake.

9    Q.  Did Mr. Ellison tell -- explain why he kidnapped and robbed

10   the rapper 6ix9ine of his chain?

11           MR. CANNICK:  Objection.

12           THE COURT:  One moment.

13           Overruled.

14   A.  No.

15   Q.  Prior to -- do you know who the three people were that were

16   in the car with you and Mr. Ellison?

17   A.  Yes.

18   Q.  Who were they?

19   A.  His three friends.

20   Q.  Had you met them before that day?

21   A.  I'm sorry?

22   Q.  Had you met them before then?

23   A.  Yes.

24           (Continued on next page)

25

J9HMMAC4                    Ramirez - Direct

1   Q.  Do you know what their names are?

2   A.  No.

3   Q.  Do you know where they are from?

4   A.  Yes.

5   Q.  Where are they from?

6   A.  The UK.

7   Q.  The UK?

8   A.  Yes.

9   Q.  Meaning England?

10  A.  Yes.

11  Q.  How did you know that they were from the UK?

12  A.  They had accents.

13  Q.  You mentioned the rapper 6ix9ine.

14          Do you know who that person is?

15  A.  I know him through social media.

16  Q.  You know him from social media?

17  A.  Yes, from social media.

18  Q.  What does that mean?

19  A.  That means people would post him, I would see him on the

20  web.

21  Q.  Have you ever met 6ix9ine?

22  A.  Never.

23  Q.  Have you ever talked to 6ix9ine?

24  A.  No.

25  Q.  Do you know what he looks like from social media?

1   A.  Yes.

2   Q.  Do you know what his full rap name is?

3   A.  Yes.

4   Q.  What is it?

5   A.  It's Daniel Hernandez.

6   Q.  Do you understand that to be his actual name?

7   A.  Yes.

8   Q.  And is 6ix9ine short for a full rap name?

9   A.  Tekashi.

10  Q.  I'm showing you what's been marked for identification as

11  Government Exhibit 3.

12      Do you know what Government Exhibit 3 is?

13  A.  Yes.

14  Q.  What is that?

15  A.  That's 6ix9ine.

16  Q.  Is that a photograph of him?

17  A.  Yes.

18          MR. REBOLD:  I'm offering into evidence what's been

19  marked for identification as Government Exhibit 3.

20          THE COURT:  Any objection?

21          MR. CANNICK:  No, your Honor.

22          MR. FASULO:  None, your Honor.

23          THE COURT:  Received.

24          (Government Exhibit 3 received in evidence)

25          MR. REBOLD:  Your Honor, also at this time I'm also

1    offering in 3A, which is the Daniel Hernandez name plate.

2              THE COURT:  Received.

3              (Government Exhibit 3A received in evidence)

4              MR. REBOLD:  May I publish Government Exhibit 3 now in

5    evidence to the jury?

6              THE COURT:  Yes.

7    Q.  Ms. Ramirez, did Mr. Ellison say anything about the

8    whereabouts of the chain that he told you he robbed when you

9    were having this conversation in his car?

10             MR. CANNICK:  Objection.

11             THE COURT:  Overruled.

12   A.  He said it was in the vehicle.

13   Q.  It was in the vehicle?

14   A.  Yes.

15   Q.  What vehicle?

16   A.  His vehicle.

17   Q.  What kind of vehicle did Mr. Ellison have?

18   A.  It was an Acura.

19   Q.  Ms. Ramirez, have you ever heard of a person named Shotti?

20   A.  Yes.

21   Q.  Do you know what his real name is?

22   A.  No.

23   Q.  Have you ever met Shotti before?

24   A.  Never.

25   Q.  How do you know that name?

1    A.   Through Instagram.

2    Q.   You received pictures of him?

3    A.   Yes.

4    Q.   Have you ever talked to him?

5    A.   No.

6    Q.   I'm showing you what's been marked for identification as

7    Government Exhibit 8.

8         Do you recognize Government Exhibit 8?

9    A.   Yes.

10   Q.   Is that a photograph?

11   A.   Yes.

12   Q.   What do you recognize that to be a photograph of?

13   A.   Of Shotti.

14        MR. REBOLD:  I'm offering Government Exhibit 8 for

15   identification into evidence.

16        THE COURT:  Any objection?

17        MR. CANNICK:  Not here, your Honor.

18        MR. FASULO:  None, your Honor.

19        THE COURT:  Received.

20        (Government Exhibit 8 received in evidence)

21        MR. REBOLD:  May I publish that, your Honor?

22        THE COURT:  Yes.

23        MR. REBOLD:  While this is being published to the

24   jury, I'm also offering into evidence Government Exhibit 8B,

25   which is the name plate with the name Shotti.

1          THE COURT:  8A or 8E?

2          MR. REBOLD:  8B, as in boy, but not 8A.

3          THE COURT:  Received.

4          (Government Exhibit 8B received in evidence)

5   Q.  I am also going to show you what's been marked for

6   identification as Government Exhibit 21.

7          Is Government Exhibit 21 a photograph?

8   A.  Yes.

9   Q.  Do you recognize the person in Exhibit 21?

10  A.  No.

11  Q.  Have you ever seen that person before?

12  A.  No.

13         MR. REBOLD:  I'm offering Government Exhibit 21 for

14  identification into evidence.

15         MR. FASULO:  Objection.

16         THE COURT:  Sustained.  Lack of foundation.  Lack of

17  relevance.

18         MR. REBOLD:  Withdrawn.

19         THE COURT:  Without prejudice to you raising it later

20  in the case.

21         MR. REBOLD:  Understood.

22  Q.  Ms. Ramirez, did there come a time after this conversation

23  you just told the jury about in Mr. Ellison's car where you

24  learned that he had been arrested for the kidnapping and

25  robbery of Daniel Hernandez, also known as Tekashi 6ix9ine?

1    A.  Yes.

2    Q.  Did you continue to communicate with Mr. Ellison after he

3    was arrested for that crime?

4    A.  Yes.

5    Q.  How did you communicate with him?

6    A.  When I went to go and see him or through the phone.

7    Q.  When you would go see him where was it?

8    A.  In jail.

9    Q.  And did there come a time during one of your visits to

10   Mr. Ellison while he was in jail where you discussed at another

11   discussion about the kidnapping and robbery of Daniel

12   Hernandez?

13   A.  Yes.

14   Q.  Can you please explain that conversation to members of the

15   jury.

16   A.  So I was the one who had brought it up to me -- I mean,

17   brought it up to him, I'm sorry, and I had told him about the

18   fact that I was seeing him all over social media being accused

19   of the kidnapping and robbing of 6ix9ine.

20   Q.  What was Mr. Ellison's reaction in response?

21   A.  He seemed pretty excited about it.

22   Q.  What, if anything, did he say?

23   A.  He said he is going to be famous for that.

24   Q.  When you say he seems pretty excited about it, what do you

25   mean?

J9HMMAC4                    Ramirez - Direct

1   A.  I'm sorry?

2   Q.  Withdrawn.

3       Ms. Ramirez, you said that you also communicated with

4   Mr. Ellison by phone, is that correct?

5   A.  Yes.

6   Q.  After he had been arrested for that incident?

7   A.  Yes.

8   Q.  How would the two of you communicate by phone?

9   A.  We would communicate through the jail phone and through

10  regular iPhone.

11  Q.  Through jail phone and regular iPhone?

12  A.  Yes.

13  Q.  Can you describe how you knew which conversations were on

14  the jail phone and which conversations were on the regular

15  iPhone?

16  A.  For the jail phone it would have an automated message in

17  the beginning.  As for the iPhone it would be through text

18  message.

19  Q.  The jail phone, you said there was an automated message at

20  the beginning?

21  A.  Yes.

22  Q.  Is that essentially a message indicating that you were

23  receiving a call from a correctional facility?

24  A.  Yes.

25              THE COURT:  Before you go further, let me just

1  reiterate the instruction that I gave to the jury earlier this

2  morning.  You are hearing evidence of Mr. Ellison's presence in

3  jail at the time of certain communications with this witness.

4          Again, the fact that the defendant was in jail,

5  according to the testimony, is being received solely to explain

6  his whereabouts at the time.  You are not to consider that

7  evidence for any other purpose.  You are not to consider the

8  fact that Mr. Ellison was incarcerated in your deliberations.

9          Go ahead, Mr. Rebold.

10 Q.  During your calls where he was on the jail phone would he

11 call you or would you call him or was it some combination of

12 both?

13 A.  He would call me.

14 Q.  You said you also communicated with him by iPhone?

15 A.  Yes.

16 Q.  What do you mean by that?

17 A.  Like when I would send him a text message the message would

18 be blue, so I knew that he had an iPhone.

19 Q.  And those were conversations that you were having with him

20 during the same time period, while he was in jail?

21 A.  Yes.

22 Q.  Did you also talk to him on the phone using the iPhone?

23 A.  At times.

24 Q.  Ms. Ramirez, did there come a time where you were

25 approached by federal agents and served a subpoena to testify

1    before the grand jury in connection with this case?

2    A.  Yes.

3    Q.  Were you still in touch with Mr. Ellison during that period

4    of time?

5    A.  Yes.

6    Q.  Was that recently, in the last month or two?

7    A.  I don't remember if it was within a month or two.

8    Q.  Was it somewhat recently?

9    A.  Yes.

10   Q.  Was it this year?

11   A.  Yes.

12   Q.  What, if anything, did you communicate to Mr. Ellison after

13   you were approached by federal agents?

14   A.  I had asked him why were the cops, you know, coming to my

15   family's house to ask me questions, and I asked him if it was

16   in regards to what had happened last year in Brooklyn.

17   Q.  First of all, how were you having this conversation?

18   A.  On the phone.

19   Q.  Which phone?

20   A.  I don't remember which phone.

21   Q.  When you asked him whether it had anything to do with what

22   happened last year, what was that a reference to?

23   A.  It was in regards to the incident that happened back in

24   October, when he had stabbed somebody.

25   Q.  What did Mr. Ellison say in response to that question?

1           MR. CANNICK:  Objection.

2           THE COURT:  One moment.

3           Overruled.  You may answer.

4    A.  Can you ask the question again.

5    Q.  After you said to Mr. Ellison, do you think this is in

6    connection with what had happened in Brooklyn last year, what

7    was Mr. Ellison's response?

8    A.  He had said he doesn't think that's the reason why, and I

9    shouldn't worry because he felt that you guys didn't have --

10   the federal agents didn't have enough evidence against him, and

11   you guys are just trying to dig up dirt on him because he is

12   getting released soon.

13   Q.  Did Mr. Ellison provide you with any instructions during

14   that conversation?

15   A.  He told me to delete text messages and phone calls between

16   us.

17   Q.  I'm sorry.  Can you lean into the microphone.

18   A.  He had instructed me to delete phone calls and texts

19   between us.

20   Q.  And did you, in fact, delete your record of phone calls and

21   text messages with Mr. Ellison?

22   A.  Yes.

23           MR. REBOLD:  Your Honor, may I briefly confer with my

24   colleagues?

25           THE COURT:  Yes.

1           MR. REBOLD:  I have no further questions of this

2    witness.

3           THE COURT:  Cross-examination.

4           MR. CANNICK:  Thank you, your Honor.

5           THE COURT:  Mr. Cannick, just for planning purposes,

6    without holding you to it, rough estimate of cross?

7           MR. CANNICK:  Probably about 45 minutes to an hour.

8           THE COURT:  Let's get started now.

9           MR. CANNICK:  Sure.  Thank you.

10   CROSS-EXAMINATION

11   BY MR. CANNICK:

12   Q.  Good afternoon, Ms. Ramirez.

13   A.  Good afternoon.

14   Q.  Are you a Blood?

15   A.  No.

16   Q.  Do you associate with folks who are members of the Bloods?

17   A.  I'm sorry?

18   Q.  Do you associate with members of Blood?

19   A.  No.

20   Q.  Do you flash Blood signs?

21   A.  I do sometimes.

22   Q.  Do you use Blood lingo?

23   A.  I do.

24   Q.  Give us an example of Blood lingo that you use.

25   A.  Replacing a C with a B.

1    Q.  In one of the messages that you communicated with my client

2    that was just received in evidence, when you put in the bity,

3    you meant in the city, am I correct?

4    A.  Yes.

5    Q.  But bity was your substitute of the C with a B to suggest a

6    Blood connection, am I correct?

7    A.  Not a Blood connection.

8    Q.  Why did you do it?

9    A.  I just do it for the fun of it.

10   Q.  You do it for the fun of it?

11   A.  Yes.

12   Q.  You used it several times in that communication with my

13   client, correct?  You used Bs where Cs or other consonants

14   would be?

15   A.  I did.

16   Q.  In fact, do you have 800I in front of you?

17          MR. CANNICK:  Can we pull it up, please.  Could we go

18   to page 2.  Could you highlight the second communication in

19   blue, please.

20          THE COURT:  Mr. Cannick, I take it you want this

21   published?

22          MR. CANNICK:  Yes, please.

23          THE COURT:  Go ahead.

24   Q.  Do you see what's on the screen in front of you?

25   A.  I do.

1    Q.  Could you read for us?

2    A.  That's in the bity.

3    Q.  In the bity?

4    A.  Yes.

5    Q.  You wrote that, am I correct?

6    A.  Correct.

7    Q.  And you used a B where the C would be in city, am I

8    correct?

9    A.  I did.

10         MR. CANNICK:  Can we go to page 4.  Can we pull up the

11   third item on the left.

12   Q.  Could you read that for us?

13   A.  I said:  It's bute, right.

14   Q.  What are you saying there?

15   A.  I was asking him if the hotel was cute.

16   Q.  Instead of cute you put bute, correct?

17   A.  Yes.

18         MR. CANNICK:  Can we go to page 10.  Can we focus on

19   the last --

20   Q.  Could you read that for us, please.

21   A.  I said:  I can't leave.  He gonn start brying.

22   Q.  What were you talking about there?

23   A.  I was talking about my dog.

24   Q.  When you say brying, you are saying that, I can't leave, he

25   gonna start brying because your dog would start crying if you

1    left, am I correct?

2    A.  Yes.

3    Q.  Your dog was with you in your hotel that night, correct?

4    A.  He was.

5    Q.  In fact, the dog was with you when you were in Brooklyn, am

6    I correct?

7    A.  Yes.

8    Q.  The dog was with you when you were at my client's aunt's

9    house, am I correct?

10   A.  Correct.

11   Q.  And the dog was with you when you walked down the block, am

12   I correct?

13   A.  Yes.

14   Q.  Now, you told us a short while ago that you used this

15   substitute of consonants, you used a B, because it's fun to do

16   so?

17   A.  Yes.

18   Q.  And I asked you earlier, did you ever flash gang signs.

19       Do you remember me asking that?

20   A.  Yes.

21   Q.  What did you tell me?

22   A.  I said yes.

23   Q.  Can you flash a gang sign for the.jury.

24       What is that sign?

25   A.  Blood.

J9HMMAC4                        Ramirez – Cross

1    Q.   Blood, right?

2    A.   Right.

3    Q.   How long have you been flashing that sign?

4              THE COURT:  Mr. Cannick, can you move to the

5    microphone, please.

6    Q.   How long have you been flashing the Blood signs?

7    A.   I don't remember.

8    Q.   You don't remember.

9         But you definitely flashed it before October 24, 2018, am I

10   correct?

11   A.   Right.

12   Q.   And you were definitely flashing them before you met my

13   client, am I correct?

14   A.   Right.

15   Q.   Would it be fair to say you didn't learn Blood signs from

16   my client, am I correct?

17   A.   No.

18   Q.   I'm not correct?

19   A.   I didn't learn it from him.

20   Q.   And you didn't learn how to speak Blood lingo from my

21   client, am I correct?

22   A.   Correct.

23   Q.   But you are not a Blood?

24   A.   No.

25   Q.   Now, you testified that you were in the car with Anthony,

J9HMMAC4                    Ramirez - Cross

1   with Harv, and a song was being played, and he asked you pretty
2   much to turn on off that song because the song was by a Crip.
3           Do you recall telling us about that?
4   A.  That's all I remember.
5   Q.  That's all you remember.
6       Who was the Crip that was singing the song?
7   A.  I don't remember.
8   Q.  What's the name of the song?
9   A.  I have no idea.
10  Q.  Did you like the song?
11  A.  I did.
12  Q.  You liked the song.  But you don't remember the name of the
13  song?
14  A.  No.
15  Q.  You don't remember who was singing the song?
16  A.  No.
17  Q.  Was it a rap?
18  A.  Yes.
19  Q.  Do you know artists that are associated or acknowledge
20  themselves as being members of the Crip?
21  A.  I don't know them personally.
22  Q.  No.
23          Have you heard?
24  A.  I have heard.
25  Q.  Name me some artists that you have heard that are members

1    of the Crips.

2    A.  I know there is Snoop Dogg, Babe East.  I don't know who

3    else.

4    Q.  Was it a Snoop song?

5    A.  I don't remember.

6    Q.  Have you heard of artists who associate themselves as being

7    a Blood?

8    A.  I'm sorry.

9    Q.  Have you heard of artists who associate themselves as being

10   members of the Bloods?

11   A.  Yes.

12   Q.  Name them.

13   A.  I know there is YG, there is 6ix9ine, Cardi B.  I don't

14   know who else.

15   Q.  Cardi B the rapper, right?

16   A.  Right.

17   Q.  You've had some brushes with the law, am I correct?

18   A.  I couldn't hear you.

19   Q.  You've had some brushes with the law, am I correct?

20   A.  Yes.

21   Q.  In fact, you were prosecuted for using stolen credit cards,

22   am I correct?

23   A.  Right.

24   Q.  How many times?

25   A.  I am going to say like two, three times.

1  Q.  Could you tell us about the first time.

2  A.  The first time it was somebody that was my friend, and he

3  had told me this was a quick way to make money.  So he had gave

4  me the credit cards, told me to purchase some items, and he

5  would be selling on his part and give me my part.

6  Q.  And you did that, right?

7  A.  I did.

8  Q.  And you got money for it?

9  A.  I did.

10  Q.  How much money?

11  A.  Not a lot.  Probably like 600.

12  Q.  Tell us about the second time.

13  A.  The second time he had told me to buy him some stuff and

14  then instead of giving me money, I can get like my own articles

15  of clothing.

16  Q.  You were arrested?

17  A.  Hum?

18  Q.  You were arrested for that?

19  A.  No.

20  Q.  How much money did you make off that?

21  A.  I didn't make money.  He gave me clothing.

22  Q.  What was the clothing?

23  A.  It was a pair of heels and sneakers.

24  Q.  About how long ago was that?

25  A.  Maybe like four years ago.

```
 1    Q.  And the first one that you spoke to us about, about how
 2    long ago was that?
 3    A.  The first time?
 4    Q.  Yes.
 5    A.  The same amount of time.
 6    Q.  Were you arrested any other time?
 7    A.  I was arrested, yes.
 8    Q.  What was that for?
 9    A.  He had told me to purchase some shirts.  That way he can do
10    the whole reselling process.  But when I had gaven the clerk my
11    ID and the credit card, they took it to the back, and then they
12    had the police come out and arrest me.
13    Q.  Any other instances where you were arrested and convicted?
14    A.  I'm sorry?
15    Q.  Any other times where you were arrested and convicted?
16    A.  No.
17    Q.  When was it that you first met, spoke with law enforcement
18    regarding what you just told the jury?
19    A.  With what just happened?
20    Q.  Yes.
21    A.  With my crimes, right?
22    Q.  No, not your crimes.  What you told this jury about Harv,
23    the reason why you are here.
24    A.  This was recently.  I am not sure which day exactly, but
25    definitely between like last month.
```

1    Q.  You've met with the government?

2    A.  Yes.

3    Q.  How many times have you met with the government?

4    A.  I don't remember.

5    Q.  Was it more than one?

6    A.  Yes.

7    Q.  More than three?

8    A.  Yes.

9    Q.  More than five?

10   A.  Probably around five, six times.

11   Q.  Five six times.

12        And when you met with the government you basically spoke to

13   them about what you just told the jury, am I correct?

14   A.  Yes.

15   Q.  In fact, it was somewhat of a rehearsal session, am I

16   correct?

17   A.  No.

18   Q.  You didn't go over the questions that you were asked

19   earlier?

20   A.  We went over the questions about once or twice.

21   Q.  Once or twice.

22            When was the last time that you went over those

23   questions with the government?

24   A.  On my last visit.

25   Q.  When was that, ma'am?

1    A.  This week.

2    Q.  When this week?

3    A.  I don't remember which day it was.

4    Q.  Was it yesterday?

5    A.  Probably.  I don't remember.

6    Q.  You don't remember yesterday?

7    A.  Not at this moment.

8    Q.  Now, the government, before you went and spoke with him,

9    were harassing you, am I correct?

10   A.  No.

11   Q.  They weren't harassing you?

12   A.  No.

13   Q.  They weren't calling you to get you to come in and speak

14   with them?

15   A.  They weren't necessarily harassing me.  I was just

16   overexaggerating because it was just annoying how they were

17   contacting my family without me knowing what's going on.

18   Q.  You text the government, you responded to them, you told

19   them they were harassing you, am I correct?

20   A.  Yes.

21   Q.  And you told them this, that they are harassing you and

22   disrespecting, am I correct?

23   A.  Yes.

24   Q.  You told them this before you went in and started speaking

25   with them, am I correct?

1   A.  Yes.

2   Q.  How long had they been calling you and harassing you before

3   you went in and started speaking to them?

4   A.  One day.

5   Q.  One day, ma'am?

6   A.  Yes.

7   Q.  You remember sending the government a text telling them,

8   can you stop calling my mother, she has bad anxiety and she

9   keeps calling me over and over, I'm a grown person and take

10  care of what I have to take care of.  Please stop.

11            MR. REBOLD:  Objection.

12            THE COURT:  Overruled.

13  Q.  Do you remember sending the government a text that I just

14  read?

15  A.  Yes.

16  Q.  You told them in this text, can you stop calling my mother,

17  she has bad anxiety, she keeps calling me over and over.  I'm a

18  grown person and I take care of what I have to take care of

19  myself.

20            Are you telling us that the government only called you

21  one day and this prompted you to give this type of response?

22  A.  Yes.

23  Q.  Do you remember sending them a second text message, stop

24  calling my mother, please respect that.  I will get back to you

25  when I can.

 1                    Do you remember sending the government that text?

 2                    MR. REBOLD:  Objection.

 3                    THE COURT:  Overruled.

 4    A.  Yes.

 5    Q.  Do you remember sending this one to the government:  OK,

 6    but stop harassing my mother?

 7    A.  After what?

 8    Q.  Beg your pardon?

 9    A.  After what text?

10    Q.  This text:  OK.  But stop harassing my mother.

11    A.  Yes.

12    Q.  Do you remember sending this one:  I am speaking to your

13    partner?

14    A.  Yes.

15    Q.  Do you remember sending this one:  What do you mean, you

16    are running out of time?

17                    MR. REBOLD:  Objection, your Honor.

18                    THE COURT:  Overruled.

19    A.  Yes.

20    Q.  Why were you asking the government:  What do you mean, you

21    are running out of time?

22    A.  They had sent me a prior text message with those words

23    involved, but I don't remember the text message exactly.

24    Q.  According to you and according to what you just told this

25    jury under oath is that the government basically only called

1    you once and then you responded to them.

2    A.  They called my mother once.

3    Q.  Do you remember sending the government one saying:  Can we

4    reschedule?

5    A.  Yes.

6            MR. REBOLD:  Your Honor, objection.

7            THE COURT:  Mr. Cannick, let's move on.

8    Q.  Now, you testified and told us that you met Harv, that this

9    was sometime in the latter part, the end of summer?

10   A.  Yes.

11   Q.  And to you the end of summer was sometime in September?

12   A.  Around September.

13   Q.  Around September.

14        And before the October 24 incident that you told us about

15   you had only hung out with him probably about two or three

16   times, am I correct?

17   A.  Correct.

18   Q.  When you met him you were at your place of business, at a

19   Honda dealership, and he came in and started speaking with you,

20   am I correct?

21   A.  Correct.

22   Q.  And he just purchased a new car, correct?

23   A.  Yes.

24   Q.  In fact, you have ridden in that car, am I correct?

25   A.  Yes.

1    Q.  In fact, you showed him how to operate certain things in

2    that car, am I correct?

3    A.  Yes.

4    Q.  Now, you testified that on the night of October 24, when

5    you were supposed to meet up with Harv, you initially were in

6    the Bronx, correct?

7    A.  Yes.

8    Q.  You were there with your dog?

9    A.  I was there with my dog.

10   Q.  And you were initially supposed to meet him at the Redford

11   Hotel on Ludlow Street?

12   A.  Was I supposed to what?

13   Q.  Meet him at the Redford Hotel on Ludlow Street.

14   A.  What is the question in regards to?

15   Q.  You were initially supposed to meet him at the Redford

16   Hotel on Ludlow Street?

17   A.  That was the last-minute plans.

18   Q.  You were a little upset about the location where you were

19   supposed to meet him, correct?

20   A.  I don't remember.

21   Q.  You don't remember if you were upset?

22   A.  No.

23   Q.  You didn't want to travel from Bronx down to Manhattan or

24   Brooklyn, am I correct?

25   A.  Correct.

1   Q.  In fact, you waited there for him because you had been out

2   of touch and he had not spoken with you in a while before

3   eventually saying, yes, we are going to hang out and meet

4   later?

5   A.  Can you rephrase the question?

6   Q.  You had been waiting for Harv for a while before the plans

7   were confirmed, am I correct?

8   A.  Correct.

9   Q.  And you testified that there came a point in time that you

10  took a cab down from Bronx to Brooklyn to meet up with Harv?

11  A.  Yes.

12  Q.  And when you got there you said Harv came by and eventually

13  left to go back and -- withdrawn.

14      When you got there did you meet up with Harv initially?

15  A.  Yes.

16  Q.  And he was with several other people?

17  A.  Yes.

18  Q.  And you said that he left you alone with a bunch of people,

19  am I correct?

20  A.  Correct.

21  Q.  I think you testified, you said it was strange that he left

22  you alone with those people because you didn't know those

23  folks, am I correct?

24  A.  Correct.

25  Q.  This was the first time that you had been with him when he

1    left you alone with people that you didn't know, am I correct?

2    A.  This is the first time that what?

3    Q.  That you were with him, and then he left you alone with

4    people that you did not know.

5    A.  Yes.

6    Q.  Do you remember being with Harv and he left you once with

7    Seqo?  You know Seqo, right?

8    A.  Yes.

9    Q.  Do you remember the instance when you guys were together

10   and then he left and you were alone with Seqo?

11   A.  Yes.

12   Q.  And you remember a time when you and Harv were together and

13   you were at the studio and he left you at the studio?

14   A.  I don't remember him leaving me at the studio.

15   Q.  You talked about him being with friends earlier in your

16   testimony, two friends, when you were talking about the robbery

17   and kidnapping of 6ix9ine, according to you.

18          You have to answer yes or no.

19   A.  I'm sorry?

20   Q.  You have to answer yes or no.

21   A.  What was the question?

22   Q.  Do you remember telling us that there was a time when Harv

23   was talking about this supposed kidnap and he was with his

24   friends and his friends were from the UK?

25   A.  Yes.

J9HMMAC4                          Ramirez - Cross

1    Q.  Do you remember telling us about that?

2    A.  Yes.

3    Q.  You know those guys, am I correct?

4    A.  Yes.

5    Q.  They were his artists, am I correct?

6    A.  Yes.

7    Q.  The group was called the Clones, am I correct?

8    A.  Yes.

9    Q.  You hung out with them, am I correct?

10   A.  Yes.

11   Q.  In fact, you were very good friends with William, am I

12   correct?

13   A.  Yes.

14   Q.  You DM with William, am I correct?

15   A.  I used to.

16   Q.  When you told the jury a short while ago that you didn't

17   know these people, you weren't being truthful, were you?

18   A.  I didn't know the people that he had left me with.

19          MR. REBOLD:  Objection.

20   Q.  I beg your pardon?

21   A.  I didn't know the people he had left me with in Brooklyn.

22   Q.  The two men, the people that he was in the car with you,

23   according to you, when he said that I kidnapped and robbed

24   Tekashi and the guys he was with said, we no longer follow him,

25   we don't like him because he's a rat fink, do you remember

1    telling us about that?

2    A.  Yes.

3    Q.  Those weren't his friends.  Those were his artists, am I

4    correct?

5            MR. REBOLD:  Objection.

6            THE COURT:  Sustained.

7    Q.  The young men in the car, they were from the UK, as far as

8    you know?

9    A.  Yes.

10   Q.  And they were musicians?

11   A.  Two of them were.

12   Q.  You've been in the studio with them?

13   A.  Once.

14   Q.  The answer to my question is yes, you have been in the

15   studio with them?

16   A.  Yes.

17   Q.  Now, do you remember speaking with the government on August

18   5 of this year?

19   A.  Did I speak to the government August 5?

20   Q.  Yes.

21   A.  I don't remember.

22           MR. CANNICK:  Your Honor, may I approach the witness

23   and show the witness 3504 and see if it refreshes her

24   recollection?

25           THE COURT:  Is there a particular page?

1          MR. CANNICK:  The first page.

2          THE COURT:  Yes, you may.

3          MR. CANNICK:  Thank you.

4          May I ask the question here, your Honor, or do I have

5     to go back to the podium?

6          THE COURT:  If you really can project your voice, you

7     can do it here, but let's not make it a habit because it's hard

8     to hear.

9          MR. CANNICK:  I'll go back, your Honor.

10    Q.  Ms. Ramirez, I want you to look at the top of that document

11    and see if it refreshes your recollection that you had a

12    meeting with the government on August 5, 2019.

13         THE COURT:  Before the witness answers, let me just

14    explain to the witness, the issue is whether you having

15    reviewed this document now remember having a meeting with the

16    government on that day.  It's not what the document says.  It's

17    what your memory is, now that you reviewed the document.

18    A.  I remember.

19    Q.  You remember?

20    A.  Yes.

21    Q.  Does it refresh your recollection that you had -- that you

22    in fact had a meeting with the government on that particular

23    day?

24    A.  Yes.

25         MR. CANNICK:  May I have the document back?

J9HMMAC4                          Ramirez - Cross

1           THE COURT:  Go ahead.

2    Q.  Do you remember telling the government during that meeting

3    that this morning on a call with Harv he told me that he

4    stabbed a guy that night at the hotel.

5           Do you remember telling the government that?

6    A.  Yes.

7           MR. REBOLD:  Objection.  It is a prior consistent

8    statement.

9           THE COURT:  Overruled.

10   Q.  Do you remember telling the government further that this

11   caught you off guard because --

12          THE COURT:  Mr. Cannick, there is no basis for further

13   questioning about what was said at an earlier meeting.  There

14   is no rule of evidence that admits that.  Just ask the question

15   you want.

16   Q.  Do you remember telling the government during that meeting

17   that this caught you off guard because you didn't think that

18   Harv was that type person?

19   A.  Yes.

20   Q.  Now, you testified earlier, didn't you, that Harv had told

21   you or you learned that night that Harv had stabbed someone?

22   A.  Yes.

23   Q.  There came a point in time you told us that Harv came back

24   to the hotel and met you at the hotel on the morning of October

25   25?

1    A.  I am not sure what time it was.

2    Q.  When you saw him again at the hotel, did he have the same

3    clothing on?

4    A.  Yes.

5    Q.  Did you see any blood on his clothes?

6    A.  No.

7    Q.  Did you smell any blood on him?

8    A.  No.

9    Q.  Did he have any blood spots?

10   A.  No.

11   Q.  On his shoes?

12   A.  No.

13   Q.  Did your dog go up and sniff him and smell blood --

14            MR. REBOLD:  Objection.

15            THE COURT:  Sustained.

16            Mr. Cannick, how much longer?

17            MR. CANNICK:  Your Honor, I probably have about

18   another 15, 20 minutes, your Honor.

19            THE COURT:  Keep going.

20   Q.  When you got to Utica Avenue that night, when you meant to

21   meet Harv, there were a lot of police cars already at the

22   scene, am I correct?

23   A.  I don't remember.

24   Q.  You don't remember seeing police cars all over the place?

25   A.  I remember there were police cars, but I am not sure if it

J9HMMAC4                         Ramirez - Cross

1   was a lot.

2   Q.  And you said you walked up and down the block, am I

3   correct?

4   A.  Yes.

5   Q.  What time did you eventually leave his aunt's house?

6   A.  What time did I leave his aunt's house?

7   Q.  Yes.

8   A.  I don't remember the time.

9   Q.  Let me ask this.  You testified and told us that when you

10  had meetings with the government, you spoke to them about

11  conversations that you and Harv had had while Harv had been in

12  jail.

13          Do you remember telling us about that?

14  A.  Yes.

15  Q.  Now, during those conversations the government asked you

16  what did Harv tell you his lawyer was talking to him about?

17          MR. REBOLD:  Objection.

18          THE COURT:  Sustained.

19          MR. CANNICK:  Your Honor, may we have a sidebar?

20          THE COURT:  No.  Next question.

21          MR. CANNICK:  A second, please, your Honor.

22  Q.  Ms. Ramirez, you read a lot about Harv on social media.

23  A.  Some.

24  Q.  You said earlier in your direct examination that there was

25  information all over social media, am I correct?

1    A.  I'm sorry?

2    Q.  You told us on your direct examination that there was

3    information all over social media about Harv and this alleged

4    incident, am I correct?

5    A.  Yes.

6    Q.  And you read those, am I correct?

7    A.  Some of them.

8    Q.  Now, going back to the hotel, you testified --

9              MR. REBOLD:  Your Honor, Mr. Cannick said this alleged

10   incident.  Can we just clarify which alleged incident he is

11   referencing?

12             MR. CANNICK:  The alleged incident --

13             THE COURT:  One moment.  I think that is worthwhile.

14   Go ahead and ask the question again, being clear about what you

15   mean by incident.

16   Q.  When I said this alleged incident, I was referring to the

17   things that you said he admitted to you that night, on October

18   24.

19             THE COURT:  Sorry.  What incident are you referring

20   to?

21             MR. CANNICK:  The slashing as well as the alleged

22   kidnapping.

23             THE COURT:  In that case I am going to ask the jury to

24   disregard the previous exchange which referred to a single

25   incident.

 1              If Mr. Cannick wants to inquire about multiple

 2     incidents, you are at liberty to do that, but you need to break

 3     out the question because it's not clear to me that there is

 4     clarity as to what that exchange is about, so dial it back and

 5     start again.

 6              MR. CANNICK:  Very well.

 7              Give me one second, your Honor.

 8     Q.  Ms. Ramirez, you read a lot about the alleged incident of

 9     the supposed robbery and kidnapping on social media?

10     A.  I didn't read a lot about it, but I seen it.

11     Q.  You seen it?

12     A.  Yes.

13     Q.  What about the alleged slashing?

14     A.  No.

15     Q.  Nothing?

16     A.  Nothing.

17     Q.  But you heard others talk about it on the street?

18     A.  Yes.

19              THE COURT:  About what?

20              MR. CANNICK:  About the alleged slashing.

21              MR. REBOLD:  Objection.

22              THE COURT:  Overruled.  But the content of those

23     conversations is another story.  Go ahead.

24              MR. CANNICK:  One second, your Honor.  Let me check

25     with my colleague.

 1              THE COURT:  Ladies and gentlemen, we are approaching

 2    the lunch break, for your planning purposes, very soon.

 3              MR. CANNICK:  Your Honor, I'm done.

 4              THE COURT:  Mr. Fasulo, any questions from you?

 5              MR. FASULO:  No questions of this witness, your Honor.

 6              THE COURT:  Redirect.

 7              MR. REBOLD:  Just one moment, your Honor.

 8              Just a few questions, your Honor.

 9              THE COURT:  Go ahead.

10    REDIRECT EXAMINATION

11    BY MR. REBOLD:

12    Q.  Ms. Ramirez, there were some questions on cross-examination

13    about text messages you exchanged with members of the

14    government, correct?

15    A.  Correct.

16    Q.  Were those messages about people coming to your mother's

17    house?  Were you exchanging those with members of the

18    prosecutors at this table or with federal agents?

19    A.  Federal agents.

20    Q.  Mr. Cannick asked you whether you felt you were being

21    harassed, is that correct?

22    A.  Correct.

23    Q.  He asked you about messages indicating numerous outreach

24    attempts to members of your family to get you to come down to

25    meet with the government, is that correct?

J9HMMAC4                          Ramirez - Redirect

```
 1   A.  Correct.
 2   Q.  Did you want to meet with the government?
 3   A.  Not at all.
 4   Q.  Why not?
 5             MR. CANNICK:  Objection.
 6             MR. FASULO:  Objection.
 7             THE COURT:  Overruled.  The door was open.
 8   Q.  Why didn't you want to come down and meet with the
 9   government?
10   A.  Because this is just something new to me.  I never thought
11   that I was going to be in something like this.  It's a really
12   scary situation.  I didn't know what was going to come out of
13   it.
14   Q.  When you say a really scary situation, what do you mean by
15   that?
16   A.  I mean like, me being basically forced, subpoenaed into
17   this.  I have no other choice but to tell my truth.
18   Q.  What about that scares you?
19   A.  I don't know what Harvey is capable of doing.
20             MR. CANNICK:  Objection.
21             THE COURT:  Sustained.  I am going to ask the jury to
22   disregard the witness' last answer.
23             Mr. Rebold, next subject.
24             MR. REBOLD:  I have no further questions.
25             THE COURT:  Any recross?
```

J9HMMAC4

1          MR. CANNICK:  No, your Honor.

2          THE COURT:  Ms. Ramirez, you may step down.  Your

3     testimony is complete.

4          (Witness excused)

5          THE COURT:  Before anyone leaves the courtroom, in a

6     moment I am going to excuse the jury.

7          I have an instruction for the members of the public

8     who are here.  I am going to ask that everybody, while in this

9     building, elevators, hallways, stairways, not discuss the case

10    or any of the personnel involved in the case.  There is too

11    great a risk of being in contact or being overheard by a juror.

12    So please save your conversations until you're safely out of

13    range of any of the members of the jury.

14         With that, Mr. Smallman, you can take the jury back to

15    the jury room.

16         Ladies and gentlemen, I'll see you promptly at 2:10.

17    It's 1:07 now.

18         (Jury not present)

19         THE COURT:  Let me put a couple of things on the

20    record.

21         Mr. Rebold, earlier in your examination you asked the

22    witness whether she learned that Mr. Ellison was in a gang.

23    The problem is that without specifying the source of that,

24    there are a number of hearsay routes in which a person could

25    have learned it.  That's why I insisted that the question be

1    focused, to make it clear that the source was a person who is a

2    party opponent under the hearsay rules.

3          MR. REBOLD:  Yes, your Honor.  It just took me a

4    minute to pick up what you were dropping.

5          THE COURT:  I permitted Mr. Cannick's extended

6    questions about communications with the government for a couple

7    of reasons.  One was that he appeared to have elicited that the

8    witness believed she had been communicated with by the

9    government on only one day.  I took Mr. Cannick to be

10   impeaching that by showing him in fact that there had been a

11   sustained period of communications, which I assumed he was

12   going to try to develop, took place over a day.  I see him

13   nodding.  Ultimately, the witness clarified that she was

14   distinguishing between communications with her mother on the

15   one hand and communications with herself.

16         Mr. Cannick also, I was giving him broad latitude if

17   he wanted to go into this sensitive area, if he wanted to do so

18   on the ground that the manner in which the witness was

19   contacted might in some way bear on her credibility.  That

20   obviously carried the risk of opening the door as to why she

21   was choosing not to meet with the government more readily.

22   That door was opened and Mr. Rebold appropriately went through

23   it.  In the end the nature of her answer was such that I

24   thought the better course was to ask the jury to disregard it.

25         Counsel, Mr. Smallman has asked me to advise all of

1    you, but I think it applies specifically mostly to Mr. Cannick,

2    please consistently be near the microphone.  The mic is not

3    always picking you up.  We have an overflow courtroom.  I don't

4    know if anyone is there.  You get lost if you're away from the

5    microphone.  Please, you need to plant yourself by the mic

6    there.

7            Anything further from the government before we break

8    for lunch?

9            MR. LONGYEAR:  No, your Honor.

10           THE COURT:  Anything from Mr. Fasulo?

11           MR. FASULO:  Nothing, your Honor.

12           THE COURT:  Anything from Mr. Cannick?

13           MR. CANNICK:  No, your Honor.

14           THE COURT:  Have a good lunch.  I will see you five

15   minutes before the jury is back.

16           Government, you should be prepared, when you call your

17   next witness, to immediately put that person in the witness

18   box.

19           MR. REBOLD:  Your Honor, just clarity of the time?

20           THE COURT:  You should be back here at 2:05.  But when

21   you call your next witness, you don't need to have the witness

22   sitting in the box, but the witness needs to be so proximate

23   that we are not wasting time while the jury is in the box.

24           MR. LONGYEAR:  Yes, your Honor.  Thank you.

25           (Continued on next page)

```
 1
 1                        AFTERNOON SESSION

 2                           2:10 p.m.

 3          THE COURT:  Be seated.  Welcome back, everyone.

 4  Mr. Smallman is going to check on the jury, and then we'll get

 5  started.

 6          One thing for the members of the public who are here,

 7  I was informed over the lunch break that there was a degree of

 8  murmuring or commentary in the audience during some of the

 9  testimony this morning.  I really need to admonish everybody,

10  no talking, no verbal expressions, no nothing.  It's really

11  important that none of that be audible or visible to the jury.

12  Please save your communications and save your reactions for

13  outside of the courthouse.

14          Thank you.

15          We're waiting on one juror.  While we wait, let me

16  just go around the horn and find out if there are any issues I

17  need to take up.

18          Mr. Longyear.

19          MR. LONGYEAR:  Your Honor, with the next witness -- I

20  don't know if we'll get to it today; we may get to some --

21  there are transcripts, and so we have transcript binders for

22  the jury.  I don't know if it makes to have them ready for them

23  or pass them out when the time comes.

24          THE COURT:  Right.  I don't want to pass them out

25  before they're authenticated and until relevant.  My experience
```

J9hWmac5

1    is you put something in front of a person and it distracts them

2    from what they're otherwise here to do.

3              Thank you.

4              MR. LONGYEAR:  Thank you, your Honor.

5              THE COURT:  All right.  Anything from you, Mr. Fasulo?

6              MR. FASULO:  Nothing, your Honor.

7              THE COURT:  Mr. Cannick.

8              MR. CANNICK:  Your Honor, just briefly.

9              During my examination of Ms. Ramirez, I was attempting

10   to explore whether or not at one point she was acting as an

11   agent for the government in terms of going back and soliciting

12   information from my client, and I think the foundation was

13   through whether or not Harv gave you any information as to what

14   he and his attorneys were talking about, and you sustained the

15   objection.  I asked for a sidebar because I just wanted the

16   Court to appreciate that I was just merely trying to explore

17   whether or not, in fact, she at some point was acting knowingly

18   as an agent of the government or unwittingly as an agent of the

19   government.

20             THE COURT:  There was no question whatsoever to her

21   whether the government asked her to make an inquiry on

22   anybody's behalf.  That would have been the way to preface that

23   question, and we would've seen then whether there was a factual

24   predicate for it.  But there was no question like that ever

25   asked.  On the contrary, the questioning was emphatic that she

J9hWmac5

1    had tried to circumvent meetings with the government.  If you

2    wanted to pursue that line of questioning, that would have been

3    a potentially viable line.  I don't know if you needed to ask

4    that question.

5              MR. CANNICK:  That was where I was going, your Honor.

6              THE COURT:  That may have been where you were going in

7    your own notes, but not as expressed to the Court.

8              MR. CANNICK:  All right.

9              THE COURT:  Mr. Longyear, while we wait, let me just

10   ask if you have a ballpark, not holding you to it, as to the

11   length of the direct of the next witness.

12             MR. LONGYEAR:  Lengthy, your Honor.  It will take us

13   through the end of the day.

14             THE COURT:  Is it likely to take us through the middle

15   of tomorrow?

16             MR. LONGYEAR:  Likely.

17             THE COURT:  OK.  Thank you.

18             (Continued on next page)

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  Be seated.

 3              Welcome back, ladies and gentlemen.

 4              Government, please call your next witness.

 5              MR. LONGYEAR:  Your Honor, the government calls Daniel

 6     Hernandez.

 7              Your Honor, one moment.  I think the marshals are

 8     bringing him now.

 9      DANIEL HERNANDEZ,

10          called as a witness by the government,

11          having been duly sworn, testified as follows:

12              THE COURT:  Good afternoon, Mr. Hernandez.  I'll ask

13     you to please keep your voice up and speak slowly and

14     distinctly for the benefit of everybody in this large

15     courtroom.

16              Counsel, you may inquire.

17              MR. LONGYEAR:  Thank you, your Honor.

18     DIRECT EXAMINATION

19     BY MR. LONGYEAR:

20     Q.  Good afternoon, Mr. Hernandez.

21     A.  How you doing?

22     Q.  Mr. Hernandez, how old are you?

23     A.  23.

24     Q.  Do you go by any other names?

25     A.  Yes.

1   Q.   What are those names?

2   A.   Tekashi.  Tekashi 6ix9ine.  Bix.  Yeah.

3   Q.   Mr. Hernandez, where were you born?

4   A.   Bushwick, Brooklyn.

5   Q.   How far did you go in school?

6   A.   About the 10th -- 11th grade or so, like that.

7   Q.   Mr. Hernandez, are you currently in federal custody?

8   A.   Yes, sir.

9   Q.   Approximately when did you start living in federal custody?

10  A.   About November the 18th, 2018.

11  Q.   What were you arrested for?

12  A.   Racketeering charges, you know, violent crimes, shootings,

13  drug distribution.

14  Q.   At some point did you decide to cooperate with the

15  government?

16  A.   Yes.

17  Q.   When did that happen?

18  A.   A day after, November 19, the day after we was taken down.

19  Q.   In connection with your cooperation, have you pleaded

20  guilty to certain crimes?

21  A.   Yes.

22  Q.   What crimes did you plead guilty to?

23  A.   I believe it was nine counts of racketeering, shootings,

24  and drug distribution.

25  Q.   You listed racketeering as one of the crimes to which you

1    pleaded guilty.  Were you a member of any gang?

2    A.  Yes, sir.

3    Q.  What was the name of the gang that you were a member of?

4    A.  Nine Trey Bloods, Nine Trey Bloods.

5    Q.  Approximately when did you become a member?

6    A.  Around I would say November of 2017.

7    Q.  What sorts of things did Nine Trey members do?

8    A.  I'm sorry?

9    Q.  What sorts of things did Nine Trey members do?

10   A.  We participated in a lot of, you know, violent crimes,

11   robberies, assaults, drugs, stuff of that nature.

12   Q.  Mr. Hernandez, do you recognize anyone in the courtroom who

13   was a member of Nine Trey when you were a member?

14   A.  Yes.

15   Q.  Who do you recognize?  And if you can identify that person,

16   could you identify where they're sitting and an article of

17   clothing that person may be wearing?

18   A.  Harv, Anthony Ellison, has a gray suit on.  And Nuke has a

19   brown suit and a white thing on his head.

20            MR. LONGYEAR:  Your Honor, may the record reflect that

21   the witness has identified Mr. Mack and Mr. Ellison?

22            THE COURT:  Yes.  The record reflects that

23   Mr. Hernandez, in sequence, identified Mr. Ellison and then

24   Mr. Mack.

25            MR. LONGYEAR:  Thank you, your Honor.

1   Q.  Now, Mr. Hernandez, we'll turn back to Nine Trey in a

2   minute, but before that I'd like to ask some questions about

3   your life before Nine Trey.  Where did you grow up?

4   A.  Raised and lived in Bushwick, Brooklyn.

5   Q.  Where did you go to school?

6   A.  For elementary I went to PS-59; middle school I went to

7   Juan Morel Campos; and high school, Legacy high school.

8   Q.  Did you work?

9   A.  Yes.

10  Q.  What did you do?

11  A.  I started working at the, I want to say the age of 13.  My

12  first job was at Community Youth Court, a job that handled

13  misdemeanor cases with youth where youth acts like a judge,

14  jury, type of thing.  I did that for about two months.

15          THE COURT:  Mr. Hernandez, I'm going to cut you off.

16  I think that you are speaking so close to the mike that you're

17  blurring some of your words.  Maybe move a bit back from the

18  mike and keep your voice up and speak slowly.

19  A.  So I did that for about a year.  I didn't make a lot of

20  money doing that, so I started working with my brother busing

21  tables.  I did that for about a year and a half.  Then I got a

22  job at a grocery store, Stay Fresh Grill, where I worked as a

23  delivery boy.  I did that about two years.  I worked up to

24  register.

25          Shortly after that I landed another busboy job, and then

1    after that became a rapper.

2    Q.  So, you said that you started a music career, is that

3    right?

4    A.  Yes.

5    Q.  Approximately when did that happen?

6    A.  I'd say around 2014.

7    Q.  And how did it come about?

8    A.  Well, at the -- at the store I was working in, Stay Fresh

9    Grill, there was a guy by the name Peter Rogers always, always

10   coming in there, buying things like tilapia, peanuts, stuff

11   like that.  He asked me if I, if I made music, if I rap.  I was

12   like, No.  And he was like:  Well, you got the image for it.

13   You look cool.

14       I was like, you know, I took it into consideration, and we

15   started making music with the guy.

16   Q.  And again, this is around 2014?

17   A.  Yes, sir, like late 2014.  Like September.

18   Q.  So when you started making music around September 2014,

19   what type of music were you making?

20   A.  It was more of, like, a rock and roll rap.

21   Q.  Approximately how many records or songs did you release?

22   A.  Eight, I believe.  I believe around eight.

23   Q.  Did you go on any tours?

24   A.  Yeah.

25   Q.  Where did you tour?

1  A.   Eastern Europe.  I toured in Prague; Slovakia -- Prague;

2  Czech Republic, Brno -- Brno, Czech Republic; St. Petersburg,

3  Russia, and Moscow.

4  Q.   Were you making any money at this time as a metal rap

5  performer?

6  A.   I mean, for all those shows I made about $2,000 profit.  I

7  did it just for the experience.

8  Q.   Mr. Hernandez, did there come a time when the type of music

9  you recorded changed?

10 A.   Yes.

11 Q.   Approximately when did that happen?

12 A.   Around -- it changed in September of 2017.

13 Q.   Directing your attention to September 2017, did there come

14 a time when you filmed a music video in Brooklyn?

15 A.   Yes, sir.

16 Q.   Where in Brooklyn?

17 A.   Bedford Stuyvesant, Brooklyn, on Madison, between Tompkins

18 Avenue and Throop.

19 Q.   Do you remember the address?

20 A.   I believe, I want to say it's 370 Madison.

21 Q.   370?

22 A.   370.

23        MR. LONGYEAR:  Ms. Harney, can we please pull up for

24 the witness what's been marked for identification as Government

25 Exhibit 202.

1    Q.  Mr. Hernandez, do you see Government Exhibit 202?

2    A.  Yes.

3    Q.  What is that?

4    A.  370 Madison.

5    Q.  Is that a photograph of 370 Madison?

6    A.  Yes, sir.

7    Q.  Does it fairly and accurately depict the way 370 Madison

8    looked?

9    A.  Yes, sir.

10          MR. LONGYEAR:  Your Honor, the government offers

11   Government Exhibit 202.

12          THE COURT:  Any objection?

13          MR. CANNICK:  No objection.

14          MR. HUOT:  No objection.

15          THE COURT:  Received.

16          (Government Exhibit 202 received in evidence)

17          MR. LONGYEAR:  May we publish it, your Honor?

18          THE COURT:  Yes.

19   BY MR. LONGYEAR:

20   Q.  You filmed the music video in front of 370 Madison?

21   A.  Yes, sir.

22   Q.  What was the name of that song?

23   A.  Gummo.  Gummo, G-U-M-M-O.

24          MR. LONGYEAR:  Ms. Harney, you can take down 202.

25   Q.  Mr. Hernandez, how did the filming of Gummo come about?

1   A.   Around August of 2017, I made the song Gummo.  At this time

2   I had signed a management deal with Chris Ehigiator, who was my

3   press manager.  When I met Chris Ehigiator, I signed a 20

4   percent management deal where I would give him 20 percent of my

5   earnings.  He had a best friend named Seqo Billy.  Being that

6   Seqo Billy was Chris Ehigiator's best friend, I would be around

7   him a lot, so I made the song Gummo and I put a line in there

8   saying that, "in the hood with them Billy niggas," and I'm

9   recording, in my hood -- "in the hood with them Billy niggas,

10  them Hoover niggas."

11          THE COURT:  If the court reporter doesn't hear what

12  you said, you need to repeat it so she can write it down.

13          THE WITNESS:  I'm recording a song that says "in the

14  hood with Hoover and Billy.  Hoover and Billy.

15  Q.   Now --

16  A.   So -- so, then I put that line in the song.  When I was

17  ready to film the video, I approached Seqo Billy and I asked

18  him if we could get -- Billy was Nine Trey, so I asked him if

19  we could get some Nine Trey members to be part of the video,

20  because I wanted the aesthetic to be, you know, full with Nine

21  Trey Blood members because I'm in the song.

22  Q.   Mr. Hernandez, let me pause you right there.

23          MR. LONGYEAR:  Ms. Harney, if we could please pull up

24  what's been marked for identification for the witness

25  Government Exhibit 22.

1    A.   That's Seqo Billy.

2    Q.   That's a photograph of Seqo Billy?

3    A.   Yes.

4    Q.   Does that fairly and accurately depict what he looks like?

5    A.   Yes.

6              MR. LONGYEAR:  Your Honor, the government offers

7    Government Exhibits 22 and 22A, which is the nameplate Seqo

8    Billy.

9              THE COURT:  Any objection?

10             MR. HUOT:  No objection.

11             MR. CANNICK:  No objection.

12             THE COURT:  Received.

13             (Government Exhibits 22 and 22A received in evidence)

14             MR. LONGYEAR:  Your Honor, may we publish Government

15   Exhibit 22?

16             THE COURT:  Yes.

17   BY MR. LONGYEAR:

18   Q.   Mr. Hernandez, who is Seqo Billy?

19   A.   Seqo Billy is a Nine Trey member.  He was the first one I

20   ever knew, came, like, he's the one I met first.  I met him in

21   the studio in Williamsburg.  So, then again, we -- we would

22   meet a lot because he would be my best friend's manager.  So I

23   made the song.  I asked him for permission if we could shoot

24   video.  And a week later he said that, you know, we -- the

25   video was going to happen, and I think we came for that

1  Saturday.  For whatever reason, I don't know, it got postponed.

2  I don't know if we shot it the week after or the very next day.

3  And that's how the video came about.  So I got it approved from

4  him, and -- and he set it up.

5  Q.  And again, this took place approximately September of 2017?

6  A.  Yes, sir.  Around September, August.

7  Q.  Now, Mr. Hernandez, did there come a time when you actually

8  went to film Gummo?

9  A.  Yes.  So, the day that I went to film Gummo, I was with my

10  best friend, Andrew Green.  We gotten a text from Seqo,

11  Chris -- I forget who.  I believe it was Seqo, because he sent

12  me the address of 370 Madison.  That's the place of residence

13  where he lived at.  So, me and Andrew Green walked there.

14      Oh, before we walked there, I went -- I told Seqo that I

15  would like for them to all be in red.

16  Q.  Why red?

17  A.  Because red is, is what a Blood member would wear, so I

18  want the video to be full of red.  So, before the video shoot I

19  went to go buy over 3,000 red bandannas and I showed them to

20  370 Madison.  Right after that, when I got there, Seqo greeted

21  me and introduced me to Shotti.  Shotti was at the top of the

22  stairs.  When I met him, I -- I went straight to him, and he

23  said:  What's up, homey?  We here for you.  Whatever you need,

24  we here.  Couple of the homeys going to show up in a little

25  bit.  It's just us right now, but a couple of the homeys going

J9hWmac5                        Hernandez - Direct

1    to show up.  In the meantime, you need anything, I said I'm

2    good.

3        I told him if he needed anything.  He said, Get a bottle of

4    Henny and something to eat for the guys.

5    Q.  What is a bottle of Henny?

6    A.  Henny's a type of liquor.  Hennessy.

7    Q.  Going back, what was your understanding at the time that

8    you met him -- what was your understanding of who Shotti was?

9    A.  From my understanding, Shotti was a big-home player.

10   Shotti was -- everyone was under him.

11   Q.  Who did you learn that from?

12   A.  Seqo.

13   Q.  And you also mentioned a word that Shotti said; he told you

14   the homeys were coming.  What does homeys mean?

15   A.  It's like another word for the other blood members.

16   Q.  Now, Mr. Hernandez, whom did you meet at this video shoot?

17   A.  I met Shotti.  I met Billy Ado.  I met Gunz, Poppo.

18            MR. CANNICK:  Sorry.  Repeat that name?

19            THE WITNESS:  Sorry?

20            THE COURT:  Back up a sentence or two.  Apart from

21   Shotti, who else did you meet?

22            THE WITNESS:  Shotti, Billy Ado, Gunz Billy, Poppo.

23            MR. LONGYEAR:  Ms. Harney, if we could show

24   Mr. Hernandez what is in evidence, I guess, Government Exhibit

25   8.

1            THE WITNESS:  Yeah, that's Shotti.

2    BY MR. LONGYEAR:

3    Q.  Do you know Shotti's real name?

4    A.  Kifano Jordan.

5            MR. LONGYEAR:  The government would offer Government

6    Exhibit 3A, which is the nameplate Kifano Jordan.

7            THE COURT:  Received.

8            MR. LONGYEAR:  I'm sorry.  8A.  I apologize.  8A.

9            THE COURT:  Received.

10           (Government Exhibit 8A received in evidence)

11           MR. LONGYEAR:  Your Honor, the government at this time

12   would also offer Government Exhibits 3A, 3B, 3C and 3D, which

13   are all nameplates associated with Daniel Hernandez.

14           THE COURT:  Any objection?

15           MR. HUOT:  No objection.

16           MR. CANNICK:  No objection.

17           THE COURT:  They're all received.

18           (Government Exhibits 3A, 3B, 3C and 3D received in

19   evidence)

20           MR. LONGYEAR:  Thank you, your Honor.

21           Ms. Harney, can we show the witness what's been marked

22   for identification as Government Exhibit 19.

23   Q.  Mr. Hernandez, do you recognize that person?

24   A.  Yeah, that's Billy Ado.

25   Q.  Does that picture fairly and accurately depict the way

1    Billy Ado looks?

2    A.  Yes, sir.

3              MR. LONGYEAR:  The government offers Government

4    Exhibit 19.

5              THE COURT:  Any objection?

6              MR. CANNICK:  No objection.

7              MR. HUOT:  No objection.

8              THE COURT:  Received.

9              (Government Exhibit 19 received in evidence)

10             MR. LONGYEAR:  Thank you, your Honor.

11             The government also offers Government Exhibit 19B, as

12   in boy, which would be Billy Ado's nameplate.

13             MR. HUOT:  No objection.

14             MR. CANNICK:  No objection.

15             THE COURT:  Received.

16             (Government Exhibit 19B received in evidence)

17             THE COURT:  Counsel, going forward, can I assume there

18   won't be an objection to the nameplates?

19             MR. CANNICK:  There will not, your Honor.

20             THE COURT:  Very well.

21             MR. LONGYEAR:  Thank you, your Honor.

22             Ms. Harney, can you show Mr. Hernandez what's been

23   marked for identification as Government Exhibit 21.

24   Q.  Do you recognize this person, Mr. Hernandez?

25   A.  Yes, Gunz Billy.

1    Q.  I'm sorry?

2    A.  Gunz Billy.

3          MR. CANNICK:  I'm sorry.  I didn't hear.

4          THE WITNESS:  Gunz.

5    Q.  Does that fairly and accurately depict the way he looks?

6    A.  Yeah.

7          MR. LONGYEAR:  Your Honor, the government offers

8    Government Exhibit 21 and the nameplate, 21A.

9          THE COURT:  Any objection?

10          MR. CANNICK:  No, your Honor.

11          MR. FASULO:  No objection.

12          THE COURT:  Received.

13          (Government Exhibits 21 and 21A received in evidence)

14          MR. LONGYEAR:  Your Honor, may we publish Government

15    Exhibits 19 and 21?

16          THE COURT:  Yes.

17    BY MR. LONGYEAR:

18    Q.  Mr. Hernandez, this is Government Exhibit 21 -- I'm sorry.

19    This is Government Exhibit 19.  Who is that?

20    A.  Billy Ado.

21          MR. LONGYEAR:  Could we publish Government Exhibit 21?

22          THE COURT:  Go ahead.

23    A.  Gunz Billy.

24    Q.  Now, Mr. Hernandez --

25          MR. LONGYEAR:  Thank you, Ms. Harney.  You can take

1   that down.

2            Your Honor, may I approach?

3            THE COURT:  You may.

4   Q.  Mr. Hernandez, I've put in front of you a stack of CDs.  In

5   preparation for your testimony today, have you reviewed a

6   series of videos?

7   A.  Yes.

8   Q.  Can you please find the CD marked 607.  The CDs are in

9   number order.

10       Have you found Government Exhibit 607?

11  A.  Yes.

12           MR. LONGYEAR:  Ms. Harney, please just pull up the

13  opening frame of Government Exhibit 607.

14  Q.  Mr. Hernandez, what is on Government Exhibit 607?

15  A.  It's a video of Gummo.

16  Q.  Is it the entire video or a portion of the video Gummo?

17  A.  A portion.

18  Q.  Prior to your testimony, did you review the contents of

19  Government Exhibit 607?

20  A.  Yeah.

21  Q.  How do you know that?

22  A.  I watched it.

23  Q.  Did you do anything to the CD?

24  A.  Yeah, I initialed it with my --

25           MR. LONGYEAR:  Your Honor, at this time the government

1  would offer Government Exhibit 607.

2            THE COURT:  Any objection?

3            MR. HUOT:  No objection.

4            MR. CANNICK:  No, your Honor.

5            THE COURT:  Received.

6            (Government Exhibit 607 received in evidence)

7            MR. LONGYEAR:  Your Honor, there are also transcripts.

8  There's a transcript associated with this.  I think at this

9  time government has prepared a binder of transcripts --

10           THE COURT:  Which will be given to each juror?

11           MR. LONGYEAR:  Yes, your Honor.

12           THE COURT:  Yes, you may do so.

13           The transcripts are stipulated to, correct, counsel?

14           MR. CANNICK:  Yes.

15           THE COURT:  All right.

16           Ladies and gentlemen, government counsel has prepared

17  binders which I understand to contain transcripts of multiple

18  things.  I will ask you to strictly follow along and only turn

19  to the transcript that is the subject of the current

20  discussion; in other words, don't look ahead.  The other items

21  we may or may not get to in good time, but I ask you to focus

22  just on the exhibit that's being addressed.

23           Go ahead, Mr. Longyear.

24           Keep those transcripts closed until otherwise

25  directed.

219

1           Go ahead, Mr. Longyear.

2           MR. LONGYEAR:  Ms. Harney, can we please pull up for

3    the witness what's been marked for identification as Government

4    Exhibit 607-T.

5    Q.  Mr. Hernandez, do you see Government Exhibit 607-T?

6    A.  Yes, sir.

7    Q.  What is that?

8    A.  It's the lyrics, the beginning lyrics to Gummo.

9    Q.  Prior to your testimony today, did you review those lyrics?

10   A.  Yes.

11   Q.  Are they accurate?

12   A.  Yes, they are.

13          MR. LONGYEAR:  Your Honor, the government offers

14   Government Exhibit 607-T.

15          THE COURT:  Any objection?

16          MR. HUOT:  No objection.

17          MR. CANNICK:  None, your Honor.

18          THE COURT:  All right.  Received.

19          (Government Exhibit 607-T received in evidence)

20          MR. LONGYEAR:  Your Honor, at this time the government

21   would like to play Government Exhibit 607, and the transcript

22   is in the binder.

23          THE COURT:  All right.  Are you directing members of

24   the jury to turn to the tab near the back of the binder that

25   says 607-T?

1        MR. LONGYEAR:  Yes, your Honor.

2        THE COURT:  Ladies and gentlemen, kindly do so, but

3   just stay on that page.

4        MR. LONGYEAR:  Ms. Harney, can you please play 607.

5        (Video played)

6        MR. LONGYEAR:  Thank you, Ms. Harney.

7        Before turning to the lyrics, Ms. Harney, if we can

8   just mute it and I just want to go to certain portions of this

9   video, beginning about 12 seconds in the video.

10        (Video played)

11  Q.  Now, Mr. Hernandez, on the left side of the screen, about

12  three people from the left, who is depicted there?

13  A.  Seqo, Seqo Billy, with an olive green, I would say, shirt;

14  a flag tied around the neck.

15        MR. LONGYEAR:  Ms. Harney, if we could fast forward to

16  about 17 seconds in the video.

17        (Video played)

18  Q.  Mr. Hernandez, there's a woman there in the front, the

19  foreground.  Who is that person?

20  A.  Chanel.

21  Q.  Who is Chanel?

22  A.  From my understanding, Chanel is Seqo's aunt or cousin.

23  Q.  And what relationship, if any, did Ms. Chanel have to Nine

24  Trey?

25  A.  She went by Ms. TreyWay.  Ms. TreyWay, I don't know if she

1    put any -- any, you know, work in for the gang, but I know she

2    used her house, members of Nine Trey, her apartment.

3    Q.  Where was her apartment?

4    A.  370 Madison.

5    Q.  She lived there?

6    A.  Yeah.

7    Q.  And members of Nine Trey would meet there?

8    A.  Members of the Nine Trey would have meetings there and meet

9    up there.

10             MR. LONGYEAR:  Ms. Harney, if we could fast forward to

11    about 20 seconds in the video.

12             (Video played)

13    Q.  Mr. Hernandez, in the background a little bit, and I don't

14    know if -- are you able to annotate, if you circle on the

15    screen -- do you see Gunz in the video?

16    A.  Yes.

17    Q.  Are you able to circle on the screen and identify him?

18             MR. LONGYEAR:  Ms. Harney, finally --

19             THE COURT:  Mr. Longyear, just so that the record is

20    clear what the witness did, could you just make a record of

21    what he's done.

22             MR. LONGYEAR:  Yes.  Thank you, your Honor.

23             The witness has indicated, in about the middle of the

24    picture, in what appears to be about the second or third row,

25    the witness has circled, made a circle around the face of the

1   person he's identified as Gunz.

2           THE COURT:  Thank you.

3           MR. LONGYEAR:  Ms. Harney, if we could go to about 30

4   seconds in the video.  And are we able to delete the circle?

5           (Video played)

6   Q.  Now, Mr. Hernandez, who is depicted here at about 30

7   seconds into the video clip?

8   A.  Billy Ado is the one holding the gun, and Shotti is the one

9   behind him.

10  Q.  The gun that Billy Ado is holding, was that a real gun?

11  A.  Yes.

12          MR. LONGYEAR:  Now, Ms. Harney, we can take down

13  Government Exhibit 607.  And can we pull up Government Exhibit

14  607-T.  If we could zoom in on the lyrics, please.

15  Q.  Mr. Hernandez, I'm going to ask you some questions about

16  the lyrics of Gummo.  Beginning with the first line, there's a

17  reference to a word "blicky."  What is blicky?

18  A.  Blicky is another word for gun.

19  Q.  And on the second line, there's the phrase in the middle

20  "drum it holds fifty."  What is that in reference to?

21  A.  Drum is an attachment that you have to a gun, carries extra

22  clips, bullets.

23  Q.  Turning to the second stanza, second line of the second

24  stanza, there's a line there, "in the hood with them Billy

25  N-word and them Hoover N-word."  What is that in reference to?

1   A.  Me stating who I'm around.

2   Q.  And what is Billy?

3   A.  Billy's Nine Trey.

4   Q.  And Hoover?

5   A.  Hoover's its own set, like their own thing.

6   Q.  The last line, "no KB, you a loser N-word, up that Uzi

7   N-word."  What is KB?

8   A.  KB is, was, like, a bodyguard for another rapper named

9   Trippie Redd, so I stated, "no KB," like if you didn't have KB,

10  you would lose a N-word, up that Uzi N-word."

11      Uzi is another rapper that was related, that people

12  compared to Trippie Redd.  So I said if you don't have KB

13  watching over you, you will lose somebody and I will up the

14  Uzi.

15      I don't know.  I thought it was cool at the time.

16  Q.  Mr. Hernandez, what is Gummo about, generally speaking?

17  A.  It's a -- it was actually a dis song.  A dis song is, like,

18  something -- how I say?  It's a song towards, like, somebody

19  who I didn't get along with, best way I can describe it.

20  Q.  And who is the dis song aimed at?

21  A.  Trippie Redd.

22  Q.  Why?

23  A.  Me and him were signed to the same label around -- around

24  2017, when I signed my first deal, me and Trippie Redd were

25  signed to the same label.  He signed first.  I then signed

1     right after.  There was a lot of jealousy involved, a lot of

2     arguments back and forth on social media, so I made the song in

3     the midst of the situation.

4     Q.  Did you have an understanding as to whether or not Trippie

5     Redd was affiliated with a gang?

6     A.  Yes.

7     Q.  And what gang was that?

8     A.  He, he, I think he was saying he was part of like Five Nine

9     Brim.

10    Q.  What's Five Nine Brim?

11    A.  It's another Blood set.

12    Q.  Is that a rival set to Nine Trey?

13    A.  I mean, it became another rival at the time.

14          MR. LONGYEAR:  Ms. Harney, we can take down 607-T.

15    Q.  Mr. Hernandez, after you had filmed Gummo, did there come a

16    point in time when Gummo was released on the Internet?

17    A.  Yes.

18    Q.  What happened after Gummo was released on the Internet?

19    A.  I think we released Gummo in about, in about October,

20    around October.  Gummo became an instant, just an instant

21    sensation.  It was a sensation that went viral, viral meaning

22    people shared it, people, you know, came to like the video

23    Gummo.  They liked the song, so it was instant success, I would

24    say.

25    Q.  After the release of Gummo, did you have any other

1   conversations with either Seqo or Shotti about filming another

2   video?

3   A.   Yeah.  So -- so, when I released Gummo, I was in Los

4   Angeles.  I wasn't authorized to release the video with the

5   label, so I just put it out anyway.  I just threw it up on

6   YouTube and just said whatever happens, happens.  When I

7   uploaded the video and there was such -- like, a lot of people

8   were showing attention to it, Shotti actually called Seqo and

9   said, quote:  This little nigga knows what he's doing.  I

10  thought all that rainbow hair shit was -- you know, he was

11  bugging for that -- but he know what he's doing.  Tell him to

12  stay in touch.

13  Q.   So what happened?

14  A.   I stood in touch.

15  Q.   Did there come a time when you made another video?

16  A.   Yeah, about a month after, we, we filmed Kooda.

17  Q.   And so, how did the filming of Kooda come about?  And I'm

18  sorry.  Could you spell Kooda for the court reporter.

19  A.   Kooda, K-O-O-D-A.

20  Q.   How did Kooda come about?

21  A.   Well, after -- after -- after we shot Gummo, I knew I had a

22  formula.  I knew the formula was to repeat it.  You know what

23  I'm saying?

24  Q.   To repeat what?

25  A.   To repeat the gang -- how -- what's the word for it?  The

1    gang image, I would say, like promote it.  You know what I'm

2    trying to say?  That's what people like, so it was like -- it

3    was just a formula, a blueprint that I found that worked.  So,

4    I told Shotti I wanted to -- at this time, after Gummo came

5    out, not to skip over a lot of stuff, we became really close.

6    So, I would hang out at 370 Madison a lot, hang out with him,

7    and I asked him to -- if it was a good idea to film Kooda,

8    and -- and we started filming Kooda.

9    Q.  And approximately when, in relation to when Gummo was

10   released, approximately when did you film it?

11   A.  I would say late October, early November.

12   Q.  How did you come up with the name Kooda?

13   A.  Kooda's actually another rapper.  Before I changed my style

14   to rap, I was into this kid named Kooda.  I always thought he

15   was a talented kid.  I actually liked him a lot, so I named my

16   song after him.

17          MR. LONGYEAR:  Ms. Harney, if we could please show the

18   witness what's been marked for identification as Government

19   Exhibit 23.

20   Q.  Mr. Hernandez, what is Government Exhibit 23?

21   A.  It's Kooda.

22   Q.  A picture of Kooda?

23   A.  Yes, sir.  Kooda.

24   Q.  Fairly and accurately depict what he looks like?

25   A.  Yes, sir.

1          MR. LONGYEAR:  Your Honor, the government offers

2    Government Exhibits 23 and 23A.

3          MR. HUOT:  No objection.

4          THE COURT:  Received.

5          (Government Exhibits 23 and 23A received in evidence)

6          MR. LONGYEAR:  May we publish Government Exhibit 23?

7          THE COURT:  Yes.

8          MR. LONGYEAR:  Thank you, Ms. Harney.

9    Q.  Now, Mr. Hernandez, where was Kooda filmed?

10   A.  Kooda was filmed -- Kooda was filmed in Brooklyn, in the

11   intersection of Fulton Avenue and Utica, I believe.  Yeah, in,

12   like, Crown Heights, Brooklyn.

13   Q.  Is there a housing development that's around Utica and

14   Fulton?

15   A.  Yeah, Smurf Village.

16   Q.  Does Smurf Village have any relationship to Nine Trey?

17   A.  There was Nine Trey members who lived there.

18   Q.  Now, Mr. Hernandez, if you could turn to the CD in front of

19   you marked Government Exhibit 609.

20         MR. LONGYEAR:  Ms. Harney, if you could just open up

21   the opening frame.

22   Q.  Prior to testifying, did you review the contents of

23   Government Exhibit 609?

24   A.  Yes, sir.

25   Q.  What is on 609?

J9hWmac5                       Hernandez - Direct

1    A.  Video of Kooda.

2    Q.  Is it all of Kooda or a portion?

3    A.  A portion.

4           MR. LONGYEAR:  And also, if we could please,

5    Ms. Harney, pull up Government Exhibit 609-T.

6    Q.  Do you see 609-T in front of you?

7    A.  Yes.

8    Q.  What is 609-T?

9    A.  It's the beginning of Kooda.

10   Q.  The lyrics?

11   A.  Lyrics, yeah.

12          MR. LONGYEAR:  Your Honor, the government offers

13   Government Exhibit 609-T.

14          MR. HUOT:  No objection.

15          MR. CANNICK:  No objection.

16          THE COURT:  Received.

17          (Government Exhibit 609-T received in evidence)

18          MR. LONGYEAR:  And if I haven't, the government offers

19   609.

20          THE COURT:  I think that has not been offered yet.

21          Any objection?

22          MR. HUOT:  No objection.

23          MR. CANNICK:  No objection.

24          THE COURT:  Received.

25          (Government Exhibit 609-T received in evidence)

1              MR. LONGYEAR:  Thank you, your Honor.

2              Ms. Harney, could we please publish and play

3    Government Exhibit 609.

4              THE COURT:  Should the ladies and gentlemen of the

5    jury turn to 609-T at this point?

6              MR. LONGYEAR:  Not at this point.  I think we'll watch

7    the video, and then we'll turn to the lyrics.

8              THE COURT:  Very good.

9              (Video played)

10             MR. LONGYEAR:  Thank you, Ms. Harney.

11             Ms. Harney, if we could turn the volume down, and as

12   we did with Gummo, just go to certain clips in the video.  And

13   if we could go to about 20 seconds in the video.

14             (Video played)

15             MR. LONGYEAR:  If we could go just a little before,

16   Ms. Harney.  I'm sorry.  Start at 19 seconds.  Play it.

17             (Video played)

18             MR. LONGYEAR:  Stop.

19   Q.  Mr. Hernandez, in the middle of the screen, who is depicted

20   there?

21   A.  Seqo Billy.

22   Q.  And behind Seqo Billy -- I'm sorry.

23        Are you on the right side of the screen here?  Are you

24   depicted on the right side of the screen.  Is that your arm?

25   A.  That's my hand and my arm.

1    Q.  And behind you, who is behind you, behind your arm?

2            MR. LONGYEAR:  Ms. Harney, maybe we can play it.

3            (Video played)

4    Q.  Did you --

5    A.  Billy Ado.

6    Q.  Billy Ado?

7    A.  Yeah.

8            MR. LONGYEAR:  Ms. Harney, if we could just go to 30

9    seconds in the video.

10           (Video played)

11   Q.  Who is depicted here, Mr. Hernandez?

12   A.  The guy in the red jacket, blue and white, that's Midnight.

13   Q.  Who is Midnight?

14   A.  Midnight, from my understanding, when I was first

15   introduced to Nine Trey, was the -- he was the one who held the

16   big-homey status in Smurf Village, in the housing project right

17   across the street from Kooda.

18   Q.  Is he a Nine Trey member?

19   A.  Yes, sir.

20   Q.  And by big homey, does that mean he has high-ranking

21   status?

22   A.  From my understanding, yeah.

23           MR. LONGYEAR:  Thank you, Ms. Harney.  We can take

24   down 609.  And if we could pull up, please, 609-T and zoom in

25   on the lyrics.

1          Your Honor, at this point, the jury can turn --

2          THE COURT:  Yes.

3          Ladies and gentlemen, turn now to 609-T in your

4    binder.

5    BY MR. LONGYEAR:

6    Q.  Mr. Hernandez, the first line, "N-word runnin' out they

7    mouth but they never pop out," what does that refer to?

8    A.  Well, the whole -- the whole paragraph, it speaks about --

9    well, the first line -- actually, it's about, I wanted to

10   address all the controversy that was going on after Gummo was

11   released.  A lot of people really didn't understand it.

12   Q.  Didn't understand what?

13   A.  They didn't understand how, I guess, a kid with rainbow

14   hair could be affiliated with Nine Trey Bloods, and it just

15   didn't mix.  So, the first line is "N-word runnin' out they

16   mouth but they never pop out," just in generally speaking,

17   people -- if you replace the N-word with people, people runnin'

18   out they mouth but they never pop out.  So, that's what I meant

19   by it.

20   Q.  Again, what was the genesis of Kooda?  Why did you make

21   Kooda?  Was it in response to anything?

22   A.  Yeah, it was in response to everything, all the backlash

23   from the public to, you know -- just the Trippie Redd stuff

24   going on, everything, other rappers talking, you know.

25   Q.  In the third line, it reads, "all my N-word on fifty, so

1    you know we hopped out."  The phrase "on fifty," what does that

2    mean?

3    A.  Fifty is to be on point, like to be aware.

4    Q.  Is that a term associated with Nine Trey or Bloods in

5    general?

6    A.  Bloods in general -- I mean, I think gang awareness.

7              MR. HUOT:  Objection.  Leading.

8              THE COURT:  One moment.

9              Sustained.

10   BY MR. LONGYEAR:

11   Q.  Mr. Hernandez, the term "on fifty," how do you know about

12   that term?

13   A.  Well, I would talk about all the terms, you know -- well,

14   not all the terms, but I learned a couple just talking with

15   Seqo Billy.  And on fifty, you know --

16   Q.  Did you talk to other people?

17   A.  Yeah, Shotti.

18   Q.  And what did they teach you?

19   A.  Well, after Kooda --

20   Q.  I'm sorry.  Before Kooda, as you were writing Kooda --

21   A.  OK.

22   Q.  -- with some of the terms and the lyrics, how did you come

23   about drafting those lyrics or coming up with the words?

24   A.  Well, me and my best friend Andrew, we would write

25   together, but I would spend a lot of time with, you know, Nine

1    Trey at 370 Madison, learned on fifty.

2    Q.  Based on your time with members of Nine Trey, did you learn

3    any of their lingo or words that they used?

4    A.  Say that one more time.

5    Q.  Based on your time that you spent with members of Nine

6    Trey, did you learn about some of their lingo or words that

7    they used?

8    A.  Correct.

9    Q.  Is "on fifty" one of those terms that you learned?

10   A.  Yes.

11   Q.  What does on fifty mean?

12   A.  To be aware.

13   Q.  On the next line, line 4, it reads, "mobbed out opps out,

14   we gon' show what we about."  What are you talking about in

15   that line?

16   A.  So, in this line I'm saying mobbed out, like mob,

17   referencing, like, we're -- we're in large numbers, mobbed out.

18   Like we mobbed out.

19       Opps out is like opposition, like the opps, opposition, our

20   opposition are out, so we're mobbed out, they're opps out, "we

21   gon' show what we about."

22           MR. LONGYEAR:  Thank you, Ms. Harney.  You can take

23   down 609-T.

24           THE COURT:  Mr. Longyear, are you done with the

25   examination of this exhibit?

J9hWmac5                    Hernandez – Direct

1              MR. LONGYEAR:  Yes, I am.

2              THE COURT:  I'm looking for a natural break point

3    because I understand that the jurors' coffee has arrived.

4              All right.  Ladies and gentlemen, it's time for our

5    midafternoon break.  I'll ask you to leave your binders in the

6    jury box and retire to the jury room.  Mr. Smallman will get

7    you in 15 minutes.  Please don't, as always, discuss the case.

8              Thank you.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J9hWmac5                        Hernandez – Direct

1              (Jury not present)

2              THE COURT:  Thank you.  Everyone may be seated.

3              Marshal, you may take the witness.  I'll just need the

4    witness back in the box in 15 minutes.

5              THE MARSHAL:  15 minutes, yes, sir.

6              THE COURT:  When we resume I'll want the witness back

7    in the box.

8              THE MARSHAL:  Yes, sir.

9              (Witness not present)

10             THE COURT:  Counsel, before we break, anything from

11   the government?

12             MR. LONGYEAR:  No, your Honor.

13             THE COURT:  Counsel, anything to raise?

14             MR. HUOT:  No, your Honor.

15             THE COURT:  All right.  I'll see you in about 15

16   minutes.

17             (Recess)

18

19

20

21

22

23

24

25

1            THE COURT:  Mr. Smallman, please get the jury.

2            (Jury present)

3            THE COURT:  Welcome back, ladies and gentlemen.

4            Mr. Hernandez, I will remind you that you are still

5    under oath.

6            Counsel, you may inquire.

7            MR. LONGYEAR:  Thank you, your Honor.

8    BY MR. LONGYEAR:

9    Q.  Mr. Hernandez, what happened after you released Kooda?

10   A.  After I released Kooda, a lot happened.  That was an

11   instant sensation, too.  I think the conversation was, you

12   know, this kid was, you know -- well, just a month prior it was

13   a hit song Gummo and then to release Kooda, that was an instant

14   hit, too.

15   Q.  Let me ask you a better question.  With respect to Nine

16   Trey, what happened after you released Kooda?

17   A.  After I released Kooda, I was officially a Nine Trey

18   member.  They made me a Nine Trey member.

19   Q.  Who is they?

20   A.  Seqo, Billy, and Shotti.

21   Q.  How did that come about?

22   A.  I guess jokingly -- jokingly I was sent text messages like,

23   yo, let me shoot my 31, let me shoot my 31.  And Seqo then

24   started sending me the greetings of Nine Trey.  Never sent me

25   an oath or nothing, but just sent me like the greetings and how

1    you greet other members and stuff like that.  That's what

2    happened.

3    Q.  Now, Mr. Hernandez, you testified earlier today that you

4    recognized two of the individuals here as members of Nine Trey

5    when you were a member, is that right?

6    A.  Yes.

7    Q.  When did you first meet Anthony Ellison?

8    A.  I think I met Anthony Ellison in around October, November

9    of 2017.

10   Q.  How did you meet him?

11   A.  The first time I ran into Harv was I went to like this club

12   in midtown Manhattan.  The only person I remember being was

13   Shotti.  We get there.  We get to the club.  Harv is there with

14   five other girls.  He is there with five girls.  He doesn't

15   really say much.  Quiet.  Very quiet.  Shotti greets him.  He

16   greets Shotti back.  We didn't talk at all.  He didn't say

17   nothing to me.

18   Q.  I'm showing you what's in evidence as Government Exhibit 2.

19           MR. LONGYEAR:  Ms. Harney, can you pull up Government

20   Exhibit 2.

21   Q.  Do you recognize what's depicted in Government Exhibit 2?

22   A.  Yes.

23   Q.  What is that?

24   A.  Harv.

25           MR. LONGYEAR:  Your Honor, the government offer

1    Government Exhibits 2A and 2B, the two nameplates.

2              THE COURT:  Received.

3              (Government Exhibits 2A and 2B received in evidence)

4              MR. LONGYEAR:  Ms. Harney, we can take down Government

5    Exhibit 2.

6    Q.  Now, Mr. Hernandez, generally speaking, when you were a

7    member of Nine Trey with Mr. Ellison, generally speaking, what

8    were some of the things you saw Mr. Ellison do?

9    A.  Well, he would always be around -- crime related?

10   Q.  Sure.

11   A.  Well, fights, I would say.  The craziest thing I seen him

12   do is kidnap me.

13   Q.  We will get to that a little later.

14             With respect to the other individual you identified,

15   Mr. Mack, when did you meet Mr. Mack?

16   A.  I think I met Nuke around the same time.  I want to say

17   November.

18   Q.  How did you meet Mr. Mack?

19   A.  I met Nuke on Madison.  I think he came driving in the

20   passenger's seat of a red Durango SRT.  I heard a lot about him

21   prior.  That was the first day I met him.

22   Q.  Showing you what's been marked for identification as

23   Government Exhibit 1, do you recognize what's depicted in

24   Government Exhibit 1?

25   A.  Yeah.  Nuke.

1    Q.  Does that picture fairly and accurately depict how he

2    looks?

3    A.  Yeah.

4            MR. LONGYEAR:  Your Honor, the government offers

5    Government Exhibits 1, 1A, and 1B.

6            THE COURT:  Any objection?

7            MR. HUOT:  No objection.

8            THE COURT:  Received.

9            (Government Exhibits 1, 1A, and 1B received in

10   evidence)

11   Q.  Mr. Hernandez, we will turn back to the defendants a little

12   later.  Before we do, I'd like to talk to you about Nine Trey

13   generally.

14       Approximately when did you become a member of Nine Trey?

15   A.  Officially, I'll say like around late November, early

16   December.

17   Q.  Of what year?

18   A.  Of 2017.

19   Q.  Were you initiated into the gang?

20   A.  No.

21   Q.  Did you have an understanding based on your conversations

22   with some of the other members whether or not there was an

23   initiation process into Nine Trey?

24   A.  I acknowledged there is initiation in the gang, period, but

25   I understood from being a member of Nine Trey you would have to

1    shoot your 31.

2    Q.   What does shoot your 31 mean?

3    A.   From my understanding, like fight for 31 seconds.

4    Q.   Fight whom?

5    A.   Another Nine Trey member or multiple.

6    Q.   Were there other ways that you could become a member of

7    Nine Trey?  Withdrawn.

8            Were there other ways that one could be initiated into

9    Nine Trey?

10   A.   Yeah.  Commit another crime, like in furtherance, put in

11   work for the gang.

12   Q.   What is to put in work mean?

13   A.   That's what I try to say.  Like further put -- how would I

14   say like, committing a crime or being sent on like a mission of

15   sort to put in some type of, you know -- you know crime.

16   Q.   What sorts of crimes?

17   A.   Like cutting someone, like cutting their face.

18   Q.   Any other crimes?

19   A.   It could be anything, assault, shooting, anything.

20   Q.   You mentioned the word mission.  What's a mission?

21   A.   A mission is like something that has to be done for the

22   gang.

23   Q.   Now, Mr. Hernandez, taking a step back, you were not

24   initiated, correct?

25   A.   No.

J9HMMAC6                         Hernandez - Direct

1    Q.  But you were a member?

2    A.  Yes.

3    Q.  As a member of Nine Trey what responsibilities, if any, did

4    you have?

5    A.  Just keep making hits and be the financial support for the

6    gang.

7    Q.  What do you mean by the financial support for the gang?

8    A.  Financially support, making money, making money through the

9    records and providing it to the members of Nine Trey, whether

10   it's for their own personal reasons, equipping with guns.

11   Q.  What do you mean, equipping with guns?

12   A.  Like so they could buy guns with and stuff like that.

13   Q.  And what, if anything, did you get from Nine Trey?

14   A.  I would say my career.

15   Q.  How do you mean?

16   A.  Like the credibility.

17   Q.  What credibility?

18   A.  Street credibility.  The videos, the music, the protection.

19   All of the above.

20   Q.  Mr. Hernandez, did Nine Trey go by any other names?

21   A.  Yes.

22   Q.  What were they?

23   A.  Billy, Billy BadAss.

24   Q.  Any others?

25   A.  Billy's.

1    Q.  Are you familiar with the term TreyWay?

2              MR. HUOT:  Objection.

3              THE COURT:  Overruled.

4    Q.  Are you familiar with the term TreyWay?

5    A.  Yes.

6    Q.  What is TreyWay?

7    A.  TreyWay, from my understanding, it was a more sophisticated

8    way to name the gang, something that we could market.

9    Q.  I'm sorry.  To name which gang?

10   A.  Nine Trey.

11   Q.  Mr. Hernandez, was there a particular way that members of

12   Nine Trey greeted one another?

13   A.  Yes.

14   Q.  What is it?

15   A.  It's a handshake.

16   Q.  Could you demonstrate the handshake to the jury and explain

17   what it is that you are doing?

18   A.  Yeah.  You need two people.

19             MR. CANNICK:  Your Honor, may I position myself?

20             THE COURT:  Of course.

21             Mr. Hernandez, why don't you stand up when you

22   demonstrate what you demonstrate so the ladies and gentlemen of

23   the jury can see better.

24             THE WITNESS:  Speak out loud?

25             THE COURT:  Yes.

1    A.  Basically, swipe up.  This is the way I did it.  Swipe up

2    the thumbs, meet the back of the index finger.  You hit the

3    back of the index finger, lock it into the Nine Trey sign.

4    That's the way I was taught.

5    Q.  Who taught you that?

6    A.  I was doing it with Shotti a lot.

7    Q.  You had mentioned that as part of the handshake one of the

8    things that was accomplished with the handshake was making the

9    Nine Trey sign?

10   A.  Yeah.

11   Q.  What is the Nine Trey sign?

12   A.  Nine Trey sign is like this.

13   Q.  I'm sorry.  If you can describe it with words for the jury

14   and for the court reporter.

15   A.  The Nine Trey sign shows you the nine right here and like

16   your middle finger, your ring finger and your pinky, I guess,

17   running parallel up just to show the three, and the nine is

18   with your index finger and your thumb so you are making a 93,

19   Nine Trey.

20   Q.  Mr. Hernandez, who taught you how to make that sign?

21   A.  Nuke.

22          MR. LONGYEAR:  Ms. Harney, if we could show for the

23   witness what's been marked for identification as Government

24   Exhibit 501X.

25   Q.  Mr. Hernandez, you see 501X?

1    A.   Yes.

2    Q.   What's depicted in 501X?

3    A.   501X is a picture of me on the far right, Nuke in the

4    middle, and another rapper under the name of Handsome Balla on

5    the left.

6              MR. LONGYEAR:  Your Honor, the government offers

7    Government Exhibit 501X.

8              THE COURT:  Any objection?

9              MR. HUOT:  No objection.

10             MR. CANNICK:  No objection.

11             THE COURT:  Received.

12             (Government Exhibit 501X received in evidence)

13             MR. LONGYEAR:  May we publish, your Honor?

14             THE COURT:  Yes.

15   Q.   Mr. Hernandez, you're depicted on the right side of this

16   picture?

17   A.   Yes.

18   Q.   Are you making the Nine Trey sign?

19   A.   I think I was just getting the hang of it.

20   Q.   You testified a moment ago that Nuke is the one who taught

21   you how to make the Nine Trey sign?

22   A.   Yes.

23   Q.   Can you describe that?  How did that come about?

24   A.   I want to say I believe this is the first day I met Nuke.

25   We show up to Luster Club.  It's a strip club in Brooklyn.  We

1    get there.  We show up or whatever.  After the whole strip club

2    thing we go out towards the cars.  Hold on.  I want to say it

3    was Lust Strip Club or Angel's.  I don't want to be quoted and

4    be wrong.  Lust or Angel's Strip Club.  Just a strip club.

5    After the strip club, we -- Nuke told me to take a picture with

6    this other artist, Handsome Balla.  I actually did the sign

7    wrong.  I just threw it up like this.

8    Q.  Why was it wrong?

9    A.  It was wrong because it wasn't making a nine and the

10   fingers weren't running parallel to the other fingers.  He

11   pulled me to the side, I want to say, before the photo or

12   after.  But it looks like I'm doing it wrong here.  So I want

13   to say after the picture and said, yo, like, do it like this.

14   Q.  Did he tell you anything else as to why you needed to make

15   the sign correctly?

16   A.  Yeah.  If I'm going to be a Nine Trey member or Billy, I

17   have to do the sign right.

18            MR. LONGYEAR:  Thank you, Ms. Harney.  We can take

19   down 501X.

20   Q.  Mr. Hernandez, did you ever see Mr. Ellison make any of

21   those signs?

22   A.  Yeah.

23   Q.  There are two disks in front of you.  One is marked 800K.

24   The other 802N.  We will begin with 800K.

25            MR. LONGYEAR:  Ms. Harney, if he can just pull up the

1    opening frame of 800K.

2    Q.  800K and 802N.

3        Beginning with 800K, Mr. Hernandez, looking at the screen,

4    have you seen this video before?

5    A.  Yes.

6    Q.  On the disk on 800K, did you review this before you

7    testified today?

8    A.  Yes.

9    Q.  How do you know that?

10   A.  Because my initials are on it.

11   Q.  What's depicted, generally, in 800K?

12   A.  Harv is on the far right.

13   Q.  Generally, what is 800K?

14   A.  I'm sorry?

15   Q.  What is 800K?  Is it a video or picture?

16   A.  It's a video.

17           MR. LONGYEAR:  Your Honor, the government offers

18   Government Exhibit 800K.

19           THE COURT:  Received.

20           (Government Exhibit 800K received in evidence)

21           MR. LONGYEAR:  May we publish, your Honor?

22           THE COURT:  You may.

23           (Video played)

24           MR. LONGYEAR:  One moment, your Honor.

25           Your Honor, there is a little technical issue.  We are

1  going to pull up the original.

2          Ms. Harney, could you please play 800K again.

3          (Video played)

4  Q.  Mr. Hernandez, who is depicted in that video?

5  A.  Harv was on the far right.  Chris Ehigiator, the manager I

6  previously testified about that I signed a management deal

7  with, was in the middle, and I was on the left side with the

8  red shirt on.

9  Q.  Towards the end of the video did you see Mr. Ellison hold

10  up a sign?

11  A.  Yeah.

12  Q.  What sign was that?

13  A.  It was a Nine Trey sign.

14          MR. LONGYEAR:  Ms. Harney, the next exhibit, if we can

15  just show the witness the opening frame of 802N.

16  Q.  Mr. Hernandez, prior to testifying did you review the

17  contents of 802N?

18  A.  Yes.

19  Q.  What is 802N?

20  A.  It's a video of Harv.

21          MR. LONGYEAR:  Your Honor, the government offers

22  Government Exhibit 802N.

23          THE COURT:  Any objection?

24          MR. HUOT:  No objection.

25          MR. CANNICK:  No objection.

1            THE COURT:  Received.

2            (Government Exhibit 802N received in evidence)

3            MR. LONGYEAR:  May we publish?

4            THE COURT:  Yes.

5            (Video played)

6    Q.  Mr. Hernandez, right there the frame is paused at around

7    seven seconds.

8            Who is depicted in that video?

9    A.  Harv.

10   Q.  What is he doing with his hands?

11   A.  That's the Nine Trey sign.

12           MR. LONGYEAR:  Thank you, Ms. Harney.  We can take

13   that down.

14           Ms. Harney, if we could show the witness what have

15   been marked for identification as Government Exhibits 802A,

16   802B, 802D, and 802H.  If we can show them just quickly for him

17   just to preview, and then we will go from there.

18   Q.  Mr. Hernandez, did you have a second to look at those

19   photos?

20   A.  Yes.

21   Q.  Generally speaking, who is depicted in those photos?

22   A.  The one I'm looking at right now, on your left side you

23   have Billy Ado.  On your right side you have Harv.

24   Q.  Looking at all the videos, the individuals that you have

25   testified about today, are they depicted in those photographs?

1    A.  Yes, and more.

2             MR. LONGYEAR:  Your Honor, the government offers

3    Government Exhibits 802A, 802B, 802D, and 802H.

4             THE COURT:  Any objection?

5             MR. HUOT:  No objection.

6             MR. CANNICK:  No objection.

7             THE COURT:  Received.

8             (Government Exhibits 802A, 802B, 802D, and 802H

9    received in evidence)

10            MR. LONGYEAR:  Turn to 802A, Ms. Harney.  If we can

11   zoom in, Ms. Harney, on the middle of the picture down.

12   Q.  Mr. Hernandez, if you can go through and identify some of

13   the individuals who are in this photograph, beginning on the

14   left side of the photograph and working to the right.

15   A.  I don't know the guy in the LA hat.  The yellow sweater is

16   Fleazy Bambino and the white tank top you have Harv.  Two

17   people over from Harv to the right you have Shotti.  Right

18   under Shotti and Harv you have Seqo Billy.

19   Q.  What is Seqo Billy wearing?

20   A.  A black -- I want to say off white sweatshirt.  It's a

21   brand called Off White.  But it's all black with the white

22   things on the arm.

23   Q.  Who is in front of Seqo Billy?

24   A.  On the bottom left of the picture under Seqo is Nuke, and

25   on his right side is Mel Murda.

1   Q.  Is who?

2   A.  Mel Murda.

3   Q.  What is Mel Murda wearing?

4   A.  Mel Murda is wearing a red shirt with red Cincinnati Reds

5   baseball cap.

6   Q.  Who is Mel Murda?

7   A.  Mel Murda is the grandfather -- godfather for the Nine Trey

8   Bloods.

9            MR. LONGYEAR:  Ms. Harney, can we turn to Government

10  Exhibit 802B.  Can we publish that, please.

11           THE COURT:  Yes.

12  Q.  Mr. Hernandez, directing your attention to the middle of

13  the picture, who is the individual wearing the red hat and the

14  white tank top?

15  A.  Harv.

16  Q.  What is Harv doing?

17  A.  Harv is covering his face with a Nine Trey sign.

18           MR. LONGYEAR:  Ms. Harney, can we please pull up

19  Government Exhibit 802D.

20           Your Honor may we publish?

21           THE COURT:  Yes.

22  Q.  Mr. Hernandez, what's depicted in 802D?

23  A.  It's a picture of Harv with a red flag around his neck.  I

24  want to assume he is making the Nine Trey sign, but it's cut

25  off, the top of it.

1          MR. HUOT:  Objection to the assumption.

2          THE COURT:  Mr. Longyear, why don't you follow up with

3     the basis for the assumption.

4     Q.  Mr. Hernandez, why are you assuming that he's making a Nine

5     Trey sign?

6     A.  Because I previously testified that the Nine Trey sign is

7     like this.  And if you see the bottom of the photo, it's making

8     a nine, but you can't see the -- the photo is cut off, so you

9     can't see the top of his hand.

10         THE COURT:  I'll overrule the objection.  Go ahead.

11         MR. LONGYEAR:  Ms. Harney, if we can pull up 802H.

12    Q.  Who is depicted in 802H?

13    A.  On the left you have Billy Ado and on the right you have

14    Harv.

15         MR. LONGYEAR:  Ms. Harney, show the witness what has

16    been marked as Government Exhibit 501P.

17    Q.  Mr. Hernandez, do you recognize 501P?

18    A.  Yes.

19    Q.  What's depicted in 501P?

20    A.  It's a picture of me and Nuke.

21         MR. LONGYEAR:  Your Honor, the government offers

22    Government Exhibit 501P.

23         THE COURT:  Any objection?

24         MR. HUOT:  No objection.

25         THE COURT:  Received.

1          (Government Exhibit 501P received in evidence)

2          MR. LONGYEAR:  May we publish?

3          THE COURT:  Yes.

4   Q.  Mr. Hernandez, what's depicted in Government Exhibit 501P?

5   A.  I'm on the right side with the bright blue jacket throwing

6   up the Nine Trey, and Nuke is with the red sweater, red hat

7   throwing up Nine Trey to the left.

8          MR. LONGYEAR:  Thank you, Ms. Harney.  We can take

9   down 501P.

10  Q.  Turning back to Nine Trey, Mr. Hernandez, did Nine Trey

11  have a leadership structure?

12  A.  Yes.

13  Q.  Generally speaking, how was Nine Trey organized?

14  A.  From my understanding, being a part of Nine Trey I knew

15  there was a street lineup and a prison lineup.

16  Q.  Beginning with the prison lineup, did you have an

17  understanding how the prison lineup was structured?

18  A.  I didn't really understand who was on top of who, but I

19  knew there was a lineup, and they were the ones who sanctioned

20  most --

21         MR. HUOT:  Objection.  He said he wasn't sure.

22  A.  I said my understanding.

23         THE COURT:  I think he said his understanding.

24  Overruled.

25  A.  My understanding with the prison lineup was that there were

1   the higher-ups there who you had to report to to get anything

2   sanctioned on the street, sanction meaning that if it was a go

3   or a no go.

4   Q.  Taking a step back, with the prison lineup and the street

5   lineup, which one of those two lineups had authority over the

6   other?

7   A.  Prison lineup was more powerful than the street lineup.

8   Q.  And who did you understand were the leaders of the prison

9   lineup?

10  A.  I spoke to two guys.  I believe Frank White, Magoo.

11  Q.  That was Frank White and Magoo?

12  A.  Yeah.  And Shotti used to visit some other guy.

13  Q.  What authority, if any, did you understand that those

14  individuals had over others in Nine Trey?

15  A.  They could make -- they could say who is Blood, meaning who

16  was a member of Blood, or not.  Who was -- who had ranking and

17  who didn't and stuff like that.

18  Q.  Ranking within Nine Trey?

19  A.  Yeah.

20  Q.  Now, turning to the street lineup, did you have an

21  understanding as to whether or not the street lineup had a

22  leadership structure?

23  A.  Yeah.

24  Q.  Were there ranks?

25  A.  Yeah.

1   Q.  Going from the top down, could you explain to the jury what
2   the ranks were in the street lineup.
3   A.  I'm sorry.  Say that one more time.
4   Q.  Could you explain to the jury, not asking for individuals,
5   but just what the ranks were from the top down on the street
6   lineup.
7   A.  Yeah.  There was a godfather who overruled like -- was at
8   the top.  Then you had your high 020 that was under the
9   godfather, and you got your low 020.
10  Q.  Godfather and then high 020 and low 020?
11  A.  Yeah.
12  Q.  What was under the low 020?
13  A.  Your generals, your five-stars, and then you have just the
14  ranking, your five-star, four-star, three-star, two-star.
15  Q.  And the stars referred to the generals?
16  A.  Yeah.
17  Q.  A five-star general, four-star general, and so on?
18  A.  Yeah.
19  Q.  Mr. Hernandez, at the time that you joined Nine Trey in
20  November of 2017, what was your understanding of who occupied
21  those leadership positions in the street lineup?
22  A.  When I became a Nine Trey member I learned that Mel Murda
23  was the godfather for the murder line, the murder line lineup.
24  Lineup, it's a lineup of, you know, certain members.  There is
25  different lineups, is what I'm trying to say.

1                   From my understanding, Mel Murda was the top, which

2       was the godfather of the lineup I fell under.  Right after --

3       right under Mel Murda you had Shotti, who was the high 020; you

4       had Harv, who was the low 020; and you have your five-stars,

5       like Seqo Billy.  Yeah, stuff like that.

6       Q.  Were there any other five-stars at the time you joined?

7       A.  Billy Ado.

8       Q.  Did you know any four-stars?

9       A.  No.  I think Gunz was a three-star, but I don't want to,

10      you know, say he was a three-star and he was a four.

11                  THE COURT:  Mr. Longyear, I'm looking for a stopping

12      point.  Let me know when you're at one.

13                  MR. LONGYEAR:  One or two more questions and that will

14      be enough for the day, your Honor.

15      Q.  Mr. Hernandez, how did one achieve a higher rank within the

16      gang?

17      A.  Say the question one more time.

18      Q.  How did one go from a lower rank to a higher rank in the

19      gang?

20      A.  Seniority, I would say.  Like the work you put in for the

21      gang, work meaning, you know, the crimes and stuff like that.

22      Q.  If you put in more work you could achieve a higher rank?

23      A.  Yeah.  Also, I think the main thing was -- Shotti's main

24      thing was taking care of the people behind the wall gave you

25      that rank, you know what I'm saying.  He always told me if you

1    take care of them, they will take care of us.

2    Q.  You just used the phrase behind the wall.  What does that

3    mean?

4    A.  Behind the prison wall.

5    Q.  Take care of people in the prison lineup?

6    A.  Yeah.

7            MR. LONGYEAR:  One moment, your Honor.

8            Your Honor, I think now would be a natural breaking

9    point.

10           THE COURT:  Very good.  I'll ask the marshals kindly

11   to remove the witness.  Thank you.

12           Ladies and gentlemen, as promised yesterday, we are

13   breaking early today, at 4:00.  Tomorrow we will be back on our

14   normal schedule, meaning breakfast will be available at 8:45.

15   I promise you we will not have a repeat of today.

16           I will need all of you here at 9:30 so you can take

17   the jury box at 9:30.

18           Will everyone please stay put for a moment because I

19   want to address myself to the members of the audience.

20           We will work until 5:00 tomorrow.  There is one small

21   change in our routine tomorrow.  Given the sheer number of

22   people here, I think it will be faster, a lunch break will move

23   faster if we order lunch for you and have it delivered to the

24   jury room.  Don't pack a lunch, if it was anybody's plan.  Mr.

25   Smallman will be giving each of you a menu in the morning, and

J9HMMAC6

1  you will complete it, and he will send them in as we begin the

2  receipt of evidence in the morning.  Your lunch will arrive at

3  midday.  That way it will spare everyone the need of going in

4  and out of the crowds to the courthouse.

5          With that, I wish you a very good evening.  As always,

6  please do not discuss the case.  Do not research the case in

7  any way.  Have a good evening.  Thank you.

8          (Jury not present)

9          THE COURT:  Before I address myself just to the

10  members of the public, let me ask if anyone has anything to

11  raise.

12          Government?

13          MR. LONGYEAR:  No, your Honor.  Thank you.

14          THE COURT:  Mr. Fasulo.

15          MR. FASULO:  Nothing right now.

16          THE COURT:  Mr. Cannick.

17          MR. CANNICK:  Nothing.

18          THE COURT:  I'll ask defense counsel just to be on the

19  alert for points at which I ought to be giving any of the

20  limiting instructions we addressed.

21          It wasn't clear to me that there was a prompt for the

22  party admission, the limited use instruction under which

23  evidence can be considered against one defendant as opposed to

24  another today, but I'm looking for you to cue me if you believe

25  there is one.

J9HMMAC6

1          With that, let me say something to the members of the
2     public.  I very much appreciated that everyone was more quiet
3     and contained during the afternoon.
4          Again, I'll ask you, as you are in the courthouse and
5     you're in the courtroom, the elevators, the stairwells, the
6     steps of the courthouse, please do not discuss the case, lest
7     you inadvertently be speaking in the presence of the jury.
8          I wish everyone a good evening.
9          Counsel, I'll see you at 9:00 tomorrow.
10          Thank you.
11          (Adjourned to September 18, 2019, at 9:00 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
1                        INDEX OF EXAMINATION
```

```
2    Examination of:                         Page

3    ROBERT DECK

4    Direct By Mr. Rebold . . . . . . . . . . . . . .64

5    Cross By Mr. Fasulo  . . . . . . . . . . . . .90

6    Cross By Mr. Scholar . . . . . . . . . . . . .96

7    JAZLYN RAMIREZ

8    Direct By Mr. Rebold . . . . . . . . . . . . 124

9    Cross By Mr. Cannick . . . . . . . . . . . . 170

10   Redirect By Mr. Rebold . . . . . . . . . . . 195

11   DANIEL HERNANDEZ

12   Direct By Mr. Longyear . . . . . . . . . . . 203
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         GOVERNMENT EXHIBITS

2       Exhibit No.                                      Received

3       6    . . . . . . . . . . . . . . . . . .  .72

4       6A   . . . . . . . . . . . . . . . . . .  .73

5       210  . . . . . . . . . . . . . . . . . .  .74

6       1000 . . . . . . . . . . . . . . . . . .  .80

7       606  . . . . . . . . . . . . . . . . . .  .81

8       200  . . . . . . . . . . . . . . . . . .  .87

9       201  . . . . . . . . . . . . . . . . . .  .89

10      1001 . . . . . . . . . . . . . . . . . . 106

11      1002, 900, 901, and 902   . . . . . . . . 108

12      1003 . . . . . . . . . . . . . . . . . . 110

13      1004 . . . . . . . . . . . . . . . . . . 115

14      1005 . . . . . . . . . . . . . . . . . . 118

15      2    . . . . . . . . . . . . . . . . . . 132

16      800I . . . . . . . . . . . . . . . . . . 140

17      800I1 . . . . . . . . . . . . . . . . . . 145

18      211  . . . . . . . . . . . . . . . . . . 151

19      800J2 . . . . . . . . . . . . . . . . . . 154

20      800J1 . . . . . . . . . . . . . . . . . . 156

21      3    . . . . . . . . . . . . . . . . . . 161

22      3A   . . . . . . . . . . . . . . . . . . 162

23      8    . . . . . . . . . . . . . . . . . . 163

24      8B   . . . . . . . . . . . . . . . . . . 164

25      202  . . . . . . . . . . . . . . . . . . 209

22 and 22A  . . . . . . . . . . . . . . . 211

8A     . . . . . . . . . . . . . . . . . . 214

3A, 3B, 3C and 3D  . . . . . . . . . . . . 214

19     . . . . . . . . . . . . . . . . . . 215

19B    . . . . . . . . . . . . . . . . . . 215

21 and 21A  . . . . . . . . . . . . . . . 216

607    . . . . . . . . . . . . . . . . . . 218

607-T  . . . . . . . . . . . . . . . . . . 219

23 and 23A  . . . . . . . . . . . . . . . 227

609-T  . . . . . . . . . . . . . . . . . . 228

609-T  . . . . . . . . . . . . . . . . . . 228

2A and 2B  . . . . . . . . . . . . . . . . 238

1, 1A, and 1B  . . . . . . . . . . . . . . 239

501X   . . . . . . . . . . . . . . . . . . 244

800K   . . . . . . . . . . . . . . . . . . 246

802N   . . . . . . . . . . . . . . . . . . 248

802A, 802B, 802D, and 802H  . . . . . . . . 249

501P   . . . . . . . . . . . . . . . . . . 252